# EXHIBIT 8

**Capital Reporting Company**

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE

 2                  DISTRICT OF COLUMBIA

 3   ----------------------------------:

 4   MICHAEL J. PHILBIN                :

 5               Plaintiff             : At Law No.

 6          v.                         : CL05-1389

 7   THE WACKENHUT CORPORATION, ET AL  :

 8               DEFENDANTS            :

 9   ----------------------------------:

10                          Washington, D.C.

11                          Friday, March 9, 2007

12   Deposition of:

13              JEREMY L. HARMAN,

14   called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the law Office

16   of Jordan, Coyne & Savits, 1100 Connecticut

17   Avenue, N.W., Suite 600, Washington, D.C., before

18   Sheri C. Stewart, Registered Professional

19   Reporter and Notary Public in and for the

20   District of Columbia, beginning at 9:42 a.m.,

21   when were present on behalf of the respective

22   parties:
```

Capital Reporting Company

Page 2

1  APPEARANCES:
2
3  ON BEHALF OF PLAINTIFF:
4     ROBERT G. SAMET, ESQUIRE
5     ASHCRAFT & GEREL
6     One Central Plaza
7     11300 Rockville Pike, Suite 1002
8     Rockville, Maryland  20852
9     (301)770-3737
10
11
12  ON BEHALF OF DEFENDANT WACKENHUT SERVICES, INC:
13     DEBORAH MURRELL WHELIHAN, ESQUIRE
14     JORDAN, COYNE & SAVITS, LLP
15     1100 Connecticut Avenue, N.W.
16     Washington, D.C.  20036
17     (202)496-2810

Page 3

1     APPEARANCES (Continued)
2
3  ON BEHALF OF DEFENDANT BRICKMAN:
4     H. PATRICK DONOHUE, ESQUIRE
5     ARMSTRONG, DONOHUE, CEPPOS & VAUGHAN
6     204 Monroe Street, Suite 101
7     Rockville, Maryland  20850
8     (301)251-0440
9
10
11  ALSO PRESENT:
12     JAY HARMAN
13     GREG LEWANDOWSKI
14
15        * * * * *

Page 4

1                  CONTENTS
2
3  EXAMINATION BY                        PAGE
4     Mr. Samet                            5
5     Mr. Donohue                         90
6     Mr. Samet                          100
7
8  HARMAN DEPOSITION EXHIBITS:    *     PAGE
9   1   SUBCONTRACT AGREEMENT              8
10  2   SUBCONTRACT AGREEMENT              8
11  3   SNOW & ICE REMOVAL PLAN            8
12  4   REVISED SNOW & ICE REMOVAL PLAN    8
13  5   SUBCONTRACT AGREEMENT              8
14  6   E-MAIL                            26
15  7   E-MAIL                            26
16  8   PAGE OUT OF OF CONTRACT           32
17  9   PAGE OUT OF OF CONTRACT           34
18  10  MAXIMO WORK ORDER                 64
19  11  OVERHEAD TICKET                   64
20  12  PHONE RECORD                      96
21
22      (*EXHIBITS RETAINED BY COUNSEL)

Page 5

1              PROCEEDINGS
2  Whereupon,
3         JEREMY L. HARMAN,
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. SAMET:
8      Q   Could you state your full name and
9  address for the record, sir?
10     A   Jeremy Len Harman.
11     Q   And what is your address?
12     A   4173 Chatham Village, King George,
13  Virginia, 22485.
14     Q   Chatham is spelled?
15     A   C-H-A-T-H-A-M.
16     Q   Okay.  And by whom are you employed
17  now?
18     A   Wackenhut Services, Incorporated.
19     Q   By whom were you employed back in
20  February of 2003?
21     A   Wackenhut Services, Incorporated.
22     Q   And what was your position in February

2 (Pages 2 to 5)

Capital Reporting Company

Page 6

1 of 2003?
2  A  Facilities manager.
3  Q  Okay. And what is your position now?
4  A  Program manager.
5  Q  What were your job duties back in 2003,
6 February 2003, as the facilities manager?
7  A  Oversee maintenance operations for the
8 site.
9  Q  Okay. And that site would have been
10 the Nebraska Avenue complex?
11  A  Correct.
12  Q  You were stationed there full time?
13  A  Yes.
14  Q  You were not a facilities manager over
15 any facilities?
16  A  Not at that time.
17  Q  Okay. And when you say "oversee
18 maintenance operations," did that include the
19 security guards?
20  A  No.
21  Q  Okay. So that was a different part of
22 the operation?

Page 7

1  A  Correct.
2  Q  All right. So how many total managers
3 were there out there for Wackenhut? I'm referring
4 to the Nebraska Avenue complex.
5     MR. DONOHUE: I'm sorry, how many total
6   managers?
7     MR. SAMET: Yeah.
8  A  Depends upon your classification of a
9 manager; approximately four, five.
10 BY MR. SAMET:
11  Q  All right.
12  A  Four or five.
13  Q  Let me ask you this. How many
