# EXHIBIT 9

Capital Reporting Company

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2                  DISTRICT OF COLUMBIA

3    -----------------------------------:

4    MICHAEL J. PHILBIN                 :

5              Plaintiff                : At Law No.

6         v.                            : CL05-1389

7    THE WACKENHUT CORPORATION, ET AL   :

8              DEFENDANTS               :

9    -----------------------------------:

10                         Washington, D.C.

11                         Friday, March 9, 2007

12   Deposition of:

13            GREGORY LEWANDOWSKI,

14   called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the law Office

16   of Jordan, Coyne & Savits, 1100 Connecticut

17   Avenue, N.W., Suite 600, Washington, D.C., before

18   Sheri C. Stewart, Registered Professional

19   Reporter and Notary Public in and for the

20   District of Columbia, beginning at 12:14 p.m.,

21   when were present on behalf of the respective

22   parties:

## Capital Reporting Company

Page 2

```
 1       APPEARANCES:
 2
 3  ON BEHALF OF PLAINTIFF:
 4     ROBERT G. SAMET, ESQUIRE
 5     ASHCRAFT & GEREL
 6     One Central Plaza
 7     11300 Rockville Pike, Suite 1002
 8     Rockville, Maryland  20852
 9     (301)770-3737
10
11
12  ON BEHALF OF DEFENDANT WACKENHUT SERVICES, INC:
13     DEBORAH MURRELL WHELIHAN, ESQUIRE
14     JORDAN, COYNE & SAVITS, LLP
15     1100 Connecticut Avenue, N.W.
16     Washington, D.C.  20036
17     (202)496-2810
```

Page 3

```
 1       APPEARANCES (Continued)
 2
 3  ON BEHALF OF DEFENDANT BRICKMAN:
 4     H. PATRICK DONOHUE, ESQUIRE
 5     ARMSTRONG, DONOHUE, CEPPOS & VAUGHAN
 6     204 Monroe Street, Suite 101
 7     Rockville, Maryland  20850
 8     (301)251-0440
 9
10
11  ALSO PRESENT:  JAY HARMAN
12
13         * * * * *
```

Page 4

```
 1              CONTENTS
 2
 3  EXAMINATION BY                PAGE
 4     Mr. Samet                    5
 5     Ms. Whelihan                34
 6
 7  LEWANDOWSKI DEPOSITION EXHIBITS:  *    PAGE
 8  13  SNOW REMOVAL SITE VISIT REPORTS    10
 9
10
11
12  (*EXHIBITS RETAINED BY COUNSEL)
```

Page 5

```
 1           PROCEEDINGS
 2  Whereupon,
 3       GREGORY LEWANDOWSKI,
 4  called as a witness, and having been first duly
 5  sworn, was examined and testified as follows:
 6     EXAMINATION BY COUNSEL FOR PLAINTIFF
 7  BY MR. SAMET:
 8     Q   State your full name and address for
 9  the record, sir.
10     A   Gregory Lewandowski.  Home address?
11     Q   Please.
12     A   2940 New Rover Road, West Friendship,
13  Maryland, 29794.
14     Q   Okay.  And by whom are you employed
15  now?
16     A   The Brickman Group, LTD.
17     Q   Okay.  And is that who you were
18  employed by in February of 2003?
19     A   Yes.
20     Q   All right.  And your position in
21  February 2003 was?
22     A   Branch manager.
```

2 (Pages 2 to 5)

Page 6

1  Q  And what is your position today?
2  A  Branch manager.
3  Q  Okay. If I mispronounce your name,
4  please forgive me.
5  A  That's fine; everyone does.
6  Q  I've been thinking of you as
7  Lewandowski, and I didn't realize that it was
8  Lewandowski.
9     Mr. Lewandowski, were you physically
10 present at the Nebraska Avenue complex at any time
11 between February 14 of 2003 and February 26 of
12 2003?
13 A  I do not recall.
14 Q  Okay.
15 A  Specifically that time frame.
16 Q  Okay.
17 A  I was there in the winter.
18 Q  All right.
19 A  Various points.
20 Q  I understand. But you were not there
21 on the day that Mr. Philbin, the plaintiff in this
22 case, was injured; is that correct?

