# EXHIBIT 10

## Capital Reporting Company

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2                   DISTRICT OF COLUMBIA

 3     ---------------------------------:

 4  MICHAEL J. PHILBIN                  :

 5            Plaintiff               : At Law No.

 6            v.                      : CL05-1389

 7  THE WACKENHUT CORPORATION, ET AL   :

 8            DEFENDANTS              :

 9     ---------------------------------:

10                        Washington, D.C.

11                   Friday, March 9, 2007

12  Deposition of:

13            ADAM A. GRASSWICK,

14  called for oral examination by counsel for

15  Plaintiff, pursuant to notice, at the law Office

16  of Jordan, Coyne & Savits, 1100 Connecticut

17  Avenue, N.W., Suite 600, Washington, D.C., before

18  Sheri C. Stewart, Registered Professional

19  Reporter and Notary Public in and for the

20  District of Columbia, beginning at 12:58 p.m.,

21  when were present on behalf of the respective

22  parties:
```

## Capital Reporting Company

Page 2

1  A P P E A R A N C E S:
2
3  ON BEHALF OF PLAINTIFF:
4    ROBERT G. SAMET, ESQUIRE
5    ASHCRAFT & GEREL
6    One Central Plaza
7    11300 Rockville Pike, Suite 1002
8    Rockville, Maryland  20852
9    (301)770-3737
10
11
12  ON BEHALF OF DEFENDANT WACKENHUT SERVICES, INC:
13    DEBORAH MURRELL WHELIHAN, ESQUIRE
14    JORDAN, COYNE & SAVITS, LLP
15    1100 Connecticut Avenue, N.W.
16    Washington, D.C.  20036
17    (202)496-2810
18
19
20
21
22

Page 4

1  C O N T E N T S
2
3  EXAMINATION BY                    PAGE
4    Mr. Samet                    5
5    Ms. Whelihan            63
6    Mr. Samet              68
7    Ms. Whelihan          73
8
9  GRASSWICK DEPOSITION EXHIBITS:  *    PAG
10  14  SITE PLAN                15
11
12
13
14
15  (*EXHIBITS RETAINED BY COUNSEL)
16
17
18
19
20
21
22

Page 3

1  A P P E A R A N C E S (Continued)
2
3  ON BEHALF OF DEFENDANT BRICKMAN:
4    H. PATRICK DONOHUE, ESQUIRE
5    ARMSTRONG, DONOHUE, CEPPOS & VAUGHAN
6    204 Monroe Street, Suite 101
7    Rockville, Maryland  20850
8    (301)251-0440
9
10
11  ALSO PRESENT:
12    JAY HARMAN
13    GREG LEWANDOWSKI
14
15      * * * * *
16
17
18
19
20
21
22

Page 5

1  P R O C E E D I N G S
2  Whereupon,
3      ADAM A. GRASSWICK,
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. SAMET:
8    Q    State your full name and address for
9  the record, please, sir.
10   A    Adam Andrew Grasswick.  My home
11 address?
12   Q    Yes, please.
13   A    618 Aldershot Road, Baltimore,
14 Maryland, 21229.
15   Q    Is that A-L-D-E-R-S-H-O-T?  Aldershot,
16 did you say?
17   A    Oh, yes, A-L-D-E-R-S-H-O-T.
18   Q    And by whom are you employed now,
19 Mr. Grasswick?
20   A    The Brickman Group.
21   Q    Who were you employed by in February of
22 2003?

2 (Pages 2 to 5)

# Capital Reporting Company

Page 6

1    A    The Brickman Group.
2    Q    And what did you do in February 2003,
3    what was your position with Brickman?
4    A    Supervisor slash superintendent.
5    Q    Okay.
6    A    I don't recall which, I think it was in
7    transition there.
8    Q    Were you also called a project director
9    for the NAC project?
10    A    Snow captain, I think it was probably.
11    Q    Captain?
12        MS. WHELIHAN:  Snow captain.
13    A    Snow Captain.
14    BY MR. SAMET:
15    Q    Where were you stationed from day to
16    day during the month of February 2003?  Were you
17    stationed at the Nebraska Avenue complex, or were
18    you stationed somewhere else?
19    A    I was only there for snow-related
20    purposes.
21    Q    Okay.  And only when you were called
22    out there?

Page 7

1    A    Yes.
2    Q    All right.  You have an office at the
3    Nebraska Avenue complex?
4    A    No.
5    Q    Were you the highest Brickman person
6    located at the Nebraska Avenue complex?
7    A    Yes.
8    Q    Were you the supervisor, superintendent
9    or snow captain for any other Brickman projects at
10    the time besides the Nebraska Avenue complex?
11    A    No.
12        MR. SAMET:  Counsel, we have an
13    agreement to do in this deposition just what
14    we did with Mr. Lewandowski, which is to
15    incorporate all of the previously marked
16    exhibits and adopt them for this deposition
17    also?
18        MR. DONOHUE:  Yes.
19        MR. SAMET:  Deb?
20        MS. WHELIHAN:  Yes.
21        MR. SAMET:  All right.
22

Page 8

1    BY MR. SAMET:
2    Q    I call your attention to February 26,
3    2003.  Do you recall finding out or learning that
4    Mr. Philbin, the plaintiff in this case, had been
5    injured?
6    A    Yes.
7    Q    Okay.  How did you find out, by the
8    way?
9    A    I got a call from Jay Harman.
10    Q    And do you remember when he called you?
11    A    I'd say probably about quarter to nine,
12    maybe.
13    Q    Okay.  And what did he tell you?
14    A    That someone had fallen and broken
15    their leg.
16    Q    Okay.  And he didn't give a name of
17    anybody at that time?
18    A    No, no.
19    Q    Did he ask you to go over and see what
20    was going on?
21    A    He asked me to go over and check things
22    again.

Page 9

1    Q    Okay.  "Check things," meaning check
2    the parking lot, check the gate, check what?
3    A    Check the gate area.
4    Q    Okay.  He told you that Mr. Philbin had
5    been hurt in the gate area?
6    A    Yes.
7    Q    Okay.  Did you do that?
8    A    Yes.
9    Q    All right.  What time did you arrive on
10    February 26th on the project there?
11    A    On the project?
12    Q    Yeah.
13    A    Around 7 o'clock.
14    Q    7 o'clock at the Nebraska Avenue
15    complex?
16    A    Around that, yes.
17    Q    Okay.  You actually remember that, or
18    is it an estimate?
19    A    I'd say that's a reasonable certainty.
20    Q    Okay.  Mr. Harman's phone log shows
21    that he called you at 20 of seven, 6:40.
22    A    Um-hum.

3 (Pages 6 to 9)

# Capital Reporting Company

Page 10

1    Q    Would that indicate to you that you
2  were there by seven if he called for the first
3  time at 6:40, or would it have taken somewhat
4  longer to get there?
5    A    If I was at my office, it would take
6  longer.  But based on experience and the fact it
7  started snowing, we were on our way down.
8    Q    So you --
9    A    Knowing that they would call and if
10 they didn't, then it would be a little bit of a
11 waste of a trip, but we would beat the traffic.
12   Q    So where were you when he called you,
13 do you remember?
14   A    In my Brickman truck.
15   Q    I deserve that.
16       Do you remember where you were in your
17 truck when you --
18   A    No.
19   Q    Okay.  Had you plowed the parking lot
20 that morning?
21   A    I don't believe so, no.
22   Q    Okay.  Had you sanded or salted the

Page 11

1  parking lot that morning?
2    A    Yes.
3    Q    The back parking lot?
4    A    The entire parking lot?
5    Q    Yeah.
6    A    It's possible, yes.
7    Q    It's possible, meaning you don't really
8  remember whether you had or hadn't that morning?
9    A    What I mean is the entire -- the entire
10 complex I may or may not have, you know, it takes
11 time so --
12       MR. DONOHUE:  Could we have a
13    clarification as to what time your question
14    is directed to?  He can tell you what he did,
15    but we don't know without a time reference.
16 BY MR. SAMET:
17   Q    Did you sand and salt any of the
18 parking lots at any time on the morning of the
19 26th of February 2003?
20   A    Yes.
21   Q    And what did you use to sand or salt
22 the parking lots?

Page 12

1    A    My Brickman truck with my spreader.
2    Q    Okay.  And can you show me where on the
3  snow removal site visit report for February 26,