14 people -- how many Wackenhut employees worked at
15 the Nebraska Avenue complex in February 2004,
16 approximately?
17  A  Approximately, yeah, it's not going to
18 be accurate but --
19     MS. WHELIHAN: When we're talking about
20   Wackenhut, we're talking about Wackenhut
21   Service, Incorporated, because the Wackenhut
22   Corporation was not there.

Page 8

1    So just so we're all on the same page,
2   you know, we got the two defendants, but it's
3   really only WSI.
4  A  Approximately 17, but that doesn't
5 count security. I wouldn't be able to guess how
6 many in security personnel there were because we
7 had part-timers.
8    I don't know the shifts, the posts.
9 There was 24/7 coverage, I wouldn't even be able
10 to guess that.
11    So approximately 17 on the
12 maintenance -- maintenance and management for
13 maintenance. Seventeen to 20.
14    (Whereupon, there were discussions off
15 the record.)
16    (Whereupon, Exhibit Nos. 1-5 were
17 marked for identification.)
18 BY MR. SAMET:
19  Q  Mr. Harman, I'm going to show you
20 what's been marked as Exhibit No. 1 to this
21 deposition. I'm going to ask you if you can
22 identify that document?

Page 9

1  A  Yes.
2  Q  And what is it?
3  A  It's our subcontract agreement with
4 Brickman.
5  Q  Okay. And I'm going to show you what's
6 been marked as Exhibit No. 2 and ask you if you
7 can identify that?
8  A  Yes.
9  Q  And what is this Exhibit No. 2 to your
10 deposition?
11  A  It appears to be the same contract.
12  Q  Okay. Are there any differences that
13 you were able to ascertain in looking over them?
14  A  Just briefly looked at them. No, I
15 don't know if there are any differences.
16  Q  Okay.
17    MS. WHELIHAN: Bob, just so you know,
18   the one that has been marked as 2 is the one
19   that Jay gave me that came out of his file
20   which is what they have.
21    The one that is 1, I got from them in
22   2004, and that's the same one that Pat has.

Capital Reporting Company

Page 46
1   A   No.
2   Q   Did Wackenhut keep records of their
3   inspections of Brickman's work?
4   A   I don't believe so.
5   Q   All right.
6   A   Again, we did a joint inspection with
7   the Navy before Brickman left after each event,
8   but was that documented, no, not to my knowledge.
9   Q   So you didn't -- did you create a
10  record of your inspection of Brickman's work
11  before they left?
12  A   No.
13  Q   Would you just look it over and say
14  looks good and they would go, and it would never
15  be memorialized anywhere in writing?
16  A   Yeah, actually the -- most of that
17  responsibility was on the Navy, they were the one
18  using their hours up, so Bob Yuenger, the
19  gentleman you saw in that e-mail, would physically
20  come out and do inspection and say okay, look
21  goods to me.
22  Q   All right. Now, when did you first

Page 47
1   learn that Michael Philbin had been hurt?
2   A   Sometime that morning of the incident.
3   Q   Do you remember what time it was?
4   A   I don't remember.
5   Q   Do you have a record anywhere of what
6   time it was?
7       MS. WHELIHAN: That he learned?
8       MR. SAMET: Yes.
9   A   That -- no, not when I became aware of
10  it, no.
11  BY MR. SAMET:
12  Q   Okay. Where were you when you learned?
13  A   I don't remember.
14  Q   What did you do when you learned?
15  A   I don't remember.
16  Q   You don't remember whether you went out
17  to the scene of the accident?
18  A   I do not.
19  Q   Okay. What time did you arrive at work
20  on February 26th?
21  A   I don't remember.
22  Q   You don't remember?

Page 48
1   A   That's correct. I could guess and give
2   a time frame, but I don't remember the exact.
3   Q   Did you arrive at work the same time
4   every day?
5   A   I arrived not the exact time every day
6   but, yeah, generally around the same time.
7   Q   Where do you park, by the way?
8   A   Usually in -- usually in one of the
9   outer parking lots, either the back parking lot or
10  there was actually two outside perimeter parking
11  lots.
12  Q   What was the condition of the back
13  parking lot on the morning of February 26th?
14  A   I don't remember. Honestly, I don't
15  remember the condition of it.
16  Q   Okay. Was it snowing that day?
17  A   Yes.
18  Q   Do you actually remember that, or do
19  you know just from reviewing --
20  A   I don't actually remember a blizzard or
21  light snow, I don't remember how much, but