Page 7

1  A  I was not.
2  Q  You don't recall whether you were there
3  within two weeks before the day Mr. Philbin was
4  injured; is that correct?
5  A  Correct.
6  Q  All right. Did you -- strike that.
7     Do you recall the snowstorm, the huge
8  snowstorm that took place on February 14, 15 and
9  16 of 2003?
10 A  Yes.
11 Q  Okay. Am I correct that you don't
12 remember the dates, but you do recall the big
13 snowstorm?
14 A  I do.
15 Q  Okay. And do you recall whether or not
16 you had any conversations with anybody at
17 Wackenhut in between the date of that snowstorm
18 and the date that Mr. Philbin was injured?
19 A  I believe, I don't recall who it was,
20 probably either Jim Whidden or Dave or Jay Harman,
21 I'm sorry.
22 Q  And you think that those conversations

Page 8

1  took place somewhere between the time of the big
2  snowstorm and the date that Mr. Philbin was
3  injured; is that correct?
4  A  I know that they took place at that
5  point.
6  Q  What were the conversations about?
7  A  It was regarding the relocation of the
8  piles of snow.
9  Q  Okay. And you remember how many
10 conversations there were?
11 A  One, maybe two.
12 Q  Okay. And who's Jim Whidden?
13 A  Jim Whidden, to my knowledge, was Jay
14 Harman's boss.
15 Q  Okay. And where did he work? I mean,
16 besides Wackenhut?
17 A  He had an office on the base.
18 Q  What was his specific position?
19 A  I'm not quite sure.
20 Q  Okay.
21 A  Facility manager, something like that.
22 Q  I think Mr. Harman said that he was the

Page 9

1  facility manager. All right.
2     And do you remember what the exchange
3  was about between either you and Mr. Whidden or
4  you and Mr. Harman?
5  A  The request was to bring in extremely
6  heavy equipment to move the piles of snow.
7  Q  You were asked to bring in extremely
8  heavy equipment?
9  A  I wouldn't call it asked; I was
10 instructed.
11 Q  When was it, do you remember?
12 A  Probably within 48 hours of all of the
13 clearing that we could possibly do with our own,
14 you know, regular pieces, the call was put out.
15 Q  So you're saying it was probably within
16 48 hours of the big snowstorm ending?
17 A  I would say within 48 hours of us doing
18 everything that we could with the standard
19 equipment to get every inch of pavement we could
20 on the base clear.
21 Q  All right. Let me do some housekeeping
22 before we go further.

3 (Pages 6 to 9)

**Capital Reporting Company**

Page 10

1  MR. SAMET: I think we have an
2  agreement with all counsel that the exhibits
3  that we introduced as part of Mr. Harman's
4  deposition can also serve in a duplicate
5  capacity first as Exhibits 1 through 12 of
6  this deposition; is that correct, Counsel?
7      MS. WHELIHAN: Yeah. You want to make
8  them global exhibits?
9      MR. DONOHUE: So stipulated.
10     MR. SAMET: Yeah. That's okay with
11 you, Deb?
12     MS. WHELIHAN: Yeah.
13     MR. SAMET: All right. Then I'm going
14 to -- let me have these marked.
15     (Whereupon, Exhibit No. 13 was marked
16 for identification.)
17     (Whereupon, there were discussions off
18 the record.)
19 BY MR. SAMET:
20   Q  Mr. Lewandowski, you've been shown
21 Exhibit No. 13 -- what's been marked as Exhibit
22 No. 13.

Page 11

1  Can you please tell us what that
2  exhibit is?
3    A  It's a collection of snow removal site
4  visit reports. The document in format was created
5  by the Brickman Group to document basically the
6  services rendered on any of our snow removal
7  sites.
8    Q  Okay. This covers the period
9  December 5th of 2003 through February 28, 2003?
10   A  Yes.
11     MR. DONOHUE: Bear with me just a
12 second, please. Off the record.
13     (Whereupon, there were discussions off
14 the record.)
15 BY MR. SAMET:
16   Q  Mr. Lewandowski, I count 16 snow
17 removal site visit reports consisting of Exhibit
18 No. 13 that cover the period December 5th of 2002
19 to February 28 of 2003.
20     Would that be correct?
21   A  Yes.
22   Q  Okay. And are there any others besides