4  2003, that's marked as Exhibit 13, part of Exhibit
5  13, can you show me where it shows that a spreader
6  was used on the morning of February 26, 2003?
7    A    Plowing and spreading, 7 a.m. to 12.
8       MR. DONOHUE:  Keep your voice up.
9    A    Plowing and spreading, 7 a.m.
10 BY MR. SAMET:
11   Q    Okay.  Now, where does it -- under --
12 what is the space next to "number of spreaders"?
13   A    It's not marked.
14   Q    Do you know why that would not be
15 marked?
16   A    An oversight on my part, I'm sure.
17   Q    Okay.  What time did you plow -- first
18 off, is there a priority for what areas are
19 treated when you go out to the Nebraska Avenue
20 complex?
21   A    Yes.
22   Q    And what is it supposed to be, what is

Page 13

1  the priority, what comes first, what comes second?
2    A    Generally the entrances are first,
3  access roads.
4    Q    What do you mean by entrances?
5    A    There's a Nebraska Avenue entrance, and
6  there's a, whatever, the back entrance.
7    Q    When you say "the entrance," do you
8  mean the entrance for doors entering the complex,
9  or do you mean the gate for foot traffic to enter
10 within the --
11   A    Both.
12   Q    Fence.
13   A    There's -- I don't know what's the name
14 of the gate's called on Nebraska Avenue, but
15 that's one priority.
16       And the back gate and the access roads
17 leading from Massachusetts and Nebraska Avenue,
18 those are high priority to get traffic into
19 parking lots.
20   Q    So you start at the entrances, and that
21 would be first with the vehicle entrances to the
22 complex?

4 (Pages 10 to 13)

# Capital Reporting Company

Page 14

1    A    Um-hum.
2         MR. DONOHUE:  Is that "yes"?
3  BY MR. SAMET:
4    Q    You have to say "yes."
5    A    Yes.
6    Q    And then you moved from there to the
7  access roads to the parking lots themselves,
8  correct?
9    A    Based on where the salt's located, it
10 would be leaving the back gate going towards the
11 actual entrance.  Our material was inside the
12 compound.
13        MR. DONOHUE:  Off the record.
14        (Whereupon, there were discussions off
15 the record.)
16 BY MR. SAMET:
17   Q    Where is the first place you did any
18 work on the morning February 26, 2003, if you
19 know?
20   A    It would be leaving the back gate going
21 towards the exit, so to speak, or exit slash
22 entrance.

Page 15

1         MR. DONOHUE:  We're going to get
2  garbled up with words.
3  BY MR. SAMET:
4    Q    I haven't the foggiest idea what you
5  mean when you say "leaving the back gate."
6    A    I don't know what the back gate is
7  called.
8    Q    Let me ask you this question.  Does
9  Echo Gate sound familiar to you?
10   A    Yes.
11        MR. DONOHUE:  Let's get a plat -- let's
12 go off the record.
13        (Whereupon, there were discussions off
14 the record.)
15        (Whereupon, Exhibit No. 14 was marked
16 for identification.)
17 BY MR. SAMET:
18   Q    Mr. Grasswick, could you please
19 identify what's been marked as Exhibit 14?
20   A    It's a site plan of the complex.
21   Q    Can you show me what area was first
22 treated by Brickman on the morning of

Page 16

1  February 26th?
2    A    Yes.  Our material's located just
3  inside the complex in the rear gate.
4    Q    Why don't you put an M where your
5  materials are located.  Okay.
6    A    And I would leave the rear gate, follow
7  the access road down and around to the
8  Massachusetts Avenue entrance.
9    Q    Well, hold on, hold on.  Can we
10 backtrack just a minute?
11        Where did you enter the complex?
12   A    From Massachusetts Avenue or the
13 Nebraska.
14   Q    You don't remember where you entered on
15 the morning of February 26th?
16   A    I don't recall, no.
17   Q    Okay.  And so you would have initially
18 gone directly to the place where salt and sand
19 were stored?
20   A    Yes.
21   Q    Was anything else stored there?
22   A    In a building, 98, we had just some

Page 17

1  shovels and some miscellaneous equipment for our
2  members.
3    Q    On the morning of February 26, you
4  recall going first to this area for doing any
5  treatment at all?
6    A    Yes.
7    Q    Okay.  And after you -- you loaded up
8  sand or salt or both?
9    A    Salt.
10   Q    Okay.  And got some shovels?
11   A    My leg workers did, yes.
12   Q    Had some shovels?
13   A    Um-hum.
14   Q    You then proceeded to -- could you
15 maybe draw a line showing your route from the M?
16   A    Sure.
17   Q    Draw a blue line showing where you
18 went.
19   A    Out the rear gate through what I call
20 the access road (indicating).
21   Q    Okay.  To Massachusetts Avenue?
22   A    Which is one of the entrances.

5 (Pages 14 to 17)

# Capital Reporting Company

Page 18

1    Q    All right.  So then would you have
2    proceeded to work in that area?
3    A    I would have come through here
4    (indicating) and then gone into --
5    Q    So you didn't do any work at the
6    Massachusetts Avenue entrance at that time?
7    A    Salting.  As you're driving, you're
8    salting.
9    Q    I see.  So you're spreading salt along
10   the road where you have just drawn a blue line?
11   A    Correct.
12   Q    All the way up to the Massachusetts
13   Avenue?
14   A    Correct.
15   Q    Okay.  And then you would have gone --
16   A    I would have gone to what would be
17   called the main gate area.
18   Q    Could you draw a blue line where you
19   went -- were you dropping salt as you went?
20   A    No, no.  This is District of Columbia
21   Road.
22   Q    Okay.

Page 19

1    A    So I only drop what's --
2    Q    You drive long Massachusetts Avenue,
3    correct?
4    A    Yes.
5    Q    Draw a blue line, please, on
6    Massachusetts to where you went next.
7    A    Ford Circle, beared right onto Nebraska
8    Avenue, and into Nebraska Avenue entrance at the
9    main gate (indicating).
10   Q    Okay.  And then what did you do when
11   you got to the Nebraska Avenue entrance of the
12   Nebraska Avenue complex?
13   A    Salted the main gate area.
14   Q    Okay.  All right.  And any shoveling or
15   plowing or anything in that area?
16   A    No plowing.
17   Q    No plowing because?
18   A    Not that I remember.
19   Q    Not enough?
20   A    Correct.
21   Q    How long do you wait before you do any
22   plowing?

Page 20

1    A    Has to be a minimum of an inch.
2    Q    So at this point -- actually, the
3    entire snowfall that morning was only an inch; am
4    I correct?
5    A    That's reasonable.
6    Q    So you wouldn't have done any plowing
7    until later in the morning towards the end of your
8    stay out at the Nebraska Avenue complex?
9    A    Yes.
10   Q    So you were out of the Nebraska Avenue
11   complex for what hours that morning?  Where is the
12   exhibit?
13       MR. DONOHUE:  I can show him the
14   original.
15       MR. SAMET:  Why don't you get the
16   exhibit?
17       MS. WHELIHAN:  Seven to 11:30.
18   BY MR. SAMET:
19   Q    Here you go.  You were out to -- at the
20   Nebraska complex on the morning of February 26th
21   about how long, what time did you leave there?
22   A    About 12 o'clock.

Page 21

1    Q    So the plowing would have actually been
2    done in what time frame, approximately?
3    A    I didn't plow.
4    Q    Oh, you didn't do any plowing on the
5    morning of February 26th?
6    A    Not that I recall.
7    Q    Okay.  All right.  So after you went to
8    the -- after you went with the -- after you went
9    to the entrance of the Nebraska Avenue complex
10   you salted or sanded, salted --
11   A    Um-hum.
12   Q    -- the entrance area?
13   A    Yes.
14   Q    Okay.  And did nothing else, there was