22  obviously I do remember that it was snowing that

Page 49
1   day.
2   Q   Okay. Did you make any phone calls
3   after you -- strike that.
4       You don't remember how you found out
5   about the accident, correct?
6   A   No, I remember somebody called me.
7   Q   But you don't remember who?
8   A   I don't remember who it was.
9   Q   Okay. And did you then call anybody
10  else about the accident?
11  A   I don't believe I did, um-um. Whoever
12  called me had informed me, you know, that DOD
13  Police was there, they were taking a report.
14      I assumed the right people had been
15  notified, and I didn't see an action on my part to
16  notify anybody. The right thing seemed to be
17  happening.
18  Q   Okay. This document marked Exhibit 3,
19  snow and ice removal plan, calls for the
20  initiation by the Navy of the snow removal plan,
21  correct?
22  A   Correct.

**Capital Reporting Company**

Page 50

1  Q  So they would be the ones to initiate
2  it?
3  A  Yes.
4  Q  This particular day, how did that come
5  about?
6  A  They called me on my cell phone to
7  initiate it.
8  Q  You're not allowed to call them and say
9  should I initiate the snow removal plan?
10  A  Again, they purchased the hours. I'm
11  not -- I wasn't there to spend their money for
12  them. They would -- they would call me and say
13  call Brickman.
14  Q  Okay. Did you ever call them because
15  of a need to get Brickman going, did you ever call
16  and say do you want me to go ahead and do this?
17     MS. WHELIHAN: Objection.
18  BY MR. SAMET:
19  Q  Is there any specific procedure where
20  it's required that they first call you or were you
21  permitted, let's say, to call them and ask them if
22  they wanted to initiate it?

Page 51

1     MS. WHELIHAN: Objection.
2  A  The Naval facilities manager at the
3  Nebraska Avenue complex at the time was Dave
4  Sears. This was the gentleman that had a personal
5  contact with the weather center, right next door,
6  and he was in constant communication with them.
7     He knew more about the weather than
8  probably anybody in D.C. and stayed on top of it,
9  knew it was his responsibility and he would call
10  me.
11  Q  Okay. Are you saying he always would
12  call you or, to the best of your recollection,
13  most of the time it would be him calling you?
14  A  He would always initiate it. Whether
15  or not I called him or he called me, he would
16  always initiate it.
17  Q  Initiate the plan?
18  A  Yes.
19  Q  All right.
20  A  He would always say call Brickman in,
21  let's get them there and start snow removal.
22  Q  Okay. Was there a specific plan for

Page 52

1  ice treatment?
2  A  I don't recall a special plan for ice
3  treatment.
4  Q  Was there any contract or plan under
5  which there would be treatments for ice or
6  traction at times when there wasn't a need for
7  snow removal?
8     MS. WHELIHAN: Objection.
9  A  No, snow or ice removal was the same
10  thing. If they wanted something done, they would
11  let us know.
12  BY MR. SAMET:
13  Q  Okay.
14  A  It was treated the same whether it was
15  snow or ice removal, or both, combination of both.
16  It was an event and would be treated the same.
17  Q  Okay. Do you recall, were there ever
18  any occasions where Wackenhut recommended that any
19  areas of the Nebraska Avenue complex be sanded or
20  salted, not at the same time that there was going
21  to be any snow removal?
22     MS. WHELIHAN: Objection.

Page 53

1  A  I don't recall.
2  BY MR. SAMET:
3  Q  All right. That's something that you
4  could do if you wanted to, correct?
5     MS. WHELIHAN: Objection.
6     MR. DONOHUE: Are you asking whether
7  Wackenhut recommended or the Navy requested?
8     MR. SAMET: No, Wackenhut would.
9     MR. DONOHUE: Recommend?
10     MR. SAMET: Recommend.
11  A  We were allowed to make
12  recommendations, yes.
13  BY MR. SAMET:
14  Q  Okay. And did you periodically make
15  recommendations?
16     MS. WHELIHAN: Objection.
17  A  I don't -- I don't recall specific
18  instances of making recommendations.
19  BY MR. SAMET:
20  Q  I didn't ask you if you recalled
21  specific instances.
22     What I'm asking you is, did you

14 (Pages 50 to 53)

Page 62

1  and/or ice removal that came in pails or buckets?
2  A   Yes. All materials.
3  Q   To be provided by Brickman?
4  A   Correct.
5  Q   Okay.
6      MR. COOK: Could we get a color map at
7  some point?