Page 12

1  the ones that have been produced and marked today
2  as Exhibit 13?
3    A  I don't recall if there were any events
4  after the 28th.
5    Q  I'm not talking about after.
6      MR. DONOHUE: For that period.
7  BY MR. SAMET:
8    Q  After February 28?
9    A  That's it.
10   Q  Okay. All right. Now, can you show me
11 where among these snow removal site visit reports
12 the extremely heavy equipment work was done to
13 move the snow?
14   A  Yes, the sheet with the date of
15 2/23/03.
16   Q  Okay. That says it was a Sunday; is
17 that correct?
18   A  Yes.
19   Q  Okay. What equipment was brought out
20 there?
21   A  Rubber tire loader, which I believe is
22 indicated on there, that is an extremely large

Page 13

1  piece of equipment that highway -- State highway,
2  County would use to clear shoulders and things
3  like that. Just because of the sheer weight and
4  volume of the snow.
5    Q  Okay. Does that have like a bucket?
6    A  Yes.
7    Q  Okay. So you could lift up piles of
8  snow --
9    A  Yes.
10   Q  -- and then drive them somewhere else?
11   A  Yes.
12   Q  All right. Where on February 23rd was
13 the snow taken from and where was it moved to, do
14 you know?
15     MR. DONOHUE: I'm going to object
16 because we have our next witness who can
17 address these questions, Mr. Lewandowski.
18     MR. SAMET: No objection. If you can't
19 address it, you should just say that. That's
20 not a grounds for an objection. It's also a
21 speaking objection. If he doesn't know, say
22 "I don't know."

4 (Pages 10 to 13)

**Capital Reporting Company**

Page 14

1  MR. DONOHUE: If you are asking him
2  personal knowledge -- I mean, he can tell
3  certain things from documents.
4      I just want to make sure that you
5  understand that what the source of his
6  awareness is, whether it's personal knowledge
7  or document review, that's all.
8  BY MR. SAMET:
9      Q   Where was the snow removed from on
10 February 23rd and where was it moved to,
11 Mr. Lewandowski?
12     A   Can't tell you for sure because I
13 wasn't there.
14     Q   Okay. Where was it supposed to be
15 removed from, and where was it supposed to be
16 removed to?
17     A   All piles in parking lots were to be
18 removed from the parking spaces and relocated to
19 the lower perimeter wood line.
20     Q   What's a lower perimeter wood line?
21     A   I can show you on a map of the
22 property.

Page 15

1  MR. DONOHUE: I think it's No. 5, Bob.
2  BY MR. SAMET:
3      Q   Okay. I'm showing you the next to the
4  last page of Exhibit No. 5, which is a map of
5  Nebraska Avenue complex.
6      A   So for this rear lower parking lot
7  (indicating).
8      Q   Right.
9      A   Would be anywhere along this edge
10 (indicating).
11     Q   Okay.
12     A   And you know, for instance, this
13 parking lot (indicating), it would be relocated
14 probably over here (indicating).
15     Q   Okay. So snow was moved from areas
16 where it was covering parking spaces to areas
17 where it was around the edge of the parking lot?
18     MR. DONOHUE: Objection. Lack of
19 foundation. He said he wasn't there, he
20 can't tell you exactly. You asked him where
21 was it supposed to be.
22     This is the problem, he's not the right

Page 16

1  witness for these questions.
2      MR. SAMET: He's a supervisor.
3      MR. DONOHUE: No, he's not.
4      MR. SAMET: He's not?
5      MR. DONOHUE: No, he's not.
6      MS. WHELIHAN: Branch manager.
7  BY MR. SAMET:
8      Q   Mr. Lewandowski, the snow was supposed
9  to be removed from areas to the perimeter of the
10 parking lots; is that correct?
11     THE WITNESS: Should I answer?
12     MR. DONOHUE: If you know. If you
13 don't know, tell Counsel you don't know.
14     A   I don't know.
15 BY MR. SAMET:
16     Q   You don't know where it was supposed to
17 be moved to?
18     A   I know where -- I know where it was
19 directed to go to, but I didn't physically see it
20 happen.
21     Q   Okay. Where was it directed to go to?
22     A   To the perimeter of the parking lot,

Page 17

1  out of the parking lot onto grass.
2      Q   Okay. All right. And what was the
3  reason for moving the snow?
4      A   The availability of parking spaces.
5      Q   To free up parking spaces that were
6  being covered by piles of snow?
7      A   A substantial percentage of spaces were
8  null and void because of the snow pile.
9      Q   Okay. Do you know that for a fact?
10     A   I know that based on the phone call
11 that I received from Wackenhut having it removed,
12 but I did not physically see it.
13     Q   And how many workers did you have out
14 there doing this work on February 23rd, if you
15 know?
16     A   A single loader and operator.
17     Q   Was there any -- what was the weather
18 that day, do you know?
19     A   No idea.
20     Q   Was there any salt or sand put down at
21 that time?
22     MR. DONOHUE: Again, are you asking him