15   no shoveling that went on there?
16       MR. DONOHUE:  By him?
17   A    By me, no.
18   BY MR. SAMET:
19   Q    By you or your crew.
20   A    My crew, yes.
21       MR. DONOHUE:  At what point?  You're
22   following chronology if you're asking --

6 (Pages 18 to 21)

## Capital Reporting Company

Page 22

1     MR. SAMET:  We're at the entrance of
2   Nebraska Avenue.
3        MR. DONOHUE:  When he's there with his
4   truck.
5   BY MR. SAMET:
6     Q    Tell me when, was there shoveling going
7   on by your crew?
8     A    They have similar priorities listed by
9   the Navy or Wackenhut and they would -- the two
10  entrances are the first priorities.
11    Q    So they would have been shoveling?
12    A    Since the shovels are located near the
13  material at the back gate area, they would hit the
14  rear gate entrance first, then go to the main gate
15  entrance area.
16    Q    And they're marked, they're marked on
17  Exhibit 14 as "rear gate" and the "main gate,"
18  correct?
19    A    Yes.
20    Q    Okay.  So they were first to the rear
21  gate shoveling around the rear gate?
22    A    Um-hum.

Page 23

1     Q    You have to say "yes."
2     A    Yes.
3     Q    Then they would proceed over to the
4   main gate with your shoveling?
5     A    Yes.
6     Q    Meantime, you would travel along this
7   blue line that's shown in Exhibit 14 spreading
8   salt, correct?
9     A    Yes.
10    Q    Until you hit the public road, which
11  was Massachusetts Avenue, and then Nebraska
12  Avenue, you wouldn't salt along Massachusetts and
13  Nebraska?
14    A    Correct.
15    Q    Would you proceed with your truck --
16    A    Yes.
17    Q    -- to the main gate area and do salting
18  in the main gate area, correct?
19    A    Yes.
20    Q    Were you driving that truck?
21    A    Yes.
22    Q    Was there anybody supervising your men

Page 24

1   when they were doing their shoveling?
2     A    No.
3     Q    Okay.  After you finished salting the
4   main gate area, where did you then proceed?
5     A    Backtracked around to the back.
6     Q    Okay.  Could you show -- what time
7   would that have been, do you know, approximately?
8   I mean, when would you have left the main gate
9   area after having salted it?
10       MR. DONOHUE:  Are you asking him
11  specifically that morning, or are you asking
12  him --
13       MR. SAMET:  I asked the question.  Why
14  can't you just let him answer?  If you want
15  to object, you can object, I don't need you
16  to be making speaking objections.
17       MR. DONOHUE:  Objection, lack of
18  foundation.
19  BY MR. SAMET:
20    Q    Approximately what time would you have
21  left the main gate area after having salted it on
22  February 26, 2003?

Page 25

1     A    This initial little run might take 15
2   minutes or so.
3     Q    Approximately total time, total time to
4   make the run and salt the main gate area, would
5   you have -- what time -- so what time would it
6   have been that you would have finished salting the
7   main gate area, approximately?
8        MR. DONOHUE:  Objection, foundation.
9     A    Approximately?
10  BY MR. SAMET:
11    Q    Um-hum.
12    A    7:30-ish.
13    Q    So how long did it take you to load up
14  your truck with salt and you first got there and
15  went to Building 89, was it?
16    A    That's 98.
17    Q    Ninety-eight.  The area where the salt
18  was stored.  How long does that take?
19    A    Approximately five minutes to load up.
20    Q    And so you're talking a total time of
21  another ten minutes to get around up onto
22  Massachusetts Avenue, onto Nebraska Avenue, get to

7 (Pages 22 to 25)

## Capital Reporting Company

Page 26

1  the main gate and salt -- and finish salting the
2  main gate area, total time of 15 minutes from the
3  time you arrived at the Nebraska Avenue complex;
4  is that correct?
5          MR. DONOHUE: Objection. Go ahead.
6      A    That sounds reasonable.
7  BY MR. SAMET:
8      Q    Okay. And then you proceeded from the
9  main gate back around the perimeter of the
10 complex?
11     A    Yes.
12     Q    Okay. Same route that you would have
13 taken to get there, correct?
14     A    I would have backtracked more than
15 likely.
16     Q    Could you draw maybe a blue line
17 parallel to the one you drew before so we can show
18 you backtracking from the main gate area?
19     A    How about a dotted line?
20     Q    Dotted is great.
21         MS. WHELIHAN: There's a reason he's
22 the snow captain.

Page 27

1  BY MR. SAMET:
2      Q    I see that you -- okay, all right.
3          Your dotted line now goes -- instead of
4  going back completely the way you would come, you
5  entered the complex through what, what is that
6  called?
7      A    Secondary entrance, I suppose.
8      Q    Okay. So you -- that morning you went
9  back through there?
10         MR. DONOHUE: Is that "yes"?
11     A    Yes.
12 BY MR. SAMET:
13     Q    After you entered, you were dropping
14 salt?
15     A    After I entered, I would have dropped
16 salt.
17     Q    Spreading salt along the -- spreading
18 salt along the roadway, correct?
19     A    Yes.
20     Q    Your men would have, at about that time
21 would have been where? Still back at the rear,
22 rear gate areas, shoveling?

Page 28

1      A    No.
2      Q    So they in the same time frame would
3  have gotten up to the main gate area with their
4  shovels?
5      A    Yes.
6      Q    And they wouldn't be doing any
7  sidewalks -- interior sidewalks or steps or
8  anything; is that correct?
9      A    If they were done with the rear gate
10 area and the main gate area, then, yes.
11     Q    So they wouldn't do any sidewalks or
12 steps until they finished those two gate areas; is
13 that correct?
14     A    Correct, those are higher priorities.
15     Q    Okay. All right. Now, when you
16 backtracked and then entered, where did you
17 proceed to with your spreader?
18     A    More than likely the access road which
19 kind of runs the perimeter.
20     Q    What parking lot is that, that you're
21 running along there, what's that called?
22     A    I don't recall.

Page 29

1      Q    The parking lot near Echo Gate is
2  called the what, back parking lot?
3      A    I suppose.
4      Q    Okay. And you don't know what this
5  other parking area was called?
6      A    I don't recall.
7      Q    Okay.
8      A    A little fire station in the back
9  corner.
10     Q    Okay. Put that in, where the fire
11 station is, so we know where you were talking
12 about. If you could finish your dotted line, show
13 me where you went.
14         So you went around this parking lot
15 near the fire station that's marked by F, you went
16 around the perimeter road of it?
17     A    Yes.
18     Q    All right. And that's because you were
19 salting the access roads for vehicular traffic?
20     A    Yes.
21     Q    Okay. And then where did you proceed?
22 That would have been about what time that you

8 (Pages 26 to 29)

## Capital Reporting Company

Page 30

1   would have finished doing that?
2      A     That might be another ten minutes,
3   possibly.
4      Q     Okay.  And then where did you proceed?
5      A     Backtracked.
6      Q     Okay.  And then where did you go?
7   You're showing your dotted line going around the
8   perimeter of the rear parking lot?
9      A     Yes.
10     Q     And is that because that morning you
11  salted the perimeter of the rear parking lot?
12     A     Yes.
13     Q     Okay.  And then where did you go after
14  you finished that?
15     A     I would have probably gone back inside.
16     Q     Back into the interior of the complex?
17     A     Correct.
18     Q     Let's keep the dotted line going, show