8      MS. WHELIHAN: Yeah.
9      (Whereupon, there were discussions off
10 the record.)
11 BY MR. SAMET:
12 Q   I'm referring now to Exhibit No. 3, the
13 snow and ice removal plan. Somebody's handwriting
14 is on here. Is this your handwriting here?
15 A   No.
16 Q   Do you know whose it is?
17 A   No.
18 Q   Okay. I'm showing you page 6, there's
19 some handwriting there. Is that yours?
20 A   No.
21 Q   And you don't recognize that
22 handwriting?

Page 63

1  A   No.
2      MS. WHELIHAN: I asked around, nobody
3      knows whose handwriting that is.
4  BY MR. SAMET:
5  Q   Who's Waste Management of Maryland?
6      MS. WHELIHAN: That's a mistake.
7      Apparently that shouldn't be attached to
8      that.
9  A   Waste Management, that's somebody else
10 that we had -- we had a contractural agreement
11 with them to remove refuse.
12 BY MR. SAMET:
13 Q   Okay.
14 A   So --
15     MS. WHELIHAN: That's how I got it. I
16     just gave you what I had in the way I got it.
17 BY MR. SAMET:
18 Q   Are we going to be able to get a copy
19 of the Government contract or at least the
20 provisions?
21 A   I can tell you that it's going to say
22 remove snow. It's very vague. But I'll get it.

Page 64

1      MS. WHELIHAN: He'll give me a copy and
2  I'll get it.
3      MR. SAMET: Okay.
4      MR. DONOHUE: Off the record.
5      (Whereupon, there were discussions off
6  the record.)
7      MR. SAMET: We're going to take a quick
8  break.
9      (Whereupon, there was a break from
10 11:09 a.m. until 11:17 a.m.)
11     (Whereupon, Exhibit Nos. 10 and 11 were
12 marked for identification.)
13 BY MR. SAMET:
14 Q   Mr. Harman, I'm going to show you
15 what's been marked as Exhibits 10 and 11 and ask
16 you if can you identify -- let's start with 10.
17     Can you tell us, please, what 10 is?
18 A   Ten is a Maximo work order to remove --
19 the description's to remove snow from the rear
20 parking lot.
21 Q   Did you say a Maximo work order?
22 A   Maximo is the system that we use to

Page 65

1  track all of our -- our work. It's a work ticket.
2  Q   Okay. And it's a work ticket dated
3  February 26th, correct?
4  A   Correct. This February, February 25th.
5  Q   February 25th, the day before this
6  accident, correct?
7  A   Yes.
8  Q   All right. And so who asked that snow
9  be removed the day before this accident from the
10 back parking lot?
11 A   It looks like DOD Police, so it could
12 have been anybody on the police force.
13 Q   Okay.
14 A   That's who it's -- actually, anytime
15 you have a service, it's reported by somebody.
16 Then Dave Sears and Bob Yuenger would actually do
17 the approval of something like this.
18 Q   Okay. First it would be -- first the
19 request would go to the Navy and then to you?
20 A   No. The request would come to us, but
21 we wouldn't proceed on the work until we got their
22 approval.

**Capital Reporting Company**

Page 66

1   I mean, we could have tenants that
2   would code in a call to hang a clock that might
3   not be something that the Navy would want to use
4   their work orders for.
5       They prepurchased work orders on the
6   contract just like -- just like they did snow
7   removal hours. So we were obligated to perform so
8   many work orders. They authorized the use of
9   those work orders.
10      We didn't just create them without
11  their approval, nor could anybody call anything in
12  without their approval.
13      Q   Does this have to -- does this come off
14  the time that they purchased?
15      A   No. This comes off the amount of --
16  the quantity of service orders in their contract.
17      Q   So the contract not only provides for a
18  certain amount of time from you but also allows
19  them to submit a certain number of work orders to
20  you?
21      A   Yes.
22      Q   Okay. So the time couldn't be -- I

Page 67

1   think we said -- strike that.
2       Did we say before that the time is
3   actually 200 hours under this contract?
4       A   Yes, 200 hours.
5       Q   So that 200 hours couldn't necessarily
6   be divided amongst 500 work orders, correct, that
7   would be burdensome in the contract limits, the
8   number of work orders the Government can put in to
9   you?
10      A   The 200 hours has nothing to do with
11  quantity of work orders in the contract, two
12  separate things.
13      Q   Okay.
14      A   They purchase snow removal services
15  which were capped at 200 hours, then they also