5 (Pages 14 to 17)

Page 18

1  from his review of the document only?
2  BY MR. SAMET:
3  Q   Well, was any salt or sand supposed to
4  be put down at the time?
5  A   To my knowledge, based on the documents
6  alone, I would say no.
7  Q   Okay.
8      MR. DONOHUE: Off the record.
9      (Whereupon, there were discussions off
10 the record.)
11 BY MR. SAMET:
12 Q   Mr. Lewandowski, when did you first
13 learn of Mr. Philbin's injury?
14 A   I don't recall a specific date. I do
15 recall that it wasn't anytime near when it
16 happened. It was at least a year.
17 Q   Okay. And how did you learn about it
18 then?
19 A   From my corporate office.
20 Q   Okay. So you have no recollection of
21 learning about it on or about February 26, 2003?
22 A   I do not.

Page 19

1  Q   All right. Do you have any personal
2  knowledge of the condition of any of the surfaces
3  at the Nebraska Avenue complex between
4  February 14th and February 26, 2003?
5  A   I do not.
6  Q   Okay. Did Brickman perform any salting
7  or sanding in between February 19th and
8  February 25th, 2003?
9  A   Once again, I don't have direct
10 knowledge other than referencing these site visit
11 reports.
12 Q   Feel free to reference site visit
13 reports and tell me if there was any salting or
14 sanding anytime between February 19th and
15 February 25th, 2003, inclusive.
16     MR. DONOHUE: Again, on the basis of
17     lack of personal knowledge, I object. All he
18     has to go by are documents.
19 A   The 19th, the document indicates no.
20 Next date was the 23rd, no. And next document is
21 the 26th, yes. According to these papers.
22

Page 20

1  BY MR. SAMET:
2  Q   Okay. Did Brickman perform any salting
3  or sanding of any sidewalks or steps or any other
4  surface areas at the Nebraska Avenue complex
5  between February 25th -- February 19 and
6  February 25th, inclusive?
7      MR. DONOHUE: Same objection; lack of
8      personal knowledge.
9  BY MR. SAMET:
10 Q   Based upon the records you have in
11 front of you?
12 A   Based upon the records that I have in
13 front of me, no.
14 Q   Did Brickman perform any routine
15 inspections of the surfaces at the Nebraska Avenue
16 complex when Brickman's personnel were out there
17 on the scene other than in connection with the
18 work you specifically were requested to perform?
19 A   No, we were acting under the sole
20 direction from Wackenhut.
21 Q   Okay. Was Brickman supplied a copy of
22 Exhibit No. 3 when it was issued in October of

Page 21

1  2002? I'm referring to the snow and ice removal
2  plan.
3  A   The document was reviewed at a meeting
4  that I attended I guess on this date or -- no,
5  it's -- no, this would have been -- yeah, in the
6  fall, before that winter.
7      And I don't recall specifically me
8  taking this away from the meeting. It may have
9  been my co-worker.
10 Q   Who is your co-worker?
11 A   It was reviewed by my co-worker Adam
12 Grasswick.
13 Q   Adam was at this meeting, too?
14 A   Yes.
15 Q   How did this meeting come about?
16 A   It was just in preparation for the
17 upcoming winter, Wackenhut wanted to review the
18 plan for future weather events, and my
19 recollection is that Dave Sears from the Navy also
20 attended this.
21     And his -- basically his peace of mind
22 was what the meeting was about, was there was a

**Capital Reporting Company**

Page 22

1  plan in place and that the people were on the same
2  page.
3  Q  Do you know who drafted that plan?
4  A  I do not.
5  Q  Did you have any input into the
6  drafting of that plan?
7  A  Not directly, not to my knowledge.
8  Q  Okay. At that meeting, to the extent
9  that that plan called for any action on the part
10 of Brickman, did you concur that it was
11 acceptable?
12 A  I'm sorry, say that again.
13 Q  To the extent that there might have
14 been anything in that plan that would have
15 required Brickman to --
16 A  Right.
17 Q  -- do something, at that meeting did
18 you agree that it was okay with you?
19 A  Yes, from what I recall.
20 Q  Under what circumstances was Brickman
21 required to do any salting or sanding of any
22 surface areas at the Nebraska Avenue complex?