19  me where you went.  And where would you have gone
20  then?
21     A     I probably would have gone first down
22  the slope.

Page 31

1      Q     Okay.  What is that slope that you're
2   on now?
3      A     This is next to the barracks.
4      Q     Okay.  Could you put an S next to that
5   slope road that you were driving along?
6      A     (Witness complies.)
7      Q     Okay.  And would you have been salting
8   that slope?
9      A     Yes.
10     Q     Is that asphalt or concrete?
11     A     Asphalt.
12     Q     Okay.  Let's keep going.  I'm just
13  seeing where your spreader was.  All right.  Go
14  ahead, go ahead.  I want to see where you're
15  going.  Where are you going now?
16     A     This is the main cross roads, and then
17  more than likely I would have --
18         MR. DONOHUE:  Keep your voice up.
19     A     -- gone in front of -- toward the main
20  gate area.
21  BY MR. SAMET:
22     Q     You're back up to the main gate?

Page 32

1      A     Inside the compound, though.
2      Q     But inside the compound.  Are those
3   roads?
4      A     Yes.
5      Q     These are interior roads, actually,
6   asphalt roads, correct?
7      A     Yes.
8      Q     All right.  And so let's take the
9   interior road, your dotted line on it, that runs
10  adjacent to the main gate where you're back to.
11         About what time would this have been?
12     A     Probably about a half an hour or so
13  into it.
14     Q     So we're now at only 7:30 at this
15  point?
16     A     Sounds reasonable.
17     Q     Okay.  And then where did you go?
18     A     A dead end here with a fence that
19  separates the chapel from here (indicating).  So I
20  would have turned back around and then continued
21  to salt more areas.
22     Q     Retraced your path?

Page 33

1      A     Right, would have backtracked and would
2   have hit everything in sight.
3      Q     All of the interior roads?
4      A     Right.
5      Q     Okay.
6      A     I wouldn't be able to recall whether I
7   went right or left first.
8      Q     And this would have been -- all right.
9   So where did you end up?
10         So you would have gotten all of the
11  interior roads at that point, correct?
12     A     The actual roads, yes.
13     Q     How long would it take you to do all of
14  the actual interior roads in the complex, about
15  what time, approximately?
16     A     Might take 20 minutes.
17     Q     So what time, approximately, would you
18  have finished doing all of the interior roads at
19  the Nebraska Avenue complex?
20     A     Maybe quarter to eight.
21     Q     Okay.  And then where would you -- what
22  would you have done after you did all the interior

9 (Pages 30 to 33)

## Capital Reporting Company

Page 34

1  roads?
2      A    I would have come back out -- well, I
3  would have checked my salt hopper, make sure I
4  actually had material.
5      Q    By this time you think you might have
6  actually run out or --
7      A    Not necessarily.
8      Q    But you would have checked to see?
9      A    If I had large parking lots and other
10  areas to do, I don't want to go outside, run out
11  and then have to come back in.
12      Q    Okay.
13      A    So I would have got out of the truck
14  and checked the hopper, see what's in it and if I
15  needed to put more in, I would put more in.
16      Q    Back in 89 (sic) or the M?
17      A    If I need more.
18      Q    Okay.  Then what would you have done?
19      A    Then I would have continued on and
20  finished salting the property.
21      Q    Okay.  That would have been -- well,
22  what do you mean by "finish salting the property"?

Page 35

1      A    The areas that I hadn't salted yet.
2      Q    Which would have been what?
3      A    Which would have been the small parking
4  lot, the large parking lot.
5      Q    First the small one?  We didn't mark
6  that.  Can you mark that small parking lot with an
7  S?
8          MR. DONOHUE:  Can we use SP, since we
9      have an S already?
10         MR. SAMET:  That's fine, that's a good
11     idea.
12      A    How about just small lot?
13  BY MR. SAMET:
14      Q    Good.  So you would have done the small
15  lot, correct?
16      A    Yeah.
17      Q    Okay.  And then after the small lot,
18  were there any smaller lots -- interior smaller
19  lots that you would have had to get?
20      A    There's a little loading dock area back
21  into here (indicating).  I may or may not have
22  done that.

Page 36

1      Q    Okay.
2      A    Back the truck up and done that.
3      Q    Put loading -- put LD for loading dock.
4      A    (Witness complies.)
5      Q    Okay.
6      A    There's a very tiny five- or six-space
7  lot here (indicating).
8      Q    Along Nebraska?
9      A    Right, as soon as you come in the
10  entrance, as soon as you make the left, it's right
11  there.
12      Q    You might have then salted that one?
13      A    Yes.
14      Q    Okay.  So this takes us up to about
15  what time, approximately?
16      A    I don't --
17      Q    I mean, you were using the spreader a
18  total of five and a half hours out there?
19      A    Yes.
20      Q    And that would put you to 12:30,
21  approximately, is that right, 7 to 12:30, 12,
22  seven to 12?

Page 37

1      A    Yes.
2      Q    Actually, your addition is a little bit
3  off here, isn't -- 7 to 12 would be five hours,
4  not five and a half.
5      A    Correct.
6          MR. DONOHUE:  Is he allowed to load?
7          MR. SAMET:  Listen, that's not my
8      concern.  Yeah, but I think he's allowed to
9      bill for loading time.  All right.
10  BY MR. SAMET:
11      Q    You're now up to the small parking --
12  small interior parking lot, and then even smaller
13  interior lots, and using this five hours total
14  time or five and a half hours total time as a
15  gauge, about what time would that put us to that
16  you were still spreading at this point?
17      A    I mean, the first -- the whole thing
18  told takes about an hour or so.
19      Q    Oh, you didn't use the spreader for
20  five hours?
21      A    Yes, yes, but to salt an initial run is
22  about an hour, so there's checking and you're

10 (Pages 34 to 37)

## Capital Reporting Company

Page 38

1  driving around and checking different areas,
2  that's part of -- that's part of the whole truck
3  process.
4      Q    Four hours of checking with the
5  spreader?
6      A    Yeah.
7      Q    You do the salting for one hour, and
8  then you just spend the next four hours checking
9  it? I'm trying to understand what takes five
10  hours.
11      MR. DONOHUE:  He's asking what you did
12  during the five-hour period; is that fair?
13      MR. SAMET:  Yes.
14      MR. DONOHUE:  That's what he's asking.
15  BY MR. SAMET:
16      Q    With the spreader.
17      A    You salt, and then you're driving
18  around, you're spot checking, you're driving up,
19  you see your hand laborers, say hey, how you
20  making out.
21      Hey, if Jay had called and said -- this
22  is just an example, if Jay had called and said

Page 39

1  hey, we need to take care of sidewalk X, have you
2  taken care of that yet, no.
3      Okay, as soon as you're done with this,
4  go over and take care of that.  And then I'd drive
5  further to see their progress and to check on my
6  roads, et cetera, et cetera.
7      Q    Where had you gotten to on the morning
8  of February 26th by the time you got the call from
9  Jay about Mr. Philbin being injured?
10      A    I would have been finished with the
11  first run.
12      Q    What do you mean you would have been?
13  How do you -- what time did you get the call?
14      A    He called me -- which call?  About