16  purchased a set amount of service calls or work
17  orders.
18      Q   Above and beyond the snow removal
19  services?
20      A   Yes, in addition to that. This is
21  something that would typically be used for issuing
22  work, got a light out.

Page 68

1   In this case, it looks like it was
2   called in as snow removal services for the parking
3   lot.
4       Q   So that's an area where the Government
5   had a right to ask for any number of different
6   services, some of which might be snow removal, on
7   a per work order basis, correct?
8       A   Correct.
9       Q   All right. And from looking at Exhibit
10  No. 10, does it appear that somebody on the DOD
11  police force asked Wackenhut to clear snow from
12  the back parking lot?
13      MS. WHELIHAN: Objection.
14  BY MR. SAMET:
15      Q   On February 25th.
16      MS. WHELIHAN: Objection.
17      A   Again, it came from DOD Police, and
18  this is why Dave Sears would have the ultimate
19  approval authority.
20      When that came in, he would look at
21  that and see if that was actually something that
22  he would want to do or not. It may be something

Page 69

1   that was already taking place.
2       When these folks call in -- anybody
3   could call in a ticket. When they call somebody
4   or something like this in, Dave might go down
5   there, first case scenario is it may not even be
6   something he wants to use a work order for.
7       Q   I understand.
8       A   If he's paying for it under snow
9   removal hours, he's not going to waste a service
10  order for it.
11      Number two, he might go down there or
12  send Bob down and actually see that what they're
13  complaining about is a piece of snow about this
14  big, and he would step his foot on it and go like
15  that, and it would be over with.
16      So they would look -- anybody, DOD
17  Police could call in a work order to say I want a
18  new car. Ultimately, Dave Sears and Bob would
19  investigate it and see whether or not they wanted
20  to use one of their work orders for it, whether it
21  fell under snow removal services, so on and so
22  forth.

18 (Pages 66 to 69)

**Capital Reporting Company**

Page 94

1 have been put in the description.
2         And it would have been an emergency
3 ticket, which would have been a priority one, and
4 the target completion date wouldn't have been
5 thrown out with 3/11/03.
6         So there's three or four different
7 possibilities here to narrow this down a window,
8 one being priority, which is a ten-day ticket, not
9 an emergency; two being the target completion
10 date, which is all the way out March 11; and
11 three, there's nothing in the description saying
12 when it should be done, so it could have been
13 anytime.
14    Q    It's a fair statement, then, that that
15 ticket was generated to represent a task that had
16 already been completed as opposed to work yet to
17 be completed?
18        MR. SAMET:  Objection, leading.
19 BY MR. DONOHUE:
20    Q    Is that fair to say?
21    A    It's a fair assumption, yes.
22    Q    Thanks.

Page 95

1         Do you recall approximately what time
2 you received contact from Dave Sears on the
3 morning of Mr. Philbin's accident?
4    A    We have a -- I don't remember the exact
5 time.  But we had a record that indicated.
6    Q    And this has been distributed, as I
7 understand?
8    A    Yes.
9    Q    Is this a copy of the phone record?
10   A    Yes.
11   Q    That so reflects --
12   A    Um-hum.
13   Q    And what is that document?
14   A    This is a report from Nextel's -- from
15 Nextel of all incoming and outgoing calls.
16   Q    So this is a --
17   A    During that period.
18   Q    This is a dated and time record of
19 calls that were both incoming and outcoming; is
20 that correct?
21   A    Yes.
22   Q    And on your cell phone?

Page 96

1    A    Um-hum, correct.
2    Q    Your personal cell phone?
3    A    My work cell phone.
4    Q    Your work cell phone.
5         MR. DONOHUE:  I'd like to have this
6 marked as a deposition exhibit, if I may, but
7 I don't want to take Counsel's copy.  Well, I
8 just want the one document.
9         MS. WHELIHAN:  Yeah, that's fine.
10        (Whereupon, there were discussions off
11 the record.)
12        (Whereupon, Exhibit No. 12 was marked
13 for identification.)
14 BY MR. DONOHUE:
15   Q    You can determine from Exhibit 12 which
16 is your phone record, correct?
17   A    Yes.