Page 23

1       MR. DONOHUE: I object. The document
2    will speak for itself but --
3  BY MR. SAMET:
4  Q  Let me rephrase it.
5       What was your understanding as to under
6  what circumstances Brickman was required to do any
7  salting or sanding of the surface areas at the
8  National -- at the Nebraska Avenue complex?
9  A  We essentially did whatever the client
10 requested. Understand that came -- that message
11 or communication came through the voice of a
12 Wackenhut employee.
13 Q  Was Brickman ever -- to your
14 recollection, up to February 26, 2003, was
15 Brickman ever requested by Wackenhut to come out
16 solely for the purpose of sanding or salting any
17 surface areas, not in connection with actual snow
18 removal?
19       MS. WHELIHAN: Objection.
20 A  I don't know.
21 BY MR. SAMET:
22 Q  Do you recall any such instances prior

Page 24

1  to February 26 of 2003 in which Brickman may have
2  ever been asked to come out solely for the purpose
3  of sanding or salting surfaces?
4  A  Once again, I don't know. I don't
5  remember.
6  Q  Okay. As you sit here today, do you
7  recall Brickman ever being called by Wackenhut to
8  come out and sand or salt any surfaces at the
9  Nebraska Avenue complex solely for that purpose
10 and not also at the same time in connection with
11 snow removal?
12 A  I would just simply rely in referencing
13 these papers.
14 Q  I'm not asking you that. I'm asking
15 you based upon your --
16 A  No, I don't recall.
17 Q  Okay. When Brickman sanded or salted
18 parking lots, how was that done, was it done with
19 a spreader?
20 A  A Ford Super Duty with a ball hopper
21 spreader mounted on the back of it which can hold
22 up to three tons of bulk rock salt or de-icer.

Page 25

1  Q  And this would be broadcast over a
2  large area?
3  A  Yes.
4  Q  Okay. Was it ever -- were parking lots
5  ever salted and sanded by hand?
6  A  No.
7  Q  All right. What was your
8  understanding, if any, as to whether Brickman was
9  required or had an obligation to perform any
10 visual inspections of surface areas at the
11 Nebraska Avenue complex for conditions that either
12 already had or were likely to produce ice
13 formation?
14       MR. DONOHUE: Objection to the form and
15    other substantive reasons.
16       I don't instruct you not to answer.
17 A  My impression, that's the best I can
18 give you, is that I was -- it was not part of my
19 responsibility to make any decision that the work
20 looks good or we need to do more.
21       We were there to be told what to do,
22 and that's what we did. We didn't offer our

7 (Pages 22 to 25)

Page 26

1  opinion unless it was requested.
2  BY MR. SAMET:
3     Q   Did Wackenhut ever supervise any of the
4  work that your men performed out at the Nebraska
5  Avenue complex?
6        MS. WHELIHAN: Objection.
7        MR. DONOHUE: I'm going to object only
8     to the extent that your question may fairly
9     call for personal knowledge, and he was not
10    involved in performing the work.
11       So you're -- there's a gap here. Part
12    of the problem.
13       To the extent you have knowledge, I
14    don't instruct you not to answer because it's
15    a foundation issue.
16    A   I don't have direct knowledge. All I
17 know --
18       MR. SAMET: Speaking objections,
19    improper.
20       MR. DONOHUE: But he's --
21       MR. SAMET: I don't care. You've made
22    long speeches. You essentially tell your

Page 27

1  witness what to answer.
2  BY MR. SAMET:
3     Q   Listen, I interrupted your answer. Let
4  me ask the question again.
5        Did Wackenhut ever provide any
6  supervision of Brickenhut's (sic) work at the
7  Nebraska Avenue complex?
8        MS. WHELIHAN: Objection.
9        MR. DONOHUE: Same objection.
10    A   To my knowledge, which is solely based
11 from talking to my employees there, we would
12 receive communication to move to such-and-such an
13 area of priority if they deemed it necessary based
14 on their discussions with the Government.
15 BY MR. SAMET:
16    Q   All right. So there were -- your
17 understanding is there were occasions when they
18 would tell you where they wanted the work
19 performed and in what order; is that correct?
20    A   To my knowledge, that -- that was what
21 my employees told me happened on occasion.
22    Q   Okay. Did Mr. Grasswick ever get sick