15  Mr. Philbin?
16      Q    Yeah.
17      A    If I recall correctly, he called about
18  quarter to nine.
19      Q    You remember what time he called you?
20      A    I said if I recall correctly.
21      Q    Well, do you remember?
22      A    That sounds reasonable to me.

Page 40

1      Q    Where were you?
2      A    Inside the property.
3      Q    Well, I'm really not asking you about
4  what's reasonable.  Do you actually recall getting
5  the phone call?
6      A    Do I recall getting the phone call,
7  yeah.
8      Q    Do you remember the time that you got
9  the phone call?
10      A    I recall about quarter to nine.
11      Q    Where were you at the time?
12      A    Inside the property.
13      Q    Where on the property?
14      A    Approximately Building 18.
15      Q    Doing what?  Doing what at Building 18?
16      A    In my truck checking on my guys driving
17  around.
18      Q    No longer spreading?
19      A    I would have probably been done by
20  then.
21      Q    What about the stairs, the interior
22  sidewalks --

Page 41

1      A    What about them?
2      Q    -- in the project?
3      Did your men do any salting of the
4  stairs or interior sidewalks on the project?
5      A    No.
6      Q    That would have not -- that was not
7  something that was ordered or you decided not to
8  or was it worth it or what was the reason?
9      A    That's not something that we were doing
10  in year one due to new concrete.
11      Q    But any of the footpaths, did you all
12  do it, salting of any of the footpaths in the
13  Nebraska Avenue complex?
14      A    No.
15      Q    What about --
16      A    Not that I recall.
17      Q    What about Echo Gate, did you salt in
18  and around Echo Gate?
19      A    Not that I recall.
20      Q    Okay.
21      A    It's concrete, Echo Gate.
22      Q    When you were called and told about

11 (Pages 38 to 41)

# Capital Reporting Company

Page 42

1  Mr. Philbin's injury, what did you do?
2      A    Jay asked me to go down and check out
3  Echo Gate.
4      Q    Okay.  And you went down there?
5      A    Yes.
6      Q    And what did you see?
7      A    There was a thin film of snow on the
8  sidewalks which I got out of my truck and used the
9  shovel on it.
10      Q    Mr. Philbin was gone by then?
11      A    No.  I believe he was in the --
12  whatever the -- this -- I don't know what it's
13  called, where you show the IDs.
14          MR. DONOHUE:  Guard house.
15      A    Guard shack, I suppose.
16  BY MR. SAMET:
17      Q    Do you remember seeing him?
18      A    I don't recall seeing him; I saw
19  medical personnel.
20      Q    You saw medical personnel helping him?
21      A    I suppose they were helping him.
22      Q    Was there an ambulance there?

Page 43

1      A    I don't recall seeing an ambulance.
2      Q    Okay.
3      A    They were inside that little -- the
4  little guard thing.
5      Q    And did you say anything to him or talk
6  to him?
7      A    No, I didn't go inside.
8      Q    Did you even actually see him?
9      A    No.
10      Q    Okay.
11      A    I had no idea who --
12      Q    Did you talk to anybody?
13          MR. DONOHUE:  Can he complete his
14  answer?  He was going to say something.
15      A    I had no idea who fell, whether it
16  was -- Jay never mentioned whether it was a woman
17  or a man or anything, he just mentioned that
18  somebody had fallen.
19  BY MR. SAMET:
20      Q    What did Jay want you to do when you
21  got down to Echo Gate?
22      A    He wanted me to double-check the

Page 44

1  sidewalk areas again to make sure that everything
2  was okay.
3      Q    Okay.  And you did that, found a film
4  of snow, and you treated it?
5      A    I used a shovel and pushed off the
6  little film of snow.
7      Q    Okay.  But you didn't put any salt
8  down?
9      A    No.
10      Q    All right.  Were you alone when you
11  went there?
12      A    Yes.
13      Q    Did you talk to anybody at Echo Gate
14  when you were there?
15      A    I don't believe so.
16      Q    When had you last been out to the
17  Nebraska Avenue complex before February 26th?
18      A    I would have to check the reports.
19      Q    Here you go.
20      A    Myself personally or --
21          MR. DONOHUE:  Yeah.  When did you last
22      A    It would be Wednesday, the 19th.

Page 45

1  BY MR. SAMET:
2      Q    Wednesday, the 19th.
3      A    Yes.
4      Q    And would -- if that was the last time
5  you were out there, that was the last time anybody
6  from Brickman was out there; am I correct?
7          MS. WHELIHAN:  Objection.
8          MR. DONOHUE:  Objection.
9  BY MR. SAMET:
10      Q    Am I correct?
11          MS. WHELIHAN:  Objection.
12      A    If it was snow related, possibly.
13  BY MR. SAMET:
14      Q    Okay.  So there wasn't anybody -- I
15  mean -- strike that.
16          Take a look at the February 23rd site
17  report.  Were you out there on February 23rd?
18      A    No.
19      Q    Okay.  So that would have been somebody
20  else going out there without you?
21      A    Correct.
22      Q    Who was that?

12 (Pages 42 to 45)

# Capital Reporting Company

Page 46

1    A    It was a subcontractor of ours.

2    Q    Who?

3    A    I believe it was Pogo.

4    Q    Did you have a written subcontract with

5 Pogo?

6    A    We have -- we use that company on other

7 sites.

8    Q    What is Pogo, is Pogo -- is it Mr. Pogo

9 or -- I mean, I'm trying to find out if this is a

10 big company, a little company, a one-man

11 operation, I mean?

12    A    He's -- I don't know how big or small

13 he is. I don't believe that that's his actual

14 name. That's the company name.

15    Q    Okay. And why did you subcontract out

16 work on February 23rd?

17      MR. DONOHUE: I'm going to object,

18      foundation. This gentleman is not the one

19      who subcontracted work out.

20      I won't instruct him not to answer with

21      whatever information he has.

22      MR. SAMET: This gentleman is the

Page 47

1 supervisor of that project.

2 BY MR. SAMET:

3    Q    Go ahead. Why did Brickman subcontract

4 that work out on February 23rd?

5    A    The big rubber tire loader that's

6 listed on there, we don't own that size machine,

7 and the volume of the snow piles needed to be

8 moved at the direction of Wackenhut and the Navy

9 stating that they needed every possible spot

10 available for parking.

11    Q    Okay. Did you go out and inspect

12 Pogo's work?

13    A    On Sunday, no.

14    Q    Did you go out and inspect Pogo's work

15 at all, ever?

16    A    In terms of --

17    Q    They -- Pogo did some work out there on

18 February 23rd -- between February 23rd and

19 February 26th, did you inspect Pogo's work?

20    A    I suppose the 26th I would see if

21 there's piles or not.

22    Q    Do you remember whether there were any

Page 48

1 piles?

2    A    There were, the piles were moved off

3 from the middle of the parking lots to the edges.

4    Q    Okay.

5    A    The perimeter areas.

6    Q    It this something you remember?

7    A    Yes.

8    Q    Okay. If it hadn't been for that snow

9 on the 26th, were you scheduled to come out and

10 inspect Pogo's work?

11    A    No.

12    Q    Okay.

13    A    If it wasn't done to the satisfaction

14 of the Navy or Wackenhut, we would know about it.

15    Q    Okay. They would complain?

16    A    Right.

17    Q    Okay. On February the 19th, Brickman

18 went out and cleaned up parking areas?

19    A    Yes.

20    Q    Evidently hadn't cleaned up all of the

21 parking areas, is that correct, hadn't moved all

22 of the snow piles?

Page 49

1    A    Correct.