18   Q    At what time did you received the call
19 from Mr. Sears on the morning of October 20 -- I'm
20 sorry, February 26th, '03?
21   A    I only received one incoming call --
22 let me rephrase that.

Page 97

1         The first incoming call I received that
2 day was at 6:38 a.m.
3         Now, this document does not show me the
4 phone number of that incoming call, but the very
5 next call that I made, that phone call lasted one
6 minute 36 seconds.
7         The very next phone call that I made,
8 first phone call, 6:38 a.m., lasted one minute 36
9 seconds.
10        My very next outgoing phone call was at
11 6:40, and that was to Brickman.
12   Q    How do you know?
13   A    Because it does reflect their phone
14 number there.
15   Q    And you know that just from familiarity
16 with the number?
17   A    That is Brickman's phone number, yeah.
18   Q    Do you recall where you were when you
19 received the incoming call at 6:38?
20   A    No, I don't.  I would have been
21 probably on my way to work.
22   Q    In transit?

25 (Pages 94 to 97)

# Capital Reporting Company

Page 98

1  A   Yeah, in transit.
2  Q   And based on your review of that
3  document, do you have -- does that assist you in
4  remembering from whom you received a call at 6:38?
5  A   It would have been Dave Sears.  Yes,
6  Dave would have called.
7  Q   Okay.  And does your review of that
8  document assist your memory as to what the
9  substance of your conversation with Mr. Sears
10 would have been at that time?
11 A   Again, it's been a long time.  I don't
12 remember the exact conversation, but just based on
13 the fact that as soon as I hung up the phone with
14 him, I immediately called Brickman, that would
15 definitely be the initiation of the event for that
16 day.
17 Q   Do you know who you spoke to at
18 Brickman?
19 A   I do not.
20 Q   Did you have a typical contact person
21 at Brickman?
22 A   Yeah, typically it would have been --

Page 99

1  typically it would have been Adam.
2  Q   Adam is the gentleman sitting out in
3  the lobby?
4  A   Correct.  Yeah, he would have been the
5  person that I called.
6  Q   Do you have a recollection of your
7  contact with Adam at that -- on that date?
8  A   I do not.
9  Q   Okay.
10 A   But I do know from this I spoke to
11 somebody, whom I would assume to be him, for about
12 two minutes 21 seconds.
13 Q   Just in general recollection, do you
14 recall that Brickman personnel presented to the
15 NAC that day?
16 A   I would have to assume so.  Yes.
17 Q   Okay.
18 A   Yeah.
19 Q   Did you ever have any difficulty with
20 the timeliness of Brickman's response following a
21 request from you to perform snow removal
22 procedures?

Page 100

1  A   No.  Again, Brickman, very qualified
2  snow removal company.  If there was an event or
3  something, because of the years that we worked
4  together, I mean, they pretty much knew when to
5  expect a call from us.
6      MR. DONOHUE: That's all I have.
7      MR. SAMET: Do you have any questions?
8      MS. WHELIHAN: No, I have no questions,
9  and he's going to read.
10     MR. SAMET: Well, no, I have a
11 question.
12     MS. WHELIHAN: I'm sorry.
13     MR. SAMET: That's all right.
14 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
15 BY MR. SAMET:
16 Q   Mr. Harman, you got the call from Dave
17 Sears at 6:40 a.m.?
18     MR. DONOHUE: Thirty-eight.
19 A   6:40, yes.
20 BY MR. SAMET:
21 Q   Oh, I see.  No, 6:30 --
22 A   I'm sorry, 6:38, correct.

Page 101

1  Q   Mr. Donohue was right.  6:40 you called
2  to Brickman?
3  A   Correct.
4  Q   Okay.  So this -- and this would have
5  been a call directly to the cell phone of Adam
6  whatever -- pardon me, his name is?
7  A   Adam was my typical contact.  I
8  don't -- I compared this to the numbers in the
9  roster, and I had multiple numbers for Adam, I
10 even had his home numbers.  He was my typical
11 point of contact.
12     So I'm not saying that is his cell
13 phone number, because I have -- I had a pager, I
14 had a cell phone, I had his home phone, probably
15 even have his wife or girlfriend's phone number,
16 just so I could get ahold of him.
17 Q   How long did he have to get out there?
18 I mean, was there a requirement that he report,
19 bring a crew out within a certain time?
20 A   Well, in our Navy contract, refer to
21 our technical -- you have different requirements,
22 but all snow and ice personnel are required to