Page 28

1  when you had to go out and fill in for him up at
2  the Nebraska Avenue complex?
3     A   No, our employees aren't allowed to get
4  sick during snow removal.
5     Q   Did he ever take any time off?
6     A   Not that winter, no.
7     Q   So you never performed any work at all
8  out at the Nebraska Avenue complex, you
9  personally?
10    A   Thankfully not.
11    Q   Okay. Other than the documents which
12 have been marked as Exhibit No. 13, are there any
13 other documents that Brickman has covering the
14 period December 5th to February 28, 2003, showing
15 the work that Brickman performed out at the
16 Nebraska Avenue complex?
17    A   To my knowledge, this is the only
18 formal document that we created.
19    Q   How would you know who was out at the
20 Nebraska Avenue complex on a given day, or was
21 there any way to know that?
22    A   There were -- there's a roster of

Page 29

1  employees that are dedicated to various contracts
2  and sites that would be routinely called out to go
3  to the same places.
4     Q   Mr. Grasswick was the project manager,
5  is that correct, for Brickman?
6     A   His official title was superintendent.
7  He was the project manager, if you will, for that
8  particular snow removal site at the time.
9     Q   He was a project manager for the snow
10 removal?
11    A   We called him -- we essentially called
12 them snow captains. You were the captain of the
13 operation of this particular site, and this group
14 of employees are your resources to call on.
15    Q   Okay. But was he also at the same time
16 holding other positions for Brickman at other
17 projects?
18    A   No, this was the sole responsibility,
19 for snow removal.
20    Q   Okay. What about days when it wasn't
21 snowing?
22    A   Landscaping would be his --

Page 30

1  Q  In the middle of winter?
2  A  Yes, pruning, tree pruning, things like
3  that.
4  Q  Was he also superintendent and/or
5  project director for snow removal on any other
6  projects besides the Nebraska Avenue complex?
7  A  No.
8  Q  Did Brickenhut (sic) have other
9  projects besides the Nebraska Avenue complex?
10     MS. WHELIHAN:  Brickman.
11     MR. DONOHUE:  Brickman.
12     MR. SAMET:  What did I say?
13     MS. WHELIHAN:  Brickenhut.
14     MR. SAMET:  Brickenhut, I love it.  Did
15  I really say that?
16     MR. DONOHUE:  Joint several liability.
17     MR. SAMET:  That's right.
18  BY MR. SAMET:
19  Q  Did Brickman have any other snow
20  removal projects going on in February 2003 besides
21  the Nebraska Avenue complex?
22  A  Yes.

Page 31

1  Q  Where was that?
2  A  Variety of locations, stretching from
3  just my office, Northwest Washington, D.C., to
4  Bethesda.
5  Q  So some were government contracts, some
6  were nongovernment, you had a variety of different
7  contracts?
8  A  This is the only government contract at
9  the time.
10  Q  You didn't have any other contracts
11  with Wackenhut -- Brickman didn't have any other
12  contracts in February 2003 with Wackenhut?
13  A  To my knowledge, and my knowledge is
14  limited to probably the tristate area in terms of
15  my company's contracts, this is -- actually, this
16  was a combined contract with the Nebraska Avenue
17  and the Nemic (sic) complex of Prince George's
18  County.  Those are the only sites that we worked
19  with Wackenhut.
20  Q  Okay.  So was this one contract that
21  Brickenhut -- Brickman had with Wackenhut, covered
22  both the Nebraska Avenue complex and the Prince

Page 32

1  George's County project?
2  A  Yes.
3  Q  Okay.  You sat through Mr. Harman's
4  deposition, correct?
5  A  Correct.
6     MS. WHELIHAN:  Not all of it.
7  A  Part of it.
8  BY MR. SAMET:
9  Q  Do you remember the discussion we had
10  about whether -- about three different exhibits
11  that are the contract between Brickman and
12  Wackenhut, recall that?
13     MR. DONOHUE:  In fairness, he was not
14  here for that first part.
15  A  I missed that part.
16  BY MR. SAMET:
17  Q  Let me ask you if you know whether
18  Exhibits 1, 2 or 5, which of those would be the
19  final contract between Brickman and Wackenhut?
20  A  No. 1 is the one that I signed and
21  dated on March 26, '02, and it's also signed by
22  Jack Faulkner with Wackenhut.