2    Q    All right.

3    A    With the Bobcat, we did what we could

4 with that particular size machine.

5    Q    Was there -- during the period

6 February 19th to February -- through and including

7 February 25th, was there daytime freezing? I

8 mean, daytime thawing of snow and melting and then

9 refreezing at night during that period?

10    A    Probably.

11    Q    Okay.

12    A    I don't recall exactly.

13    Q    Okay.

14      MR. DONOHUE: Don't guess. If you

15      don't recall, let Mr. Samet know, don't be

16      guessing.

17      THE WITNESS: Okay.

18 BY MR. SAMET:

19    Q    Who arranged for Pogo to come out and

20 remove the piles of snow?

21    A    Probably would be my boss.

22    Q    It wouldn't have been you?

13 (Pages 46 to 49)

# Capital Reporting Company

Page 50

1     A    No, we would have talked about it, but
2  he would have made the actual phone call.
3     Q    Okay.  When you would subcontract out
4  to Pogo, was it at Brickman's expense or
5  Wackenhut's, do you know?
6     A    To my knowledge, it was probably
7  Brickman's expense.
8     Q    Okay.  Salt and sand were also at the
9  expense of Brickman, you all would supply the salt
10 and sand at the Nebraska Avenue complex?
11    A    Yes.
12    Q    Was there any shortage of salt or sand
13 out there --
14    A    No.
15    Q    -- this particular year?
16        Did you report this injury of Mr.
17 Philbin to your boss, did you ever tell
18 Mr. Lewandowski about this?
19    A    I don't recall.  I probably did, but I
20 don't recall with certainty.
21    Q    So I understand correctly, the order of
22 priority for snow removal was to first salt and

Page 51

1  sand the entrance areas for vehicular traffic,
2  vehicular entrance areas; is that correct?
3     A    Um-hum.
4         MR. DONOHUE:  Is that "yes"?
5         THE WITNESS:  Yes.
6  BY MR. SAMET:
7     Q    And then to do internally interior
8  roads?
9     A    Yes.
10    Q    Okay.  And then to do interior parking
11 lots -- no, the perimeter of the interior parking
12 lots, correct?
13    A    Right, what you would consider the road
14 that would lead to the spaces themselves.
15    Q    And then after all of the interior
16 roads and perimeter roads for the parking lots
17 were salted, you would then go back and salt the
18 parking lots themselves; is that correct?
19    A    Yes.
20    Q    All right.  And that would include all
21 the parking areas on the Nebraska Avenue complex?
22    A    Yes, providing there weren't cars

Page 52

1  and --
2     Q    Okay.  And I see that the parking areas
3  for the small lot and the back lot, by the way,
4  the back lot we're talking about is the lot next
5  to the Echo Gate, correct?
6     A    Yeah.
7     Q    All right.  We've already marked the
8  small lot as a small lot.  Maybe I can get you to
9  mark the back lot so we know what we're talking
10 about.  Okay.
11        I'm pointing at a lot here
12 (indicating).  Is this a lot parking area?
13    A    Yes.  It's another loading dock and
14 various small parking lots.
15    Q    So everywhere where we see those little
16 hatch lines, parallel hatch lines, those are
17 parking spaces, correct?
18    A    Yes.
19    Q    Okay.  What about -- is there an area
20 called Quarters A?
21    A    Yes.
22    Q    Did you all -- did Brickman treat

Page 53

1  Quarters A?
2     A    That day?
3     Q    Well, any day.
4     A    Any day?  Only if Wackenhut called us
5  to do that.
6     Q    That day was Quarters A treated at all?
7     A    I don't believe so.
8     Q    How would you know?  Would you have to
9  look at a different set of records?
10    A    No, it would be part of these, not
11 listed separately.
12    Q    Okay.
13    A    But it was only if the admiral called
14 the Navy or Wackenhut to treat.  In many cases, he
15 didn't.  The blizzard he did, of course.
16    Q    Along this course that you took and
17 that you drew for us where you went first from
18 loading up the salt and then drove around the
19 perimeter roads to the front gate and you dotted
20 lines all along that course, were there periods
21 where you would be supervising your men?
22    A    It's possible.

14 (Pages 50 to 53)

## Capital Reporting Company

Page 54

1  Q   Okay. So would you cross paths with
2  them sometimes?
3  A   Yes.
4  Q   Okay. And did you ever work alongside
5  them, stop and help them with anything or --
6       MR. DONOHUE: For clarification, this
7  particular day?
8       MR. SAMET: Any day.
9  A   Any day, there's times.
10 BY MR. SAMET:
11 Q   Do you remember whether you had to on
12 this particular day for any reason?
13 A   It's possible. I don't recall exactly.
14 Q   All right. And apart from -- how many
15 laborers did you have that day?
16 A   I believe four hand laborers and one
17 guy, a little walk behind.
18 Q   What's a walk behind?
19 A   It's a converted mower with a plow on
20 it.
21 Q   Okay, okay. One thing I didn't
22 understand. I understand what you were doing with

Page 55

1  the spreader but the laborers -- and I understood
2  the laborers were shoveling snow near the back
3  entrance and the main entrance, correct?
4  A   First, yes.
5  Q   Okay. And then after they did that,
6  what did they do?
7  A   There was a similar set of priorities
8  dictated from the Navy or Wackenhut, I don't
9  recall who set them, and it would be the
10 entrances -- I would include in the entrance the
11 stairs that lead from the main gate down to that
12 small lot. There's some stairs.
13 Q   Okay.
14 A   Access areas.
15 Q   Right.
16 A   That would kind of be included in the
17 main gate high priority area.
18 Q   Steep set of stairs, correct?
19 A   Yes.
20 Q   There is a pretty sharp drop to go from
21 the main gate down to the small lot?
22 A   Right. It's a significant elevation

Page 56

1  change with some landings and whatnot.
2  Q   And they would shovel those stairs
3  going down?
4  A   Yes.
5  Q   Okay. What else besides those stairs?
6  A   After that, I recall the front of
7  Building 18 and 19, those were high priority
8  areas, and then the priority list would go further
9  and further down.
10 Q   Okay. All right.
11 A   They would just cycle through as they
12 hit the priorities.
13 Q   How long would that take them? How
14 long would it take them to shovel all of the areas
15 that these laborers had to shovel?
16 A   It would depend on the amount of snow,
17 wet, dry, heavy, light, whether they can just push
18 it with ease or whether it's, you know, heavy and
19 wet, takes a lot longer, or icy, what have you.
20 Q   Okay. I might be close to being
21 finished.
22     Have you ever discussed Mr. Philbin or

Page 57

1  Mr. Philbin's injury with anyone other than your
2  lawyers or any investigator investigating on
3  behalf of your lawyers?
4  A   No.
5  Q   All right. You've never discussed this
6  with Mr. Harman other than the phone call that
7  day?
8  A   No.
9  Q   So Mr. Harman never later on asked what
10 did you find when you went down there, what did
11 you do?
12 A   I don't recall.
13 Q   Okay.
14 A   I don't recall if we had a follow-up
15 specific conversation about the incident.
16 Q   And then who made the decision on any
17 given day whether you would be shoveling only,
18 shoveling and plowing, shoveling plowing and
19 salting, shoveling, plowing, salting and sanding,
20 who made that decision what to do on any given
21 day?
22 A   It would be -- we would talk with Jay,

15 (Pages 54 to 57)

# Capital Reporting Company

Page 58

1  the original conversation, and then we would touch
2  base with them when we first got down there,
3  generally.
4      Q    Okay.  So would it be Jay who would
5  tell you what he wanted?