Page 33

1  So that's the one that I consider the
2  contract.
3     MR. DONOHUE:  Could we go off the
4  record?
5     (Whereupon, there were discussions off
6  the record.)
7  BY MR. SAMET:
8  Q  Is it correct -- Mr. Lewandowski, is it
9  correct that Exhibits 1 and 5 and 2, you don't
10  know exactly what the difference is or which one
11  is which between them?
12  A  I don't know exactly, but I can surmise
13  that Exhibit 5 was what was sent to me originally
14  and minus some pieces of paper, Exhibit 1 was the
15  executed version that they sent back to me from my
16  contract file.
17  So I had never held onto the unexecuted
18  version, recently held onto the executed version
19  in our contract files, and that's why that's the
20  only one that we presented.
21  Q  Okay.  All right.  I think you already
22  answered this question, but just in case, I think

Page 34

1  you testified that Exhibit No. 3, you don't know
2  whether you ever did come away from that meeting
3  with your own copy of this document?
4      MS. WHELIHAN: Objection.
5  A   I don't know.
6      MR. SAMET: Okay. I don't have any
7  other questions.
8      MS. WHELIHAN: I have just a couple.
9      EXAMINATION BY COUNSEL FOR DEFENDANT
10         WACKENHUT SERVICES, INC.
11 BY MS. WHELIHAN:
12 Q   Correct me if I'm wrong, but would it
13 be fair to say that it was your understanding that
14 the Navy would communicate its orders regarding
15 snow and ice treatment and removal to Wackenhut
16 who would then communicate those orders to you?
17 A   Correct.
18 Q   And would it be fair to say that
19 Wackenhut would act as a conduit between the Navy
20 and Brickman?
21     MR. SAMET: Objection.
22 A   I would assume.

Page 35

1  BY MS. WHELIHAN:
2  Q   Okay. I don't want you to assume.
3      Well, Wackenhut wouldn't stand over
4  Brickman while it performed its work at the Naval
5  complex, right?
6      MR. SAMET: Objection, leading.
7  A   Once again, I wasn't there during the
8  services, but the feedback that I got didn't
9  indicate to me from my guys that people were
10 riding in the truck with us all the time and
11 checking to see if we weren't sleeping on the job,
12 that kind of thing.
13 BY MS. WHELIHAN:
14 Q   Okay. And WSI, Wackenhut, didn't
15 control how Brickman did its work, right?
16     MR. SAMET: Objection, leading.
17 A   Depends on how you define "control."
18 BY MS. WHELIHAN:
19 Q   Well, in other words, Wackenhut
20 wouldn't tell you how to remove snow or how to
21 treat the snow, that was your province or
22 Brickman's province, right?

Page 36

1      MR. SAMET: Objection.
2  A   Once again, I don't have personal
3  knowledge of exact direction that came from
4  Wackenhut to us.
5  BY MS. WHELIHAN:
6  Q   Okay. Would it be fair to say that
7  Brickman was an independent contractor?
8  A   Yes.
9  Q   And would it also be correct that
10 Brickman was a professional company involved in
11 snow and ice treatment and removal?
12 A   Yes.
13 Q   Okay.
14     MS. WHELIHAN: I don't have any other
15 questions.
16     MR. DONOHUE: You sure? Speak now or
17 forever hold your peace.
18     We'll waive signature.
19     (Signature having been waived, the
20 deposition of GREGORY LEWANDOWSKI was concluded at
21 12:54 p.m.)
22

Page 37

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Sheri C. Stewart, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10 this case and have no interest, financial or
11 otherwise, in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 26th day
14 of March, 2007 .
15 My commission expires:
16 October 14, 2009
17
18
19  _____
20     NOTARY PUBLIC IN AND FOR
21     THE DISTRICT OF COLUMBIA
22

Page 37

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2          I, Sheri C. Stewart, the officer before

3  whom the foregoing proceedings were taken, do

4  hereby certify that the foregoing transcript is a

5  true and correct record of the proceedings; that

6  said proceedings were taken by me stenographically

7  and thereafter reduced to typewriting under my

8  supervision; and that I am neither counsel for,

9  related to, nor employed by any of the parties to

10 this case and have no interest, financial or

11 otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set

13 my hand and affixed my notarial seal this 26th day

14 of March, 2007  .

15 My commission expires:

16 October 14, 2009

17

18

19                    _____

20                    NOTARY PUBLIC IN AND FOR

21                    THE DISTRICT OF COLUMBIA

22