6      A    Jay was my main contact for that
7  season.
8      Q    And he would consult with you but he
9  was the one to decide specifically what he thought
10  needed to be done?
11          MS. WHELIHAN:  Objection.
12  BY MR. SAMET:
13      Q    Is that correct?
14      A    I wouldn't necessarily say that's
15  correct.  I would say he leans on our expertise
16  and our advice as to what will work and what won't
17  work.  That's why they hired us.
18          MR. SAMET:  Let me take a break for
19      just five minutes, decide if I have anything
20      else to ask.
21          (Whereupon, there was a break from 1:51
22  p.m. until 1:53 p.m.)

Page 59

1  BY MR. SAMET:
2      Q    Mr. Grasswick, where were you coming
3  from that morning, the morning of February 26th?
4      A    I would have come from our office.
5      Q    And your office is where?
6      A    Burtonsville.
7      Q    And the truck that you had out on the
8  Nebraska Avenue complex on the morning of
9  February 26th, that would have been parked in
10  Burtonsville?
11      A    Yes.
12      Q    How long a drive is it from
13  Burtonsville down to the Nebraska Avenue complex?
14      A    Depends on traffic, varies.
15      Q    Traffic in the early morning, I mean,
16  you know?
17      A    Possibly a half an hour.
18      Q    Half an hour to get from Burtonsville
19  to Nebraska Avenue complex?
20      A    Early morning, no traffic, yes.
21      Q    Isn't Burtonsville out beyond White Oak
22  off Route 129?

Page 60

1      A    Yes.
2      Q    And how would you proceed, I'm just
3  curious, from Burtonsville to get down to Nebraska
4  Avenue complex?
5      A    29 to 16th Street, to Military, to
6  Nebraska.
7      Q    Route 29 to 16th Street, to Military
8  Road, to Nebraska.
9          And this particular morning, without
10  getting a call from Mr. Harman, you are reasonably
11  confident that you were going to be needed so you
12  set out with your spreader truck --
13      A    Yes.
14      Q    -- right?
15          And so you were reasonably confident
16  not only that he would call but that he would want
17  salt spread that day?
18      A    Yes.
19      Q    You were how far along on your trip
20  down Nebraska Avenue complex when you got the call
21  from Mr. Harman?
22      A    I don't recall exactly how far along I

Page 61

1  was.
2      Q    And you had accompanying you four or
3  five laborers?
4      A    Not in my truck, no.
5      Q    They were in their own vehicle?
6      A    Yes.
7      Q    One vehicle, two, three, four?  I mean,
8  did they each have their own?
9      A    There would be a couple vehicles.
10      Q    Okay.  What kind of truck was this
11  truck with the spreader on it?
12      A    Ford Super Duty.
13      Q    Doesn't mean anything to me.  Is that
14  like a dump truck?
15      A    Yeah, it has a dump bed on it.
16      Q    All right.  So your prediction and
17  estimation of what you need to do out there that
18  day in terms of the number of men and the
19  equipment and salting all when Mr. Harman actually
20  called you were confirmed; is that correct?
21      A    Um-hum.
22          MR. DONOHUE:  Is that a "yes"?

16 (Pages 58 to 61)

## Capital Reporting Company

Page 62

1    THE WITNESS: Yes.
2    BY MR. SAMET:
3    Q    What time did you get in to work that
4    day?
5    A    Probably -- I don't recall.
6    Q    Well, let me ask you this question.
7    February 26, 2003, your snow removal
8    site visit reports is total snowfall that morning
9    was an inch, correct?
10    A    That's what the paper says.
11    Q    Okay. And by the time you set out, how
12    much snow had fallen?
13    A    Possibly a dusting.
14    Q    And did you -- were you always called
15    out when there was a dusting of snow, or were
16    there some dustings that you wouldn't be called
17    and some you would?
18    A    It was almost an automatic anytime it
19    snowed that we would be called based on that
20    year's experience.
21    Q    And would it also be almost automatic
22    that when you were called, regardless of how much

Page 63

1    snow had fallen, that you would dump salt?
2    A    Yes.
3    Q    Every time you came out?
4    A    That's a reasonable assumption.
5    Q    Pardon?
6    A    That's a reasonable assumption.
7    Q    Okay.
8    MR. SAMET: No other questions.
9    MS. WHELIHAN: I have just a few.
10    EXAMINATION BY COUNSEL FOR DEFENDANT
11    WACKENHUT SERVICES, INC.
12    BY MS. WHELIHAN:
13    Q    Brickman was an independent contractor
14    for Wackenhut; is that your understanding?
15    MR. DONOHUE: I'm going to object.
16    This gentleman is not a legal scholar, he's
17    not here for contract statute purposes.
18    BY MS. WHELIHAN:
19    Q    Brickman was doing its own work, right,
20    as a contractor for Wackenhut?
21    A    I suppose, yeah, I guess.
22    Q    Well, was it your understanding that

Page 64

1    the Navy would communicate through Wackenhut to
2    Brickman about snow and ice removal?
3    A    Yes.
4    Q    Okay. And on February 26, 2003, it was
5    snowing when you arrived, right?
6    A    Yes.
7    Q    And it was snowing while you were
8    there?
9    A    Yes.
10    Q    And if Mr. Philbin's accident happened
11    somewhere between eight and 8:45, was it still
12    snowing during that time period?
13    A    I believe so.
14    Q    Okay. So it was snowing continuously
15    that morning while you were there?
16    A    Yes.
17    Q    Okay. And when you showed up to do the
18    snow and ice treatment on February 26, 2003, or --
19    MR. SAMET: When?
20    MS. WHELIHAN: February 26, 2003.
21    BY MS. WHELIHAN:
22    Q    When Brickman showed up on February 26,

Page 65

1    2003, including you and your team, Brickman was
2    doing the snow and ice removal, correct?
3    A    Yes.
4    Q    Okay. And Wackenhut didn't participate
5    with you in the snow and ice removal that day,
6    February 26, 2003, right?
7    A    I don't believe so. There was one guy
8    that we occasionally shovel some things.
9    Q    Okay. But on February 26, 2003,
10    Brickman was doing the snow and ice removal, not
11    Wackenhut, right?
12    A    Correct.
13    Q    And Wackenhut on February 26, 2003, had
14    called you to do snow and ice removal, right?
15    A    Yes.
16    Q    He didn't tell you how to do your job,
17    right?
18    A    Correct.
19    Q    Because you already knew how to do
20    that, right?
21    A    Correct.
22    Q    Because that was Brickman's area of

17 (Pages 62 to 65)

## Capital Reporting Company

Page 66

1    expertise, correct?

2        A    Correct.

3        Q    And you brought the equipment and the

4    laborers to do snow and ice removal on

5    February 26, 2003, correct?

6        A    Correct.

7        Q    Okay.  And in fact, you also had your

8    own materials, salt, magnesium, sand there on the

9    Naval complex, right?

10       A    We had materials on site, yes.

11       Q    Okay.  And Brickman supplied its own

12   materials for snow and ice removal, correct?

13       A    Yes.

14       Q    Okay.  And before you left, the

15   Brickman team, the Navy would inspect what you

16   did, right?

17       A    I believe the Navy would talk to

18   Wackenhut, and Wackenhut was who actually

19   inspected, but we couldn't -- we weren't to leave

20   prior to kind of getting the approval.

21       Q    Okay.  The Navy had to approve, though,

22   what was done by you before you left?

Page 67

1        MR. SAMET:  Objection.  You can answer.

2    BY MS. WHELIHAN:

3        Q    Is that right?

4        A    Yeah.

5        Q    Okay.  And had you met Dave Sears prior

6    to February 26, 2003?

7        A    Yeah.

8        Q    And Dave Sears was with the Navy,

9    right?

10       A    Yes.

11       Q    And he had an assistant, Bob Yuenger,

12   in February of 2003?

13       A    I believe so, yeah.

14       Q    And you met him, too?

15       A    Yes, I've met him.

16       Q    Okay.  And the Navy would tell

17   Wackenhut that snow removal was needed before

18   Brickman was told to come to the Naval complex; is

19   that right?

20       MR. SAMET:  Objection.

21       A    Yes.

22       MS. WHELIHAN:  Okay.  I have no further

Page 68

1    questions.

2        MR. SAMET:  Do you have any questions?

3        MR. DONOHUE:  No, you guys are covered.

4    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

5    BY MR. SAMET:

6        Q    Mr. Sears spoke to you?

7        A    When?

8        Q    Ever.

9        A    Has he ever spoken with me?

10       Q    Yes.

11       A    Yes.

12       Q    What about?

13       A    About snow.

14       MR. DONOHUE:  He's the snow captain.

15   BY MR. SAMET:

16       Q    About skiing?  I mean, what were the

17   occasions that he would speak to you that you can

18   recall, in general?

19       A    In general, the first time I met him

20   was at -- just at our original meeting of this is

21   who snow captain; Greg was present, I believe Bob

22   Yuenger did, if that's his name, Jay would have

Page 69

1    been present at that just to introduce everybody.

2    Exchange contact information, et cetera, et

3    cetera.

4        Q    Are you talking about this meeting that

5    took place in the fall before the winter season?

6        A    Right, that would have been my first

7    introduction.

8        Q    Okay.  At that meeting there was a snow

9    removal plan, it's already been -- snow and ice

10   removal plan, already been marked as Exhibit 3.

11   You saw that at that meeting; am I correct?

12       MR. DONOHUE:  Take one more look, see

13   if you remember seeing it.

14       A    Yeah, it looks familiar.

15   BY MR. SAMET:

16       Q    All right.  You had a chance to look

17   over this; is that correct?

18       MS. WHELIHAN:  Well, just ten seconds.

19   BY MR. SAMET:

20       Q    Let me ask you this question, is this

21   your handwriting on here?

22       A    No.

18 (Pages 66 to 69)

## Capital Reporting Company

Page 70

1  Q   Have you ever had an opportunity to
2  look over this?
3  A   I'm sure I've looked it over in the
4  past.
5  Q   Did you look it over at the meeting?
6  A   I'm sure we went over it.  I don't
7  recall exactly, but I'm sure we would have.
8  Q   Well, do you recall going over -- I'm
9  not asking you the details of what was said and
10  all, but do you recall going over it?
11  A   I recall going over a general plan.
12  Q   Was there anything in here that you
13  objected to?
14  A   Yes.
15  Q   What did you object to?
16  A   Now I need to look at it.  The chemical
17  applied to concrete surfaces.
18  Q   What was your objection to that?
19  A   They had a map in this denoting new
20  concrete which was scattered through the entire
21  several miles of sidewalks and it was
22  unreasonable, they didn't want any chemical on any

Page 71

1  of those new pieces of concrete.
2  Q   And your objection was you didn't know
3  --
4  A   When you said it's unreasonable to be
5  able to distinguish between new and old concrete
6  when there's snow and ice buildup and there's no
7  way that we can tell which panel is which to put
8  chemical on.
9  Q   So what was the resolution of that?
10  A   We would use some sand.
11  Q   You would use sanding on the sidewalks?
12  A   Instead of actual chemical, yes.
13  Q   Okay.  Was any sanding done, for
14  instance, on February 26th, 2003?
15  A   No, not my knowledge.
16  Q   Okay.  You already said that you first
17  got to meet Mr. Sears and Mr. Yuenger at this
18  meeting where this plan was discussed for the
19  upcoming winter.
20      Did you then thereafter over the course
21  of the winter have occasions to speak to them?
22  A   I don't recall speaking with Bob many

Page 72

1  times.  Maybe in passing.
2  Q   Just hi?
3  A   Yeah, as -- if we were working in
4  passing, we might say something.
5  Q   How about Mr. Sears?
6  A   Similar situation.  I might have spoken
7  with him a few more times, as he was the head of,
8  I guess, Navy facilities or whatever.
9  Q   Okay.  What's the speed of your vehicle
10  as you're spreading salt?  The vehicle you were
11  driving the morning of February 26th, how long can
12  you go when you're spreading salt?
13  A   I suppose you can go as fast as the
14  truck, as fast as you put the pedal down.
15  Q   There's two separate functions, the
16  motor and the spreader.  I mean, you could be
17  spreading salt as you drove down the highway at
18  60; am I correct?
19  A   Correct, you can do it simultaneously.
20  It's not like a highway salt truck, whereas it
21  stops -- your thing stops, it will keep spitting
22  it out.

Page 73

1  Q   And on the morning of February 26th,
2  how fast were you going?
3      MR. DONOHUE:  At what point?
4  A   I don't recall.
5  BY MR. SAMET:
6  Q   The entire time, do you have a fairly
7  standard speed that you drive?
8  A   Slow, due to pedestrian and vehicular
9  traffic and the normal safety concerns of just
10  wrecking a vehicle if there's a light dusting on
11  the ground.
12      MR. SAMET:  I don't have any other
13  questions.
14  FURTHER EXAMINATION BY COUNSEL FOR
15  DEFENDANT WACKENHUT SERVICES, INC.
16  BY MS. WHELIHAN:
17  Q   I just have one follow-up question
18  which is, when you say they didn't want chemicals
19  being used on the sidewalks, you're talking about
20  the Navy, right?
21  A   Yes.
22      MS. WHELIHAN:  Okay.  I don't have any

19 (Pages 70 to 73)

## Capital Reporting Company

Page 74

1    other questions.

2        MR. DONOHUE: We'll waive. Thank you.

3        (Signature having been waived, the

4    deposition of ADAM A. GRASSWICK was concluded at

5    2:07 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 75

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Sheri C. Stewart, the officer before

3    whom the foregoing proceedings were taken, do

4    hereby certify that the foregoing transcript is a

5    true and correct record of the proceedings; that

6    said proceedings were taken by me stenographically

7    and thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to

10   this case and have no interest, financial or

11   otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set

13   my hand and affixed my notarial seal this 26th day

14   of March, 2007 .

15   My commission expires:

16   October 14, 2009

17

18

19   _____

20       NOTARY PUBLIC IN AND FOR

21       THE DISTRICT OF COLUMBIA

22

20 (Pages 74 to 75)

**Capital Reporting Company**

Page 75

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2           I, Sheri C. Stewart, the officer before

3  whom the foregoing proceedings were taken, do

4  hereby certify that the foregoing transcript is a

5  true and correct record of the proceedings; that

6  said proceedings were taken by me stenographically

7  and thereafter reduced to typewriting under my

8  supervision; and that I am neither counsel for,

9  related to, nor employed by any of the parties to

10 this case and have no interest, financial or

11 otherwise, in its outcome.

12           IN WITNESS WHEREOF, I have hereunto set

13 my hand and affixed my notarial seal this 26th day

14 of March, 2007   .

15  My commission expires:

16  October 14, 2009

17

18

19                          _____

20             NOTARY PUBLIC IN AND FOR

21             THE DISTRICT OF COLUMBIA

22