**Capital Reporting Company**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    DISTRICT OF COLUMBIA

 3     ---------------------------------:

 4     MICHAEL J. PHILBIN                :

 5                  Plaintiff           : At Law No.

 6            v.                        : CL05-1389

 7     THE WACKENHUT CORPORATION, ET AL :

 8                  DEFENDANTS          :

 9     ---------------------------------:

10                              Washington, D.C.

11                      Friday, March 9, 2007

12     Deposition of:

13            JEREMY L. HARMAN,

14     called for oral examination by counsel for

15     Plaintiff, pursuant to notice, at the law Office

16     of Jordan, Coyne & Savits, 1100 Connecticut

17     Avenue, N.W., Suite 600, Washington, D.C., before

18     Sheri C. Stewart, Registered Professional

19     Reporter and Notary Public in and for the

20     District of Columbia, beginning at 9:42 a.m.,

21     when were present on behalf of the respective

22     parties:
```

DEFENDANT'S
EXHIBIT

B

## Capital Reporting Company

Page 2

1    A P P E A R A N C E S :

2

3   ON BEHALF OF PLAINTIFF:

4     ROBERT G. SAMET, ESQUIRE

5     ASHCRAFT & GEREL

6     One Central Plaza

7     11300 Rockville Pike, Suite 1002

8     Rockville, Maryland 20852

9     (301)770-3737

10

11

12   ON BEHALF OF DEFENDANT WACKENHUT SERVICES, INC:

13     DEBORAH MURRELL WHELIHAN, ESQUIRE

14     JORDAN, COYNE & SAVITS, LLP

15     1100 Connecticut Avenue, N.W.

16     Washington, D.C. 20036

17     (202)496-2810

18

19

20

21

22

---

Page 3

1    A P P E A R A N C E S (Continued)

2

3   ON BEHALF OF DEFENDANT BRICKMAN:

4     H. PATRICK DONOHUE, ESQUIRE

5     ARMSTRONG, DONOHUE, CEPPOS & VAUGHAN

6     204 Monroe Street, Suite 101

7     Rockville, Maryland 20850

8     (301)251-0440

9

10

11   ALSO PRESENT:

12     JAY HARMAN

13     GREG LEWANDOWSKI

14

15      * * * * *

16

17

18

19

20

21

22

---

Page 4

1     C O N T E N T S

2

3   EXAMINATION BY        PAGE

4     Mr. Samet       5

5     Mr. Donohue      90

6     Mr. Samet       100

7

8   HARMAN DEPOSITION EXHIBITS:   *     PAGE

9   1   SUBCONTRACT AGREEMENT      8

10   2   SUBCONTRACT AGREEMENT      8

11   3   SNOW & ICE REMOVAL PLAN     8

12   4   REVISED SNOW & ICE REMOVAL PLAN    8

13   5   SUBCONTRACT AGREEMENT      8

14   6   E-MAIL       26

15   7   E-MAIL       26

16   8   PAGE OUT OF OF CONTRACT     32

17   9   PAGE OUT OF OF CONTRACT     34

18   10   MAXIMO WORK ORDER      64

19   11   OVERHEAD TICKET      64

20   12   PHONE RECORD       96

21

22     (*EXHIBITS RETAINED BY COUNSEL)

---

Page 5

1     P R O C E E D I N G S

2   Whereupon,

3      JEREMY L. HARMAN,

4   called as a witness, and having been first duly

5   sworn, was examined and testified as follows:

6    EXAMINATION BY COUNSEL FOR PLAINTIFF

7   BY MR. SAMET:

8     Q    Could you state your full name and

9   address for the record, sir?

10    A    Jeremy Len Harman.

11    Q    And what is your address?

12    A    4173 Chatham Village, King George,

13   Virginia, 22485.

14    Q    Chatham is spelled?

15    A    C-H-A-T-H-A-M.

16    Q    Okay. And by whom are you employed

17   now?

18    A    Wackenhut Services, Incorporated.

19    Q    By whom were you employed back in

20   February of 2003?

21    A    Wackenhut Services, Incorporated.

22    Q    And what was your position in February

2 (Pages 2 to 5)

**Capital Reporting Company**

Page 6

1  of 2003?
2      A    Facilities manager.
3      Q    Okay.  And what is your position now?
4      A    Program manager.
5      Q    What were your job duties back in 2003,
6  February 2003, as the facilities manager?
7      A    Oversee maintenance operations for the
8  site.
9      Q    Okay.  And that site would have been
10 the Nebraska Avenue complex?
11     A    Correct.
12     Q    You were stationed there full time?
13     A    Yes.
14     Q    You were not a facilities manager over
15 any facilities?
16     A    Not at that time.
17     Q    Okay.  And when you say "oversee
18 maintenance operations," did that include the
19 security guards?
20     A    No.
21     Q    Okay.  So that was a different part of
22 the operation?

Page 7

1      A    Correct.
2      Q    All right.  So how many total managers
3  were there out there for Wackenhut?  I'm referring
4  to the Nebraska Avenue complex.
5          MR. DONOHUE:  I'm sorry, how many total
6  managers?
7          MR. SAMET:  Yeah.
8      A    Depends upon your classification of a
9  manager; approximately four, five.
10 BY MR. SAMET:
11     Q    All right.
12     A    Four or five.
13     Q    Let me ask you this.  How many
14 people -- how many Wackenhut employees worked at
15 the Nebraska Avenue complex in February 2004,
16 approximately?
17     A    Approximately, yeah, it's not going to
18 be accurate but --
19         MS. WHELIHAN:  When we're talking about
20 Wackenhut, we're talking about Wackenhut
21 Service, Incorporated, because the Wackenhut
22 Corporation was not there.

Page 8

1          So just so we're all on the same page,
2  you know, we got the two defendants, but it's
3  really only WSI.
4      A    Approximately 17, but that doesn't
5  count security.  I wouldn't be able to guess how
6  many in security personnel there were because we
7  had part-timers.
8          I don't know the shifts, the posts.
9  There was 24/7 coverage, I wouldn't even be able
10 to guess that.
11         So approximately 17 on the
12 maintenance -- maintenance and management for
13 maintenance.  Seventeen to 20.
14         (Whereupon, there were discussions off
15 the record.)
16         (Whereupon, Exhibit Nos. 1-5 were
17 marked for identification.)
18 BY MR. SAMET:
19     Q    Mr. Harman, I'm going to show you
20 what's been marked as Exhibit No. 1 to this
21 deposition.  I'm going to ask you if you can
22 identify that document?

Page 9

1      A    Yes.
2      Q    And what is it?
3      A    It's our subcontract agreement with
4  Brickman.
5      Q    Okay.  And I'm going to show you what's
6  been marked as Exhibit No. 2 and ask you if you
7  can identify that?
8      A    Yes.
9      Q    And what is this Exhibit No. 2 to your
10 deposition?
11     A    It appears to be the same contract.
12     Q    Okay.  Are there any differences that
13 you were able to ascertain in looking over them?
14     A    Just briefly looked at them.  No, I
15 don't know if there are any differences.
16     Q    Okay.
17         MS. WHELIHAN:  Bob, just so you know,
18 the one that has been marked as 2 is the one
19 that Jay gave me that came out of his file
20 which is what they have.
21         The one that is 1, I got from them in
22 2004, and that's the same one that Pat has.

3 (Pages 6 to 9)

**Capital Reporting Company**

Page 10

1      MR. DONOHUE: Yes.
2      MS. WHELIHAN: So I don't know, they're
3   slightly different in formatting, but they
4   appear to be similar.
5      But according to Jay, this is the
6   one -- what has been marked as Exhibit 2 is
7   the one that came directly out of their files
8   that they currently maintain for --
9      MR. SAMET: Let me ask him a couple
10   more questions, and I'll give him a chance.
11   BY MR. SAMET:
12      Q    I'm showing you, Mr. Harman, what's
13   been marked as Exhibit No. 5 and ask you if you
14   can identify that?
15      A    Yes.
16      Q    And what is that?
17      A    Same answer as before. It's our -- a
18   copy of our subcontract agreement with Brickman
19   with the same -- same answer, our subcontract
20   agreement with Brickman.
21      Q    Do you know what, if any, differences
22   exist between 1, 2 and 5 -- Exhibits 1, 2 and 5?

Page 11

1      A    The noticeable difference in 5 is the
2   Section J attachments in the back of it.
3      Q    Okay. In other words, 1 and 2 don't
4   have attachments or don't have all of the
5   attachments?
6      A    They do not appear to.
7      Q    Okay.
8      MS. WHELIHAN: Who knew a slip and fall
9   case could be this complicated.
10      (Whereupon, there were discussions off
11   the record. )
12   BY MR. SAMET:
13      Q    Is that correct?
14      A    What?
15      Q    The only difference is that not all of
16   the attachments that are present -- attached to
17   No. 5 are also present in 1 and 2?
18      A    I don't know if that's the only
19   difference. It would take a detailed analysis of
20   all of them to tell you, able to honestly tell you
21   the differences.
22      MS. WHELIHAN: Well, I'm confused.

Page 12

1   BY MR. SAMET:
2      Q    Article 2 -- I'm going to show you
3   Article 2 on Exhibit 5 and Article 2 on Exhibit 2,
4   and can you tell me if those are the same. For --
5   they appear to be slightly different.
6      MS. WHELIHAN: I can tell you, if it
7   helps, 5 and 1 have the same Article 2 but
8   No. 2 does not. I think. No, am I wrong?
9      (Whereupon, there were discussions off
10   the record.)
11      (Record read.)
12   BY MR. SAMET:
13      Q    Are they the same?
14      A    No.
15      Q    They appear to be slightly different?
16      A    No.
17      Q    Do you know which one is the final
18   version?
19      A    Don't know.
20      Q    Okay.
21      A    This -- as Deborah stated, this is the
22   one we had on file.

Page 13

1      MS. WHELIHAN: Exhibit 2 is the one we
2   had on file.
3      MR. DONOHUE: And this is the one with
4   the Jay references.
5      MS. WHELIHAN: No. That's the one
6   without the Jay references.
7      MR. SAMET: This is the one you had on
8   file, but it doesn't mean it was the last
9   one.
10      MS. WHELIHAN: All I can tell you, Bob,
11   is that all the other ones I got in 2004 and
12   this one I got from Jay, you know, in 2007,
13   '6. They're both signed, but one's signed by
14   somebody different.
15      MR. SAMET: I want to establish for the
16   record. We can't tell.
17   BY MR. SAMET:
18      Q    Of these three exhibits, Mr. Harman, do
19   you know which was the final contract? And I'm
20   referring to Exhibits 1, 2 and 5.
21      A    Not without a detailed analysis. I
22   wouldn't be able to tell you at this time.

4 (Pages 10 to 13)

# Capital Reporting Company

| | |
|---|---|
| **Page 14** | **Page 16** |

**Page 14**

1  Q    Okay.
2         MS. WHELIHAN:  All he can tell you is 2
3  came out of his historical file, his
4  property.
5         THE WITNESS:  Correct.
6         MS. WHELIHAN:  One and 5 I got from
7  Wackenhut, you know, in 2004.
8         MR. SAMET:  What else came from their
9  historical file?  That doesn't help,
10 "historical file."
11        MS. WHELIHAN:  One came from him, I
12 mean, not one.  Let's do this more clearly.
13 Deposition Exhibit No. 2 came from Jay from
14 the file that he maintained for the site that
15 he still has.  All the other contractors came
16 from headquarters in 2004.
17        MR. DONOHUE:  I represent that 1 -- I
18 think 1 came from our branch manager's file
19 in D.C.
20        MS. WHELIHAN:  Exhibit 1, which I had
21 in 2004, is the same as what came from
22 Brickman's file.

**Page 15**

1         MR. DONOHUE:  Yes.
2         MR. SAMET:  But not the same as what
3  came out of --
4         MS. WHELIHAN:  Jay's file which is
5  Exhibit 2.
6         MR. SAMET:  All right.
7         MR. COOK:  Brickman's file also had the
8  attachments, yours did not.
9         MS. WHELIHAN:  Correct.
10        MR. SAMET:  Okay.
11        MS. WHELIHAN:  But I don't know also --
12 I mean, I did not gather the documents myself
13 in 2004, they were gathered for me.
14        So it may be that I gathered through my
15 minion the originals from Jay, and that maybe
16 I only had the originals and Jay doesn't
17 anymore.
18        We don't know because, you know, by the
19 name this suit was filed, you know, when he
20 already gathered the information based upon
21 the claim being made and his file is just
22 what he had, you know, so.

**Page 16**

1         I don't think it makes any substantive
2  difference, though, for purposes of this
3  because, you know --
4  BY MR. SAMET:
5    Q    Mr. Harman, I'm going to show you
6  what's been marked as Exhibit No. 3 and ask you if
7  you can identify this document?
8    A    Yes.
9    Q    What is it?
10   A    It's our snow and ice removal plan.
11   Q    Wackenhut's snow and ice removal plan
12 for the Nebraska Avenue complex?
13   A    Correct.
14   Q    Okay.  And I think I also gave you
15 Exhibit No. --
16        MR. DONOHUE:  Four.
17        MS. WHELIHAN:  Four.
18 BY MR. SAMET:
19   Q    -- 4, and can you identify that?
20   A    Yes.
21   Q    What is it?
22   A    It is the same plan revised,

**Page 17**

1  November 26, '03.
2    Q    Okay.  And are you familiar enough with
3  them to tell us what the differences between the
4  two are?
5    A    No.
6    Q    Do you know why it was revised?
7    A    No.
8    Q    Who drafted Exhibits 2 and 3, if you
9  know?
10   A    Don't know.
11   Q    And were you involved in the process
12 of --
13        MS. WHELIHAN:  Excuse me.  For
14 reference, you mean Exhibits 3 and 4?  You
15 said 2 and 3.
16        MR. SAMET:  Yes, 3 and 4, I'm sorry.
17 BY MR. SAMET:
18   Q    Who drafted 3 and 4, do you know?
19   A    I can't remember.
20        MR. SAMET:  Thank you, appreciate it.
21        MS. WHELIHAN:  Bob, my understanding is
22 3 and 4 are not the applicable contracts to

5 (Pages 14 to 17)

**Capital Reporting Company**

| Page 18 | Page 20 |
|---|---|
| 1  this accident for February 2003. | 1  indicated that you did not take part in drafting |
| 2  Because the 11/26/03 one is clearly | 2  either Exhibit 3 or 4; is that correct? |
| 3  after February, and I don't think the | 3  A   I don't remember. |
| 4  10/18/02 was the operative contract, I think | 4  Q   So you may have, you just don't |
| 5  it was March '02, but I can verify that with | 5  remember either way? |
| 6  Bill, Bill Guy. | 6  A   I don't remember if I did or not. |
| 7  But that's what he told me, so that's | 7  Q   Okay.  And my question dealt with |
| 8  my understanding. | 8  drafting. |
| 9  MR. SAMET:  So you're telling me that a | 9  Do you remember whether you were |
| 10  document I have here today that I'm prepared | 10  involved in the development of the snow and ice |
| 11  to question the witness about is not | 11  removal plans?  Not necessarily the document |
| 12  applicable to this case? | 12  itself, but the plan that was incorporated into |
| 13  MS. WHELIHAN:  No, no, no.  I gave you | 13  the document.  If you remember? |
| 14  all the contracts we had between Brickman. | 14  A   I would have, I would have had input |
| 15  MR. SAMET:  These aren't contracts at | 15  into this. |
| 16  all. | 16  Q   Okay.  You don't remember specifically |
| 17  MS. WHELIHAN:  Subcontracts. | 17  what parts you had input on or whether you input |
| 18  MR. SAMET:  These aren't subcontracts, | 18  on all of the parts, or you don't remember any of |
| 19  just snow and ice removal. | 19  the details; is that correct? |
| 20  MS. WHELIHAN:  Removal plans, the snow | 20  A   Yes, I don't remember. |
| 21  and ice removal plans for 10/18/02 and | 21  Q   Okay.  Was there, at Wackenhut, a kind |
| 22  11/26/03 I gave you. | 22  of regular program to do inspections of the |

| Page 19 | Page 21 |
|---|---|
| 1  My understanding is that at least with | 1  grounds at the Nebraska Avenue complex during cold |
| 2  respect to Exhibit 4, that is not applicable. | 2  weather for the purposes of detecting ice and/or |
| 3  MR. SAMET:  Well, I wouldn't think it | 3  snow and removing it? |
| 4  would be. | 4  A   Our contract was with the Navy to |
| 5  MS. WHELIHAN:  Right. | 5  provide snow removal services.  We passed that |
| 6  MR. SAMET:  It was written afterwards, | 6  through as a direct subcontract to Brickman.  All |
| 7  modified in November of '03. | 7  the requirements in our contract was passed |
| 8  MR. DONOHUE:  Yeah, Deb, I misspoke. | 8  through to subcontract with Brickman. |
| 9  MS. WHELIHAN:  I think 3 counts, I'm | 9  Before Brickman was allowed to leave, |
| 10  sorry.  I've confused myself. | 10  both WSI and the Navy would do inspections. |
| 11  MR. DONOHUE:  We're cool.  Three | 11  Q   I understand that.  I'm just trying to |
| 12  counts. | 12  find out -- I'm not even asking about what the |
| 13  MR. SAMET:  All right. | 13  contract required, I'm just trying to find out if |
| 14  MS. WHELIHAN:  Write that down on your | 14  there was any kind of regular inspection program |
| 15  list of things about your crappy lawyer. | 15  by Wackenhut itself to detect ice or snow and |
| 16  BY MR. SAMET: | 16  possibly remove it at the time of this accident, |
| 17  Q   Exhibit 3 would be the snow and ice | 17  February of 2003? |
| 18  removal plan of Wackenhut for the Nebraska Avenue | 18  A   Prior to Brickman leaving, if the Navy |
| 19  complex in effect at the time of this accident, | 19  told us to come in, call Brickman in for snow |
| 20  February of 2003; is that correct, Mr. Harman? | 20  removal services, prior to them leaving, at the |
| 21  A   To the best of my knowledge, yes. | 21  end of the day, we would do an inspection with the |
| 22  Q   All right.  Now, you've already | 22  Government. |

6 (Pages 18 to 21)

# Capital Reporting Company

| Page 22 |
|---|
| 1   Q   And that's the only kind of inspection |
| 2   Wackenhut would do, was to inspect Brickman's |
| 3   work? |
| 4   A   The Navy was responsible for initiating |
| 5   snow removal services. They would periodically do |
| 6   inspections and let us know when to call Brickman |
| 7   in. |
| 8   Q   Okay. But Wackenhut didn't engage in |
| 9   any inspections at all other than inspect |
| 10   Brickman's work at the end of the day when |
| 11   Brickman was out there; is that correct? |
| 12   A   That's a true statement, yes. |
| 13   Q   Okay. And did Wackenhut ever alert the |
| 14   Government and seek permission to engage in any |
| 15   snow or ice removal or treatment from the |
| 16   Government? |
| 17   MR. DONOHUE: Objection. |
| 18   MS. WHELIHAN: Objection. |
| 19   MR. DONOHUE: Unless you specify a time |
| 20   frame. |
| 21   BY MR. SAMET: |
| 22   Q   In February 2003? |

| Page 23 |
|---|
| 1   MS. WHELIHAN: Objection. |
| 2   You can answer. |
| 3   A   I don't remember. |
| 4   BY MR. SAMET: |
| 5   Q   Okay. As the facilities manager for |
| 6   Wackenhut, if you saw a condition of ice or snow |
| 7   on the premises anywhere in the Nebraska Avenue |
| 8   complex during the period that you were working |
| 9   under this contract with the Government, would you |
| 10   call it to the attention of the Government and |
| 11   seek permission to get your subcontractor out to |
| 12   take care of it? |
| 13   MS. WHELIHAN: Objection. |
| 14   You can answer -- still answer. |
| 15   A   Yes, if we noticed something to that |
| 16   effect, obviously we'd report it to them, and it |
| 17   would be their call whether or not they want |
| 18   something done with it. |
| 19   BY MR. SAMET: |
| 20   Q   All right. But you never on your own |
| 21   actually sought to actively inspect to determine |
| 22   any kinds of conditions that needed treatment; is |

| Page 24 |
|---|
| 1   that correct? |
| 2   MS. WHELIHAN: Objection. |
| 3   You can answer. |
| 4   A   Again, if we saw something, we would |
| 5   definitely let them know about it, but we were not |
| 6   getting paid to go out and -- to go out and look, |
| 7   search and find ice, no, or snow. |
| 8   BY MR. SAMET: |
| 9   Q   Okay. There had been a fairly large |
| 10   snowfall back on February 15 and 16 of 2003; is |
| 11   that correct? |
| 12   A   I remember there were events during |
| 13   that time. I don't remember exact dates or |
| 14   accumulation. |
| 15   Q   Do you remember there being a large |
| 16   snowfall during that period? |
| 17   A   I remember a large snowfall during that |
| 18   period. |
| 19   Q   Approximately 20 inches or so? |
| 20   A   Probably. |
| 21   Q   Okay. And do you remember whether |
| 22   there came a time when the snow tapered off after |

| Page 25 |
|---|
| 1   that period of time of the large snowfall? |
| 2   A   I don't understand the question. |
| 3   Q   Well, you remember when -- strike that. |
| 4   You recall Mr. Philbin having an |
| 5   accident that brings us here today; is that |
| 6   correct? |
| 7   MS. WHELIHAN: Objection. |
| 8   A   I never witnessed the accident but -- |
| 9   BY MR. SAMET: |
| 10   Q   You're aware he had an accident, |
| 11   correct? |
| 12   A   Yes. |
| 13   Q   Okay. You came at one point to see him |
| 14   at the accident, correct? |
| 15   A   I don't remember that. |
| 16   Q   Okay. Do you recall how much time |
| 17   there was in between the snowfall -- the 20-inch |
| 18   snowfall we're talking about and when Mr. Philbin |
| 19   had his fall? |
| 20   A   I do not. |
| 21   Q   Okay. Do you remember whether it's a |
| 22   very brief period, like one day, or whether it's |

## Capital Reporting Company

Page 26

1  more like ten days or do you have any
2  recollection?
3      A    Do not.
4      Q    Okay. Does Wackenhut keep records of
5  the conditions of the surfaces at the Nebraska
6  Avenue complex during various periods?
7      A    Not to my knowledge.
8      Q    Okay. Does Wackenhut keep its own
9  records of the work performed by Brickman at the
10 Nebraska Avenue complex?
11     A    Not to my knowledge.
12     Q    All right.
13         (Whereupon, Exhibit Nos. 6 and 7 were
14 marked for identification.)
15         (Whereupon, there were discussions off
16 the record.)
17 BY MR. SAMET:
18     Q    Mr. Harman, I'm going to show you
19 what's been marked as Exhibit 6, and can you tell
20 us what that is, please?
21     A    Yes.
22     Q    What is it?

Page 27

1      A    This is an e-mail from Bob Yuenger to
2  myself reporting snow hours used at Nebraska
3  Avenue complex.
4      Q    Okay. Who is Bob Yuenger?
5      A    Bob Yuenger is a gentleman that works
6  for the Navy.
7      Q    Okay. And so the record that's
8  attached, the spreadsheet, is a record created by
9  the Navy?
10     A    Yes.
11     Q    And do you know why he sent this to you
12 on February 28, 2003?
13     A    That's a spreadsheet that he maintained
14 to track the hours, snow removal hours left in the
15 contract.
16     Q    Okay. And so this was just routine,
17 then, he was sending to you? He sent these to you
18 fairly regularly?
19     A    He sent them to me on occasion.
20     Q    Okay. Did this have anything to do
21 with Mr. Philbin's accident that it was sent to
22 you?

Page 28

1      A    No.
2      Q    Okay.
3      A    No, they had -- the Navy purchased a
4  hundred hour snow removal, and this was simply a
5  means to subtract that. When those hours were
6  used up, the snow removal responsibility was over.
7      Q    Okay. Or it would have to be subject
8  to another contract or an amendment, correct?
9      A    Correct, to get more money, yeah.
10     Q    In February 2003 -- how much was left
11 of the hundred hours as of February 28, 2003?
12     A    As of February 28, it appears that they
13 had 74.5 hours left.
14     Q    Out of a hundred?
15     A    Correct.
16     Q    Okay.
17     A    Out of 200.
18     Q    Out of 200, okay.
19         And 200 hours was for something
20 called -- for two things, Quarters A and the
21 Nebraska Avenue complex, correct?
22     A    No.

Page 29

1      Q    So 200 hours was just for the Nebraska
2  Avenue complex?
3      A    Yes.
4      Q    Okay. Now, what is Quarters A?
5      A    Quarters A is a flag quarters, an
6  admiral's house that's in my -- kind of attached.
7  It's directly outside the compound of the Nebraska
8  Avenue complex.
9      Q    Okay. Was there a separate contract
10 for that?
11     A    Same contract, they just track the
12 hours separately.
13     Q    So Quarters A didn't come off the 200
14 hours?
15     A    It had its own hours.
16     Q    Let me just do this. I made a mistake,
17 and I had two exhibits marked that I think are
18 identical, Exhibit 6 and 7.
19         Can you just confirm that they're
20 identical?
21     A    I didn't see a difference when I looked
22 at them.

8 (Pages 26 to 29)

## Capital Reporting Company

Page 30

1    Q    Okay.
2    A    I didn't see the difference at all.
3  They appear to be the same documents.
4        MS. WHELIHAN: They're the same.
5  BY MR. SAMET:
6    Q    Okay. You think that last page on both
7  of those exhibits, 6 and 7, was mistakenly
8  attached and wasn't really a part of the
9  spreadsheet set in February of 2003, Mr. Harman?
10   A    Yeah, I don't think that that -- I
11 don't think that that was -- total hours are
12 different, so I would have to assume that it
13 wasn't part of the original.
14   Q    It was a different time period, too,
15 isn't it?
16   A    I don't know. Oh, yeah.
17       (Mr. Lewandowski entered the room.)
18   A    Yeah. Yeah, it doesn't go through the
19 28th.
20 BY MR. SAMET:
21   Q    It's beyond the 28th, so almost a year
22 later, correct, the following winter?

Page 31

1    A    Correct.
2    Q    Okay. The snow and ice removal plan
3  that's been marked as Exhibit 3, was that
4  something submitted to the Government?
5        Strike that. Let me ask it a little
6  bit more precisely.
7        Was the snow and ice removal plan
8  something that Wackenhut was required to develop
9  and then submit to the Government?
10   A    I don't remember, I don't remember a
11 contract requirement. It could be something they
12 requested. It could have been something in the
13 contract, too, I just don't remember.
14   Q    Okay. Does Wackenhut have a copy of
15 this contract with the U.S. Government?
16   A    In its files. A copy of the contract.
17   Q    Between Wackenhut and the U.S.
18 Government?
19   A    The Nebraska Avenue complex.
20   Q    For the Nebraska Avenue complex?
21   A    Yes.
22   Q    Okay.

Page 32

1        MR. DONOHUE: For the record, the
2  record should reflect we've been joined by my
3  client's corporate representative, Gregory
4  Lewandowski, of the Brickman Group.
5        Thank you.
6        MS. WHELIHAN: That's it.
7        MR. SAMET: I don't think that's the
8  contract.
9        THE WITNESS: Yes, it is.
10       MR. SAMET: Let's mark it.
11       (Whereupon, Exhibit No. 8 was marked
12 for identification.)
13 BY MR. SAMET:
14   Q    Mr. Harman, you've been handed what's
15 been marked as Exhibit No. 8.
16       Would you please identify that.
17   A    This is a page out of our technical --
18 it's a page out of our technical portion of our
19 contract for Nebraska Avenue complex.
20   Q    Okay. This isn't the entire contract?
21   A    The entire contract is many documents.
22 This is one -- this is a page out of one of those

Page 33

1  documents.
2    Q    This is -- this says on the bottom page
3  65, correct?
4    A    Correct.
5    Q    Do you know how many documents the
6  contract is?
7    A    Thousands. How many, how many
8  documents or pages?
9    Q    Pages.
10   A    Thousands.
11   Q    Thousands of pages?
12       MS. WHELIHAN: It's Federal Government.
13 BY MR. SAMET:
14   Q    Is this language on the bottom of page
15 65 the only reference in the entire contract to
16 snow removal?
17   A    No.
18   Q    So do we have here or do you have
19 anywhere the pages of the contract pertaining to
20 snow and ice removal? The contract I'm referring
21 to between Wackenhut and the U.S. Government.
22   A    I believe you were provided with

9 (Pages 30 to 33)

## Capital Reporting Company

Page 34

1  another document this morning.
2      (Whereupon, Exhibit No. 9 was marked
3  for identification.)
4      (Whereupon, there were discussions off
5  the record.)
6  BY MR. SAMET:
7      Q    I'm going to show you what's been
8  marked as Exhibit No. 9.
9          Is that the other page that you were
10  provided with this morning?
11      A    Yes.
12      Q    So that's a page -- Exhibit No. 9 is
13  also a page out of the contract between Wackenhut
14  and the U.S. Government; is that correct?
15      A    It's a page out of our technical
16  proposal government which is part of the contract,
17  yes.
18      Q    Okay.  And between Exhibits 8 and 9,
19  are those the only references in the entire
20  contract between Wackenhut and the Government to
21  snow and ice removal?
22      A    No.

Page 35

1      Q    Are there any other documents that
2  Wackenhut would have out of the contract or pages
3  out of a contract that have any reference at all
4  to snow and ice removal?
5      A    Yes.
6          MR. SAMET: You'll produce those?
7          MS. WHELIHAN: Yeah. Those are the
8      only ones that I have.  I already gave you
9      what I have.
10  BY MR. SAMET:
11      Q    Okay.  Have you seen the pages in the
12  contract between Wackenhut and the U.S. Government
13  pertaining to snow and ice removal, all of the
14  pages?
15      A    Yes.
16      Q    All right.  I want to show you what's
17  been marked as -- I'm going to show you what's
18  been already been marked and identified as Exhibit
19  3.
20          And I'm going to ask you -- call your
21  attention to page 4 of Exhibit 3. The paragraph
22  down below the middle that begins, "Inspection

Page 36

1  will be made of areas."
2      A    Yes.
3      Q    All right.  Could you read that out
4  loud, because I have a question I want to ask you
5  about it?
6      A    Okay.  "Inspections will be made of
7  various encompassing the barriers at" -- "near the
8  gates to ensure they're free of ice and snow and
9  operate properly.
10          "Periodic inspections will be made of
11  streets, parking areas, sidewalks, steps, porches
12  and accessible areas to determine if additional
13  applications of ice control and traction
14  improvement substance will be applied as needed."
15      Q    Okay.  Whose obligation is it to make
16  those inspections?
17          MR. DONOHUE: Objection. Calls for
18      legal opinion.
19  BY MR. SAMET:
20      Q    Would it be fair to say that this snow
21  and ice removal plan that's been marked as Exhibit
22  3 --

Page 37

1          MR. COOK: Three.
2  BY MR. SAMET:
3      Q    -- indicates that Wackenhut will make
4  periodic inspections of the parking areas to
5  determine if additional applications of ice
6  control and traction improvement substances will
7  be applied as needed?
8          MS. WHELIHAN: Objection.
9  BY MR. SAMET:
10      Q    Would that be fair?
11          MS. WHELIHAN: Objection.
12          MR. DONOHUE: I'm only objecting for
13      the record because the document will speak --
14          MR. SAMET: You already did object.
15      You don't need to make a speaking objection.
16          MR. DONOHUE: Not for the last.
17          The document speaks for itself, says
18      what it says.
19          MR. SAMET: Can I ask what we're doing?
20      I can't seem to be able to get an answer from
21      the witness which I thought was a fairly
22      simple question.

10 (Pages 34 to 37)

**Capital Reporting Company**

Page 38

1      A    Are you asking me --
2    BY MR. SAMET:
3      Q    I think there's nobody else being
4    questioned.
5            Would you read the question back to the
6    witness.
7            (Record read.)
8      A    What page are we talking about here?
9            MS. WHELIHAN: Page 4.
10      A    Page 4. No, judging from this, that
11    wouldn't be a fair statement. It doesn't state
12    that WSI would do the inspection.
13            If you go back under
14    "responsibilities," the Navy, again, has the
15    majority of the responsibility for things like
16    this.
17    BY MR. SAMET:
18      Q    The sentence above that, "Magnesium
19    chloride will only be used to remove ice on
20    concrete surfaces," is that referring to the Navy?
21            MS. WHELIHAN: Objection.
22      A    Actually, that's referring to Brickman.

Page 39

1    BY MR. SAMET:
2      Q    Okay. Now, the paragraph that we had
3    been discussing that begins with "Inspection will
4    be made of areas encompassing," that paragraph
5    that you read into the record, is that your
6    testimony that that does not refer to an
7    obligation of Wackenhut?
8            MS. WHELIHAN: Objection.
9            You can answer.
10      A    Yes and no.
11            My testimony was I couldn't -- I
12    couldn't tell you whose responsibility, judging
13    from that individual paragraph, whose -- it
14    doesn't state who -- necessarily whose
15    responsibility it is.
16    BY MR. SAMET:
17      Q    Okay. Drawing your attention to the
18    period February of 2003. Were you familiar with
19    this document in February 2003?
20      A    Yes.
21      Q    All right. And were you operating in
22    February of 2003 under the assumption that this

Page 40

1    was an obligation of Wackenhut to make these
2    inspections?
3      A    Again, as I stated earlier, we didn't
4    actively go out and look for snow and ice. The
5    Navy directed us when they wanted snow removal
6    services to begin.
7      Q    All right. So then would it be fair to
8    say that in February 2003 you didn't interpret
9    that to require Wackenhut to make inspections,
10    correct?
11      A    I don't remember how I interpreted that
12    in 2003.
13      Q    Okay. You said that language above
14    that, "Magnesium chloride will only be used to
15    remove ice on concrete surfaces" --
16      A    Yes.
17      Q    -- you said that pertains to Brickman?
18      A    Correct.
19      Q    Is Brickman mentioned anywhere in this
20    document?
21      A    Yes.
22      Q    Can you tell me where? I'm referring

Page 41

1    now to Exhibit No. 3.
2      A    They're mentioned on page 6 under
3    "subcontract of personnel, Brickman."
4      Q    But other than that, in any of the
5    narrative portions of this that have the
6    obligations and what will be done, does it
7    anywhere say that any of these things will be done
8    by Brickman as opposed to Wackenhut?
9            MR. DONOHUE: May I have a standing
10    objection just on the -- based on the
11    document speaks for itself. May I have a
12    standing objection?
13            MR. SAMET: You can. Maybe you want to
14    change hats and defend Wackenhut. Why you
15    would object, I can't imagine, but sure.
16            MR. DONOHUE: The document speaks for
17    itself.
18      A    This document, Brickman isn't mentioned
19    anywhere else in there, but in our technical we
20    clearly state that Wackenhut Services has selected
21    the Brickman Group to perform portions of snow
22    removal, portions of the contract.

11 (Pages 38 to 41)

## Capital Reporting Company

Page 42

1 BY MR. SAMET:
2    Q    No, I understand.
3        Would it be fair to say that this snow
4 and ice removal plan that's been marked as Exhibit
5 No. 3 is a recitation of Wackenhut's obligations
6 which Wackenhut then subcontracted out to
7 Brickman; is that fair?
8        MS. WHELIHAN:  Objection.
9        MR. DONOHUE:  Same objection.
10    A    Do I answer?  I don't understand the
11 question.
12 BY MR. SAMET:
13    Q    Would it be fair to say that this
14 document that's been marked as Exhibit No. 3 and
15 described as the snow and ice removal plan, is a
16 recitation of Wackenhut's obligations under its
17 contract with the U.S. Government which Wackenhut
18 then subcontracted out to Brickman to perform;
19 would that be fair to say?
20        MS. WHELIHAN:  Objection.
21    A    This was more an operational manual
22 than requirements.  The requirements were in our

Page 43

1 technical proposal where we stated that we're
2 going to subcontract to Brickman.
3        This was more of an operation guide to,
4 you know, to list phone numbers, so on, so forth.
5 BY MR. SAMET:
6    Q    Now, section four of this plan talks
7 about responsibilities, correct?
8    A    Yes.
9    Q    And whose responsibility is that
10 referring to?
11        MS. WHELIHAN:  Objection.
12        MR. DONOHUE:  Objection.
13    A    It's the responsibility of WSI
14 personnel to establish guidelines and procedures.
15        It's the responsibility of the Navy,
16 NAC, facilities manager, or his assistant to
17 initiate snow removal, all snow removal.
18        That's the responsibility -- WSI's
19 responsibility to follow up with guidelines, it's
20 the Navy's responsibility to initiate snow
21 removal.
22 BY MR. SAMET:

Page 44

1    Q    Did Wackenhut ever itself perform any
2 physical work at all under its contract with the
3 U.S. Government in terms of snow or ice removal or
4 treatment?
5        MS. WHELIHAN:  Objection.
6    A    Only if Brickman failed to deliver
7 their services.
8        Again, this is a pass -- the snow
9 removal was a pass-through for us.  We had a
10 contract with the Navy, and we put those same
11 requirements in the contract with Brickman to
12 perform it and paid them to do snow removal
13 services.
14 BY MR. SAMET:
15    Q    Does the contract between Wackenhut and
16 the U.S. Government require periodic inspections
17 by Wackenhut?
18        MS. WHELIHAN:  Objection.
19    A    I don't recall if that language is in
20 there.
21 BY MR. SAMET:
22    Q    Okay.  Do you remember whether there

Page 45

1 was any problem in between the period February 15
2 and 16 and February 25th of 2003 with snow melting
3 at the Nebraska Avenue complex, melting during the
4 day and refreezing at night, do you recall?
5    A    I don't recall.  I don't remember.
6    Q    All right.  Was any sand or salt ever
7 applied anywhere at the Nebraska Avenue complex
8 between February 19 and February 25th, 2003?
9    A    I don't recall the dates.
10    Q    Did you exercise supervisory
11 responsibility over Brickman and its performance
12 of the subcontract with Wackenhut?
13    A    Yes.
14    Q    All right.  So if inadequate salt
15 and/or sanding was taking place, would you call it
16 to their attention?
17        MS. WHELIHAN:  Objection.
18    A    Yes.
19 BY MR. SAMET:
20    Q    All right.  Do you have records of the
21 inspections of Brickman's work that Wackenhut
22 performed?

12 (Pages 42 to 45)

# Capital Reporting Company

Page 46

1    A    No.

2    Q    Did Wackenhut keep records of their

3 inspections of Brickman's work?

4    A    I don't believe so.

5    Q    All right.

6    A    Again, we did a joint inspection with

7 the Navy before Brickman left after each event,

8 but was that documented, no, not to my knowledge.

9    Q    So you didn't -- did you create a

10 record of your inspection of Brickman's work

11 before they left?

12    A    No.

13    Q    Would you just look it over and say

14 looks good and they would go, and it would never

15 be memorialized anywhere in writing?

16    A    Yeah, actually the -- most of that

17 responsibility was on the Navy, they were the one

18 using their hours up, so Bob Yuenger, the

19 gentleman you saw in that e-mail, would physically

20 come out and do inspection and say okay, look

21 goods to me.

22    Q    All right.  Now, when did you first

Page 47

1 learn that Michael Philbin had been hurt?

2    A    Sometime that morning of the incident.

3    Q    Do you remember what time it was?

4    A    I don't remember.

5    Q    Do you have a record anywhere of what

6 time it was?

7        MS. WHELIHAN:  That he learned?

8        MR. SAMET:  Yes.

9    A    That -- no, not when I became aware of

10 it, no.

11 BY MR. SAMET:

12    Q    Okay.  Where were you when you learned?

13    A    I don't remember.

14    Q    What did you do when you learned?

15    A    I don't remember.

16    Q    You don't remember whether you went out

17 to the scene of the accident?

18    A    I do not.

19    Q    Okay.  What time did you arrive at work

20 on February 26th?

21    A    I don't remember.

22    Q    You don't remember?

Page 48

1    A    That's correct.  I could guess and give

2 a time frame, but I don't remember the exact.

3    Q    Did you arrive at work the same time

4 every day?

5    A    I arrived not the exact time every day

6 but, yeah, generally around the same time.

7    Q    Where do you park, by the way?

8    A    Usually in -- usually in one of the

9 outer parking lots, either the back parking lot or

10 there was actually two outside perimeter parking

11 lots.

12    Q    What was the condition of the back

13 parking lot on the morning of February 26th?

14    A    I don't remember.  Honestly, I don't

15 remember the condition of it.

16    Q    Okay.  Was it snowing that day?

17    A    Yes.

18    Q    Do you actually remember that, or do

19 you know just from reviewing --

20    A    I don't actually remember a blizzard or

21 light snow, I don't remember how much, but

22 obviously I do remember that it was snowing that

Page 49

1 day.

2    Q    Okay.  Did you make any phone calls

3 after you -- strike that.

4        You don't remember how you found out

5 about the accident, correct?

6    A    No, I remember somebody called me.

7    Q    But you don't remember who?

8    A    I don't remember who it was.

9    Q    Okay.  And did you then call anybody

10 else about the accident?

11    A    I don't believe I did, um-um.  Whoever

12 called me had informed me, you know, that DOD

13 Police was there, they were taking a report.

14        I assumed the right people had been

15 notified, and I didn't see an action on my part to

16 notify anybody.  The right thing seemed to be

17 happening.

18    Q    Okay.  This document marked Exhibit 3,

19 snow and ice removal plan, calls for the

20 initiation by the Navy of the snow removal plan,

21 correct?

22    A    Correct.

13 (Pages 46 to 49)

# Capital Reporting Company

Page 50

1    Q    So they would be the ones to initiate
2    it?
3    A    Yes.
4    Q    This particular day, how did that come
5    about?
6    A    They called me on my cell phone to
7    initiate it.
8    Q    You're not allowed to call them and say
9    should I initiate the snow removal plan?
10   A    Again, they purchased the hours. I'm
11   not -- I wasn't there to spend their money for
12   them. They would -- they would call me and say
13   call Brickman.
14   Q    Okay. Did you ever call them because
15   of a need to get Brickman going, did you ever call
16   and say do you want me to go ahead and do this?
17       MS. WHELIHAN: Objection.
18   BY MR. SAMET:
19   Q    Is there any specific procedure where
20   it's required that they first call you or were you
21   permitted, let's say, to call them and ask them if
22   they wanted to initiate it?

Page 51

1       MS. WHELIHAN: Objection.
2    A    The Naval facilities manager at the
3    Nebraska Avenue complex at the time was Dave
4    Sears. This was the gentleman that had a personal
5    contact with the weather center, right next door,
6    and he was in constant communication with them.
7       He knew more about the weather than
8    probably anybody in D.C. and stayed on top of it,
9    knew it was his responsibility and he would call
10   me.
11   Q    Okay. Are you saying he always would
12   call you or, to the best of your recollection,
13   most of the time it would be him calling you?
14   A    He would always initiate it. Whether
15   or not I called him or he called me, he would
16   always initiate it.
17   Q    Initiate the plan?
18   A    Yes.
19   Q    All right.
20   A    He would always say call Brickman in,
21   let's get them there and start snow removal.
22   Q    Okay. Was there a specific plan for

Page 52

1    ice treatment?
2    A    I don't recall a special plan for ice
3    treatment.
4    Q    Was there any contract or plan under
5    which there would be treatments for ice or
6    traction at times when there wasn't a need for
7    snow removal?
8       MS. WHELIHAN: Objection.
9    A    No, snow or ice removal was the same
10   thing. If they wanted something done, they would
11   let us know.
12   BY MR. SAMET:
13   Q    Okay.
14   A    It was treated the same whether it was
15   snow or ice removal, or both, combination of both.
16   It was an event and would be treated the same.
17   Q    Okay. Do you recall, were there ever
18   any occasions where Wackenhut recommended that any
19   areas of the Nebraska Avenue complex be sanded or
20   salted, not at the same time that there was going
21   to be any snow removal?
22       MS. WHELIHAN: Objection.

Page 53

1    A    I don't recall.
2    BY MR. SAMET:
3    Q    All right. That's something that you
4    could do if you wanted to, correct?
5       MS. WHELIHAN: Objection.
6       MR. DONOHUE: Are you asking whether
7    Wackenhut recommended or the Navy requested?
8       MR. SAMET: No, Wackenhut would.
9       MR. DONOHUE: Recommend?
10      MR. SAMET: Recommend.
11   A    We were allowed to make
12   recommendations, yes.
13   BY MR. SAMET:
14   Q    Okay. And did you periodically make
15   recommendations?
16       MS. WHELIHAN: Objection.
17   A    I don't -- I don't recall specific
18   instances of making recommendations.
19   BY MR. SAMET:
20   Q    I didn't ask you if you recalled
21   specific instances.
22       What I'm asking you is, did you

14 (Pages 50 to 53)

# Capital Reporting Company

Page 54

1  periodically make recommendations --
2       MS. WHELIHAN: Objection.
3  BY MR. SAMET:
4       Q    -- to the Government?
5       A    Again, Dave Sears and Bob Yuenger had
6  been there for years, many years longer than we
7  had. They pretty much knew what they wanted.
8       Q    So you didn't feel it was in your place
9  to make recommendations to them?
10      A    We could have --
11      MS. WHELIHAN: Objection.
12      A    We could have made recommendations, but
13 99.9 or a hundred percent of the time they would
14 tell us we need to do this.
15 BY MR. SAMET:
16      Q    What would you do in the day-to-day
17 performance of your duties, Mr. Harman, if you
18 spotted an area of ice --
19      A    We --
20      MS. WHELIHAN: Objection.
21      You can answer.
22      A    We again would --

Page 55

1       MR. DONOHUE: I'm going to object.
2  When you say daily performance of your
3  duties, are you talking now about the joint
4  inspection which is the only thing --
5       MR. SAMET: I'm talking about the daily
6  performance of his duties.
7       MR. DONOHUE: For clarification --
8       MR. SAMET: Their full breadth.
9       MR. DONOHUE: Okay.
10 BY MR. SAMET:
11      Q    What would you do if in the daily
12 performance of the full breadth of your duties you
13 spotted an area, a surface area where there would
14 be foot traffic, where there was ice accumulation?
15      MS. WHELIHAN: Objection.
16      A    We would report it to the Navy for
17 direction.
18 BY MR. SAMET:
19      Q    Okay. And did that ever occur, that
20 you ever spotted areas where there was ice
21 accumulation in an area where there would be --
22 expected to be foot traffic?

Page 56

1       A    I'm sure it did.
2       Q    Okay. Did you walk the grounds every
3  day, you personally?
4       A    No.
5       Q    So there were days that you would come
6  and spend -- were there days that you would come
7  and spend your entire time in the office?
8       A    Possibly, yeah, if I had, you know,
9  enough paperwork to do.
10      Q    Okay. Do you remember whether on
11 February 26, 2003, you got out of the office that
12 day?
13      A    I'm sure I got out of the office. I
14 don't remember exactly where I went or what I did,
15 but I'm sure I got out of the office.
16      Q    All right. So you're saying on most
17 days you would at least get out even for a break?
18      A    Yeah, yeah.
19      Q    Okay. Did you ever have any -- other
20 than with your lawyers or with the representative
21 of the -- strike that.
22      Other than with your lawyers or any

Page 57

1  other persons investigating this accident and
2  claim, did you ever have any conversations with
3  anyone else about the accident to Mr. Philbin?
4       A    No.
5       Q    All right. So you have never discussed
6  this with anybody from Brickman?
7       A    I don't believe so.
8       Q    Okay. When you received the call on
9  the morning of February 26, 2003, informing you
10 that somebody had been hurt, whoever it was who
11 called, told you that somebody had been hurt down
12 near Echo Gate?
13      A    Correct.
14      Q    All right. Did that person tell you
15 that somebody had slipped and fallen?
16      A    They told me that they had fallen.
17 Again, from what I remember, that DOD Police was
18 there and they would take care of the situation.
19      Q    You don't recall whether it was your
20 understanding from that conversation that it was a
21 slip and fall accident?
22      A    I didn't know why they fell.

15 (Pages 54 to 57)

# Capital Reporting Company

Page 58

1  Q  Okay. Did you understand from that
2  phone call that there might be a broken leg or a
3  foot involved?
4  A  No. I knew that -- no, I didn't know.
5  Q  Did you at any time thereafter make
6  inquiry as to what happened with the man's injury
7  and what was it or how it had happened?
8  A  Nothing officially. I'm sure I asked
9  people about it afterwards but I don't -- you
10  know, I don't recall specifically who I asked or
11  anything.
12  Q  Okay. This snow and ice removal plan
13  that's been marked as Exhibit No. 3, was that
14  given to Brickman?
15  A  I believe -- yes, I believe it was
16  because it has the priorities, has the priorities
17  for the sidewalks, says what areas can't receive
18  salt.
19  So yeah, this is something that they
20  would have had.
21  Q  I'm just curious about that, I didn't
22  exactly understand, though.

Page 59

1  What are the areas that can't receive
2  salt? I think it said parking decks.
3  A  Actually, the areas that can't receive
4  salt would be the new sidewalks.
5  Q  Okay.
6  A  And it just says it, which is
7  designated.
8  Q  Designated on there -- if this was in
9  color, show me how you can actually tell.
10  MS. WHELIHAN: He actually does have
11  the color map.
12  BY MR. SAMET:
13  Q  Show me how you tell which areas on
14  here that can't receive salt.
15  A  You can't without the color code.
16  Q  Is that because of the corrosive
17  effects of salt?
18  A  Yes.
19  Q  Is it just the sidewalks that couldn't
20  receive salt?
21  MR. DONOHUE: Objection.
22  MS. WHELIHAN: New sidewalks.

Page 60

1  A  New sidewalks I believe less than a
2  year old.
3  BY MR. SAMET:
4  Q  Why is that, do you know?
5  A  Because of the corrosive effects.
6  Q  But why, why limit it to new sidewalks
7  rather than old sidewalks, do you know? Is this a
8  different substance?
9  A  Because it takes time for concrete to
10  cure.
11  Q  I see. Salt can damage that curing
12  effect?
13  A  Well, it can damage the concrete while
14  it's in that curing stage. Once it's cured --
15  Q  What was used in lieu of salt for those
16  areas?
17  A  Magnesium.
18  Q  Is that what's called ice remover, I
19  think?
20  A  Yeah. Which actually works better than
21  salt, it's just more expensive.
22  Q  Who supplied, by the way, salt and the

Page 61

1  ice remover?
2  A  Brickman.
3  Q  Brickman is the one who purchased it?
4  A  Yes.
5  Q  And did they store it at the Nebraska
6  Avenue complex?
7  A  Yes.
8  Q  Okay. Where was it stored?
9  A  The salt was secured -- they were --
10  the bulk salt was being stored in big bins that
11  the Navy built for salt, and the magnesium was
12  spilled -- stored in a warehouse area, Building
13  98, I believe.
14  Q  Okay. But all of this was part of
15  Brickman's subcontract with Wackenhut?
16  A  Correct.
17  Q  They were required to purchase it and
18  provide for?
19  A  Um-hum.
20  Q  You have to say "yes."
21  A  Yes.
22  Q  Okay. Does that include the salt

16 (Pages 58 to 61)

# Capital Reporting Company

Page 62

1 and/or ice removal that came in pails or buckets?
2    A    Yes. All materials.
3    Q    To be provided by Brickman?
4    A    Correct.
5    Q    Okay.
6       MR. COOK: Could we get a color map at
7 some point?
8       MS. WHELIHAN: Yeah.
9       (Whereupon, there were discussions off
10 the record.)
11 BY MR. SAMET:
12    Q    I'm referring now to Exhibit No. 3, the
13 snow and ice removal plan. Somebody's handwriting
14 is on here. Is this your handwriting here?
15    A    No.
16    Q    Do you know whose it is?
17    A    No.
18    Q    Okay. I'm showing you page 6, there's
19 some handwriting there. Is that yours?
20    A    No.
21    Q    And you don't recognize that
22 handwriting?

Page 63

1    A    No.
2       MS. WHELIHAN: I asked around, nobody
3    knows whose handwriting that is.
4 BY MR. SAMET:
5    Q    Who's Waste Management of Maryland?
6       MS. WHELIHAN: That's a mistake.
7    Apparently that shouldn't be attached to
8    that.
9    A    Waste Management, that's somebody else
10 that we had -- we had a contractual agreement
11 with them to remove refuse.
12 BY MR. SAMET:
13    Q    Okay.
14    A    So --
15       MS. WHELIHAN: That's how I got it. I
16    just gave you what I had in the way I got it.
17 BY MR. SAMET:
18    Q    Are we going to be able to get a copy
19 of the Government contract or at least the
20 provisions?
21    A    I can tell you that it's going to say
22 remove snow. It's very vague. But I'll get it.

Page 64

1       MS. WHELIHAN: He'll give me a copy and
2    I'll get it.
3       MR. SAMET: Okay.
4       MR. DONOHUE: Off the record.
5       (Whereupon, there were discussions off
6 the record.)
7       MR. SAMET: We're going to take a quick
8 break.
9       (Whereupon, there was a break from
10 11:09 a.m. until 11:17 a.m.)
11       (Whereupon, Exhibit Nos. 10 and 11 were
12 marked for identification.)
13 BY MR. SAMET:
14    Q    Mr. Harman, I'm going to show you
15 what's been marked as Exhibits 10 and 11 and ask
16 you if can you identify -- let's start with 10.
17       Can you tell us, please, what 10 is?
18    A    Ten is a Maximo work order to remove --
19 the description's to remove snow from the rear
20 parking lot.
21    Q    Did you say a Maximo work order?
22    A    Maximo is the system that we use to

Page 65

1 track all of our -- our work. It's a work ticket.
2    Q    Okay. And it's a work ticket dated
3 February 26th, correct?
4    A    Correct. This February, February 25th.
5    Q    February 25th, the day before this
6 accident, correct?
7    A    Yes.
8    Q    All right. And so who asked that snow
9 be removed the day before this accident from the
10 back parking lot?
11    A    It looks like DOD Police, so it could
12 have been anybody on the police force.
13    Q    Okay.
14    A    That's who it's -- actually, anytime
15 you have a service, it's reported by somebody.
16 Then Dave Sears and Bob Yuenger would actually do
17 the approval of something like this.
18    Q    Okay. First it would be -- first the
19 request would go to the Navy and then to you?
20    A    No. The request would come to us, but
21 we wouldn't proceed on the work until we got their
22 approval.

17 (Pages 62 to 65)

# Capital Reporting Company

Page 66

1    I mean, we could have tenants that
2  would code in a call to hang a clock that might
3  not be something that the Navy would want to use
4  their work orders for.
5    They prepurchased work orders on the
6  contract just like -- just like they did snow
7  removal hours. So we were obligated to perform so
8  many work orders. They authorized the use of
9  those work orders.
10    We didn't just create them without
11  their approval, nor could anybody call anything in
12  without their approval.
13    Q    Does this have to -- does this come off
14  the time that they purchased?
15    A    No. This comes off the amount of --
16  the quantity of service orders in their contract.
17    Q    So the contract not only provides for a
18  certain amount of time from you but also allows
19  them to submit a certain number of work orders to
20  you?
21    A    Yes.
22    Q    Okay. So the time couldn't be -- I

Page 67

1  think we said -- strike that.
2    Did we say before that the time is
3  actually 200 hours under this contract?
4    A    Yes, 200 hours.
5    Q    So that 200 hours couldn't necessarily
6  be divided amongst 500 work orders, correct, that
7  would be burdensome in the contract limits, the
8  number of work orders the Government can put in to
9  you?
10    A    The 200 hours has nothing to do with
11  quantity of work orders in the contract, two
12  separate things.
13    Q    Okay.
14    A    They purchase snow removal services
15  which were capped at 200 hours, then they also
16  purchased a set amount of service calls or work
17  orders.
18    Q    Above and beyond the snow removal
19  services?
20    A    Yes, in addition to that. This is
21  something that would typically be used for issuing
22  work, got a light out.

Page 68

1    In this case, it looks like it was
2  called in as snow removal services for the parking
3  lot.
4    Q    So that's an area where the Government
5  had a right to ask for any number of different
6  services, some of which might be snow removal, or
7  a per work order basis, correct?
8    A    Correct.
9    Q    All right. And from looking at Exhibit
10  No. 10, does it appear that somebody on the DOD
11  police force asked Wackenhut to clear snow from
12  the back parking lot?
13    MS. WHELIHAN: Objection.
14  BY MR. SAMET:
15    Q    On February 25th.
16    MS. WHELIHAN: Objection.
17    A    Again, it came from DOD Police, and
18  this is why Dave Sears would have the ultimate
19  approval authority.
20    When that came in, he would look at
21  that and see if that was actually something that
22  he would want to do or not. It may be something

Page 69

1  that was already taking place.
2    When these folks call in -- anybody
3  could call in a ticket. When they call somebody
4  or something like this in, Dave might go down
5  there, first case scenario is it may not even be
6  something he wants to use a work order for.
7    Q    I understand.
8    A    If he's paying for it under snow
9  removal hours, he's not going to waste a service
10  order for it.
11    Number two, he might go down there or
12  send Bob down and actually see that what they're
13  complaining about is a piece of snow about this
14  big, and he would step his foot on it and go like
15  that, and it would be over with.
16    So they would look -- anybody, DOD
17  Police could call in a work order to say I want a
18  new car. Ultimately, Dave Sears and Bob would
19  investigate it and see whether or not they wanted
20  to use one of their work orders for it, whether it
21  fell under snow removal services, so on and so
22  forth.

18 (Pages 66 to 69)

# Capital Reporting Company

Page 70

1    But it's not -- it's not -- you know,
2  we got work orders for all different types of
3  things.
4    Q    Okay. So would that indicate that
5  somebody on the police called it in first to
6  Wackenhut, then Wackenhut prepared a work order
7  for them and submitted it to the Government?
8    A    This would suggest that somebody --
9    Q    You have to say "yes."
10    A    Yes. This would appear somebody from
11  DOD Police called in a work order for that.
12    Q    Called into Wackenhut and Wackenhut
13  prepared the form and submitted it to the
14  Government?
15    A    To the Government for approval.
16    Q    And we're talking about Exhibit No. 10;
17  is that correct?
18    A    Yes.
19    Q    Okay. And we can't tell from Exhibit
20  No. 10 whether it was ever approved or not, or can
21  we, I don't know?
22    A    Well, there's a work order status that

Page 71

1  actually says -- that actually says work
2  completed, which is odd.
3    Something else to keep in mind, this
4  could have been something that was called in.
5  Just because it was reported on this date doesn't
6  mean the work was accomplished on this date.
7    In other words, it was -- it was -- it
8  was -- date reported on the 25th, 2:28 p.m.,
9  target completion date, there's not an actual
10  completion date on here.
11    So even though it was called in during
12  that period doesn't necessarily mean that it was
13  for that day.
14    Q    Okay. All right. But we can tell that
15  it was approved, the work was actually approved to
16  be done as a work order by the Government?
17    A    Yes, it appears to be.
18    Q    Okay. And we can tell from that form
19  that the call in from the DOD Police was on the
20  25th of February, 2003; is that correct?
21    MR. DONOHUE: Objection.
22    A    Yes.

Page 72

1    BY MR. SAMET:
2    Q    All right. Exhibit No. 11, can you
3  please tell us what that document is?
4    A    Yep. This is an overhead ticket that
5  doesn't subtract from their work order quantities.
6    It's one that I assigned to Ronnell
7  Gorham, and his responsibility on this, it would
8  be oversee Brickman, which is just a way for us to
9  track our labor, Ronnell's labor, to oversee
10  Brickman while they did their work.
11    Notice the work typed over and in the
12  reporting system that wouldn't -- that wouldn't
13  subtract from their work order quantities.
14    This is just a ticket that we created
15  for Ronnell to track his time.
16    Q    Who's Ronnell?
17    A    Ronnell is an employee that we had in
18  the work force that we often assigned to oversee
19  Brickman, to interface with the Navy, to see if
20  the Navy had any concerns. If they did, then he
21  would relay those concerns to Brickman.
22    Q    Okay. Because that was an overhead, it

Page 73

1  wasn't going to be charged against the Government,
2  does that indicate it wouldn't have to be approved
3  by the Government, or can you tell?
4    A    Well, this indicated -- again, this is
5  just a way for us to track our time.
6    Again, the Navy asked us to remove
7  snow, we pass that responsibility to Brickman to
8  remove snow. We would interface between the two.
9    And that's essentially what this is
10  for, this is a ticket for Ronnell to track his
11  time.
12    If the Navy had a problem, hey,
13  Brickman isn't doing the parking lot or why aren't
14  they doing this or if -- any interface that they
15  would have, they would bring it to us and I would
16  use folks like Ronnell to relay that information
17  to Brickman.
18    Q    My question is, did the Government have
19  anything to do with this particular work order
20  represented by Exhibit 11? Is the Government
21  involved in this at all, can you tell?
22    A    No, this was requested by me.

19 (Pages 70 to 73)

# Capital Reporting Company

Page 74

1  Q  From your office.
2  A  No. I probably even put this in and
3  created it as a way for Ronnell to track his time.
4  Q  Okay.
5  A  So that we could account -- you know,
6  it's all abut productivity.
7      If Ronnell -- we had time reports, and
8  you try to get 40 hours a week and if he only had
9  charged to service calls, if you only had eight
10 hours a week, we'd say okay, okay, what did you
11 spend the rest of your time doing.
12 Q  Okay.
13 A  This was just a means for us to track
14 that time.
15 Q  Referring again to Exhibit 11, why --
16 this came from you, correct?
17 A  Yes.
18 Q  Okay. Why did you need or want someone
19 to oversee what Brickman was doing on this day,
20 February 26th, if you know?
21 A  Again, it would just be interface
22 between the Government and Brickman. The

Page 75

1  Government -- Brickman was a subcontractor of
2  ours, so the Government wouldn't always go
3  directly to them.
4      Their responsibility was to come to us,
5  and we would relay information to Brickman.
6  Q  You were assigning somebody to oversee
7  Brickman's work, correct?
8  A  Assigning somebody to relay information
9  essentially between the Government and our
10 subcontractor, Brickman. That was the majority of
11 the responsibility.
12 Q  So you were assigning Ronnell, who was
13 an employee of Wackenhut, to oversee the work of
14 Brickman and then report to the Government?
15 A  No. Again, his primary function would
16 be if the Government had any suggestions or
17 anything, he would relay those to Brickman, not
18 necessarily -- you stated overseeing Brickman's
19 contract and relaying that back to the Government,
20 no.
21 Q  I'm just trying to find out what
22 would -- you created this document?

Page 76

1  A  To track his time, yes.
2  Q  Do you know why you did -- why you did
3  it specifically?
4  A  To track Ronnell's time. Again, if you
5  have an employee working for you 40 hours a week
6  and he can only produce documentation on eight
7  hours a week, we created documents to track our
8  employees' time to make sure that they were
9  productive.
10     We didn't ask them to work 40 hours a
11 week, but we asked them to demonstrate at least 32
12 hours in the database.
13 Q  So before you created that, was Ronnell
14 overseeing Brickman's work or was he doing
15 something else?
16 A  Before I created this -- and here
17 again, you know, okay, this was for that
18 particular event, but I mean we sometimes create
19 tickets to cover an entire option year and
20 sometimes we -- obviously, you want to break it
21 down as close as you can so that you can say well,
22 he spent -- instead of saying he spent a hundred

Page 77

1  hours this year, he spent, you know, one hour
2  today on this event.
3      But, yeah, this is something that I
4  created to track his time, and it wasn't unusual.
5  I mean, we did this periodically.
6  Q  Would that suggest, though -- Exhibit
7  11, would that suggest that at some point Ronnell
8  was assigned to oversee Brickman's work?
9      MR. DONOHUE: Objection. He's already
10 answered that.
11 A  Yeah, three times.
12     MR. SAMET: Well, I don't know. I'm
13 not getting a direct answer, I'm getting a
14 whole lot of accounting talk. Maybe it was
15 answered.
16     MR. DONOHUE: It's an accounting
17 document, is the reality.
18 A  It's a document to track his time. You
19 asked me what he was doing, and his primary
20 responsibility was to relay information between
21 the Government and Brickman.
22     He was overseeing Brickman. Brickman

20 (Pages 74 to 77)

# Capital Reporting Company

Page 78

1  is a professional company that knows how to remove
2  snow, that's why we chose them for snow removal at
3  the Nebraska Avenue complex.
4  BY MR. SAMET:
5      Q    Why would Ronnell have been assigned to
6  oversee what they were doing?
7      A    Because the Government technically
8  can't go directly to our subcontractor. Our
9  contract with the Navy was between WSI and the
10  Navy. We subcontracted a portion of that; i.e.,
11  the snow removal, to Brickman.
12          Government doesn't care who we
13  contract -- subcontract it to. Our agreement was
14  with them.
15          Now, we pass that to Brickman so you
16  see how -- we pass that responsibility to
17  Brickman.
18          The Navy has a contract with us,
19  they're not going to go to Brickman. They're
20  going to come to us.
21      Q    When you say "us," you don't mean you
22  personally?

Page 79

1      A    WSI. Hence, why when they initiated
2  snow removal they would call WSI and not Brickman.
3      Q    Okay. And so are you indicating that
4  every -- all of the work of Brickman that was
5  done out of the Nebraska Avenue complex required
6  somebody from WSI to oversee?
7      A    No. Again, Brickman has been doing
8  snow removal for years, they're a very competent
9  snow removal contractor, that's why we chose them
10  for this contract. They didn't need us to
11  baby-sit them, they knew what they were doing.
12      Q    On this particular occasion,
13  February 26, 2003, you did assign Ronnell to
14  oversee Brickman's work; am I correct?
15      A    I created a ticket for him to charge
16  his time to much like I did on all.
17      Q    I understand.
18      A    I didn't assign him to oversee
19  Brickman's work. I didn't say Ronnell, go down
20  there and make sure Brickman's doing a good job.
21          I simply created a ticket for him to
22  charge his time to, his legwork, interface between

Page 80

1  Brickman and the Government.
2      Q    Where was he, Ronnell, where was he
3  that day?
4      A    I don't know exactly where he was that
5  day.
6      Q    Where was Ronnell at 3:30 p.m. on
7  February 26th?
8      A    I couldn't tell you that.
9      Q    Pardon?
10      A    Where was Ronnell at 3:30?
11      Q    Um-hum.
12      A    I couldn't tell you where he was.
13      Q    Can you tell us where he would have
14  been at 3:40?
15      A    No.
16      Q    So are you indicating that this
17  document that you created may bear no relation at
18  all to anything that Ronnell did that day?
19          MS. WHELIHAN: Objection.
20      A    The target start date on this was the
21  26th. The target completion date, estimated
22  finish date, was 3/14.

Page 81

1  BY MR. SAMET:
2      Q    Okay.
3      A    Technically during that -- anytime he
4  could have used this to charge his time to.
5          Just because the description says ice
6  and snow event of 2/26/03, doesn't mean that it's
7  narrowed down for him to use just for that single
8  event.
9          Again, the time, I put it in on that
10  day and created it on that day but I ran the
11  target completion through 3/14 .
12          So this ticket could have been used to
13  track any work associated throughout that time
14  period from this ticket. I cannot tell you what
15  he worked on that day.
16      Q    Okay. Did Ronnell -- did you ever
17  assign Ronnell to do any task in February of 2003
18  with regard to snow removal?
19      A    Did I assign him to do any task with --
20      Q    With regard to snow removal.
21      A    With regard to snow removal.
22          Again, I don't recall exactly what I

21 (Pages 78 to 81)

Page 82

1  asked him to do. That ticket was created for him
2  to charge his time to.
3      Q    Would this not suggest that you're
4  referring to time on or related to snow removal?
5      A    Yes, it would.
6      Q    So would this not suggest that at
7  sometime in February of 2003, Ronnell was
8  performing some activities relating to snow
9  removal?
10     A    Activities that I've already explained,
11 yes.
12     Q    Interfacing between Brickman and the
13 Government?
14     A    Correct. We paid -- the Government
15 paid us to provide snow removal services. We
16 subcontracted that to Brickman. If we provided
17 snow removal services, it came out of our pocket
18        We're already paying Brickman to do
19 that. If we did anything on our own, we're doing
20 it out of pocket.
21        So if we had any of our guys, that
22 overhead ticket -- for instance, this guy's on the

Page 83

1  payroll, but that's not a piece of work that we're
2  subtracting from a quantity that they have.
3        So anything -- any support that we have
4  comes out of our pocket.
5      Q    I understand.
6        What was Ronnell's position?
7      A    Ronnell was a plumber.
8      Q    He's a plumber?
9      A    Um-hum. He wasn't a snow removal
10 specialist. He was a plumber.
11     Q    What does this "problem code tower"
12 mean? I'm referring now to Exhibit No. 11.
13     A    Problem code tower. Problem code tower
14 means absolutely nothing to do with snow removal.
15 Maximo -- when you go through Maximo,
16 there's certain required fields that you have to
17 fill out. One of them is what are you working on.
18        This actually -- if you look at this,
19 this ticket says we're working on a structure and
20 what is that structure, that structure is actually
21 a tower.
22        So if you wanted to look at this

Page 84

1  document and say okay, what exactly did Ronnell
2  do, he responded to an ice and snow event on
3  2/26/03 on tower structure.
4      Q    Okay.
5        MR. DONOHUE: So could that be like a
6  roof problem or something?
7        THE WITNESS: No, it was a typo, yeah.
8  BY MR. SAMET:
9      Q    Does it say how much time would be
10 charged for this?
11     A    No.
12     Q    Would that be listed somewhere else at
13 a later date?
14        MS. WHELIHAN: Objection.
15        You can answer.
16     A    It's -- again, they would -- that's
17 just the face value of the work ticket. There's
18 different reports that you can run out of Maximo.
19 BY MR. SAMET:
20     Q    Wackenhut later on assigned, for
21 accounting purposes, an amount of time by Ronnell
22 to this work order?

Page 85

1      A    No. Would it be assigned?
2      Q    No, but I mean -- no, would they
3  account for his time somewhere in Wackenhut's
4  records?
5      A    His time would be charged to that work
6  order, yes.
7      Q    Okay.
8      A    Are these --
9        MS. WHELIHAN: Hey, Bob, maybe I can
10 help you with this, okay.
11        These are documents that I got in 2004.
12 There are no follow-up documents to these two
13 documents. These are the only -- it's two
14 isolated pages out of the accounting
15 software.
16        And I did in 2004 ask if there were any
17 follow-up documents, of any kind, and they
18 could not locate any.
19        So I mean, I think I produced them
20 because they -- you know, they all related to
21 the event potentially, you know.
22        But as far as I know, they went

22 (Pages 82 to 85)

Page 86

1    nowhere.
2    BY MR. SAMET:
3        Q    Mr. Harman, where are the rest of the
4    work orders associated with the snow removal
5    operations during the winter of 2003?
6        A    I can't tell you that there are other
7    work orders. Again, that's just something that I
8    put in for him to track his time. Did I put in
9    more? Possibly. Are there more, I couldn't tell
10   you today.
11       Q    You would have to search?
12       A    Yeah.
13       Q    Pardon?
14       A    Say again, I would have to search?
15       Q    You would have to search to see if
16   there are other work orders put in, in connection
17   with snow removal operations?
18       A    I'm assuming that what you're looking
19   at is what we have. I don't know.
20       Q    Why would you assume that?
21       A    Because that's what's in front of you.
22       Q    So as you sit here, you can't answer me

Page 87

1    whether this is all you have in the way of work
2    orders in connection with snow removal during the
3    winter of 2003?
4        A    Correct, I don't know. It wasn't
5    something that we were contracted to do.
6        MS. WHELIHAN: I only asked for that
7    26 -- 25 and 26 days, so back in 2004. Now,
8    as far as --
9        MR. SAMET: '3, '3, '3.
10       MS. WHELIHAN: Right, but it was
11   when -- when I asked, it was 2004, it was
12   actually June of 2004, I think. Before you
13   filed suit.
14       MR. SAMET: We weren't involved in
15   this, it was before I filed suit.
16       MS. WHELIHAN: Correct, but I was,
17   actually --
18       MR. SAMET: Two years before I filed
19   suit.
20       MS. WHELIHAN: Yeah, but I'm -- we can
21   go off the record if you want.
22       (Whereupon, there were discussions off

Page 88

1    the record.)
2    BY MR. SAMET:
3        Q    Mr. Harman, on Exhibit No. 2, under
4    work order status it says "work comp," W-O-R-K
5    C-O-M-P.
6            What does that mean to you?
7        A    Work complete.
8        Q    Oh, okay.
9        A    Yeah.
10       Q    All right. What does "work order
11   priority of two" mean?
12       A    For all practical purposes, nothing.
13   Work order, priority one, would be it's an
14   emergency.
15           Priority two means you have ten working
16   days to get it completed.
17       Q    What is priority zero?
18       A    Priority zero means nothing, just means
19   that we're tracking this and it doesn't have --
20   the only priority changes you have if it's
21   priority one, it's an emergency, and you have to
22   respond within a set amount of time.

Page 89

1            Priority two, you don't have to respond
2    within any given time, you just have to have the
3    work completed within ten days. So technically
4    you can wait.
5            If it's something that takes four
6    hours, you can wait nine days and finish and still
7    be within contract requirements.
8        Q    What does "SO" stand for on Exhibit No.
9    10 under work order type, "SO"?
10       A    Service order.
11       Q    Service?
12       A    Service order.
13       Q    S-E-R-V-I-C-E?
14       A    Correct.
15       Q    Okay. And I see that these things are
16   numbered, and No. 10 has Work Order No. 77402, and
17   Exhibit No. 11 has 77418, and there's 16 numbers
18   in between them.
19           So I assume the computer would assign a
20   work order number in sequence as they were put in,
21   correct?
22       A    Yes. Yes, it would.

23 (Pages 86 to 89)

# Capital Reporting Company

Page 90

1  Q  Okay. So -- okay.
2      MR. SAMET: I don't have any further
3  questions.
4      MR. DONOHUE: You're done?
5  EXAMINATION BY COUNSEL FOR DEFENDANT BRICKMAN
6  BY MR. DONOHUE:
7  Q  Mr. Harman, I just have a couple on
8  these work order things, I want to make sure I
9  understand.
10     Did you complete both 10 and 11,
11 Exhibits 10 and 11?
12 A  I have to see them again. Did I
13 complete them, create them?
14 Q  Yes. You created 11, I think you said.
15     Same question on 10, did you create 10?
16 A  No.
17 Q  Can you tell who did?
18 A  Again, it was requested by DOD Police.
19 I would have to assume -- we had a trouble desk at
20 the call center, if you will, that calls would
21 come into, and we would have a dispatcher put them
22 in.

Page 91

1  Q  Okay. Did you work weekends back in
2  February of '03?
3  A  If required.
4  Q  Do you know if you worked the weekend
5  before Mr. Philbin's accident?
6  A  I don't remember.
7  Q  Okay. If -- let me ask you first.
8      Do you have any recollection as to
9  whether Brickman was asked to do any snow removal
10 from the rear parking lot the Sunday before
11 Mr. Philbin's accident, which was on a Wednesday?
12 A  I don't recall the dates and days and,
13 I mean, that's been a long time.
14 Q  I will ask you to assume that there was
15 work done with a back loader on the rear parking
16 lot on that Sunday before.
17     MS. WHELIHAN: Do you want the
18 spreadsheet?
19     MR. DONOHUE: No.
20     MS. WHELIHAN: All right.
21 BY MR. DONOHUE:
22 Q  Would a work order be filled out for

Page 92

1  something like that, or is it possible that the
2  work order would be actually generated for
3  something like that during the weekdays following
4  completion of the work over the weekend?
5      MR. SAMET: Objection.
6  A  Would a work order be created for that.
7  Again, anybody -- anybody there could call in a
8  work order. It would depend upon the Government
9  whether or not they wanted to approve it.
10 BY MR. DONOHUE:
11 Q  I understand this is for tracking time.
12 A  Okay.
13 Q  Did you have people there on Sundays
14 available to fill out work orders?
15 A  No.
16 Q  Okay. So was it possible if a work
17 order was appropriate to be completed for work
18 that was actually done over the weekend, it may
19 not be typed up until Monday or Tuesday after
20 completion of the work?
21 A  That's a fair assessment.
22 Q  Okay. So the fact that Exhibit 10

Page 93

1  refers to snow removal from the rear parking
2  lot --
3  A  Oh, yeah.
4  Q  -- and the date of -- date reported,
5  2/25/02 --
6  A  Um-hum.
7  Q  -- does that -- is it possible that
8  work order could actually relate to work that had
9  been completed a day or two before that?
10     MR. SAMET: Objection. That's leading.
11 A  It could have been weeks before.
12     Actually, this report by date -- when
13 you click "new" in Maximo, Maximo actually fills
14 that date in for you.
15     And one of the biggest problems that we
16 have is if the work would have been done over the
17 weekend or even days prior, if we didn't for some
18 reason get it put in the system, when you click
19 "new," Maximo automatically fills in that date for
20 you.
21     Again, if it was something that had to
22 be done on a specific day, then that date would

24 (Pages 90 to 93)

# Capital Reporting Company

Page 94

1  have been put in the description.
2      And it would have been an emergency
3  ticket, which would have been a priority one, and
4  the target completion date wouldn't have been
5  thrown out with 3/11/03.
6      So there's three or four different
7  possibilities here to narrow this down a window,
8  one being priority, which is a ten-day ticket, not
9  an emergency; two being the target completion
10  date, which is all the way out March 11; and
11  three, there's nothing in the description saying
12  when it should be done, so it could have been
13  anytime.
14  Q    It's a fair statement, then, that that
15  ticket was generated to represent a task that had
16  already been completed as opposed to work yet to
17  be completed?
18      MR. SAMET:  Objection, leading.
19  BY MR. DONOHUE:
20  Q    Is that fair to say?
21  A    It's a fair assumption, yes.
22  Q    Thanks.

Page 95

1      Do you recall approximately what time
2  you received contact from Dave Sears on the
3  morning of Mr. Philbin's accident?
4  A    We have a -- I don't remember the exact
5  time. But we had a record that indicated.
6  Q    And this has been distributed, as I
7  understand?
8  A    Yes.
9  Q    Is this a copy of the phone record?
10  A    Yes.
11  Q    That so reflects --
12  A    Um-hum.
13  Q    And what is that document?
14  A    This is a report from Nextel's -- from
15  Nextel of all incoming and outgoing calls.
16  Q    So this is a --
17  A    During that period.
18  Q    This is a dated and time record of
19  calls that were both incoming and outcoming; is
20  that correct?
21  A    Yes.
22  Q    And on your cell phone?

Page 96

1  A    Um-hum, correct.
2  Q    Your personal cell phone?
3  A    My work cell phone.
4  Q    Your work cell phone.
5      MR. DONOHUE:  I'd like to have this
6  marked as a deposition exhibit, if I may, but
7  I don't want to take Counsel's copy.  Well, I
8  just want the one document.
9      MS. WHELIHAN:  Yeah, that's fine.
10      (Whereupon, there were discussions off
11  the record.)
12      (Whereupon, Exhibit No. 12 was marked
13  for identification.)
14  BY MR. DONOHUE:
15  Q    You can determine from Exhibit 12 which
16  is your phone record, correct?
17  A    Yes.
18  Q    At what time did you received the call
19  from Mr. Sears on the morning of October 20 -- I'm
20  sorry, February 26th, '03?
21  A    I only received one incoming call --
22  let me rephrase that.

Page 97

1      The first incoming call I received that
2  day was at 6:38 a.m.
3      Now, this document does not show me the
4  phone number of that incoming call, but the very
5  next call that I made, that phone call lasted one
6  minute 36 seconds.
7      The very next phone call that I made,
8  first phone call, 6:38 a.m., lasted one minute 36
9  seconds.
10      My very next outgoing phone call was at
11  6:40, and that was to Brickman.
12  Q    How do you know?
13  A    Because it does reflect their phone
14  number there.
15  Q    And you know that just from familiarity
16  with the number?
17  A    That is Brickman's phone number, yeah.
18  Q    Do you recall where you were when you
19  received the incoming call at 6:38?
20  A    No, I don't.  I would have been
21  probably on my way to work.
22  Q    In transit?

25 (Pages 94 to 97)

# Capital Reporting Company

Page 98

1    A    Yeah, in transit.
2    Q    And based on your review of that
3    document, do you have -- does that assist you in
4    remembering from whom you received a call at 6:38?
5    A    It would have been Dave Sears. Yes,
6    Dave would have called.
7    Q    Okay. And does your review of that
8    document assist your memory as to what the
9    substance of your conversation with Mr. Sears
10   would have been at that time?
11   A    Again, it's been a long time. I don't
12   remember the exact conversation, but just based on
13   the fact that as soon as I hung up the phone with
14   him, I immediately called Brickman, that would
15   definitely be the initiation of the event for that
16   day.
17   Q    Do you know who you spoke to at
18   Brickman?
19   A    I do not.
20   Q    Did you have a typical contact person
21   at Brickman?
22   A    Yeah, typically it would have been --

Page 99

1    typically it would have been Adam.
2    Q    Adam is the gentleman sitting out in
3    the lobby?
4    A    Correct. Yeah, he would have been the
5    person that I called.
6    Q    Do you have a recollection of your
7    contact with Adam at that -- on that date?
8    A    I do not.
9    Q    Okay.
10   A    But I do know from this I spoke to
11   somebody, whom I would assume to be him, for about
12   two minutes 21 seconds.
13   Q    Just in general recollection, do you
14   recall that Brickman personnel presented to the
15   NAC that day?
16   A    I would have to assume so. Yes.
17   Q    Okay.
18   A    Yeah.
19   Q    Did you ever have any difficulty with
20   the timeliness of Brickman's response following a
21   request from you to perform snow removal
22   procedures?

Page 100

1    A    No. Again, Brickman, very qualified
2    snow removal company. If there was an event or
3    something, because of the years that we worked
4    together, I mean, they pretty much knew when to
5    expect a call from us.
6        MR. DONOHUE: That's all I have.
7        MR. SAMET: Do you have any questions?
8        MS. WHELIHAN: No, I have no questions,
9    and he's going to read.
10       MR. SAMET: Well, no, I have a
11   question.
12       MS. WHELIHAN: I'm sorry.
13       MR. SAMET: That's all right.
14   FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
15   BY MR. SAMET:
16   Q    Mr. Harman, you got the call from Dave
17   Sears at 6:40 a.m.?
18       MR. DONOHUE: Thirty-eight.
19   A    6:40, yes.
20   BY MR. SAMET:
21   Q    Oh, I see. No, 6:30 --
22   A    I'm sorry, 6:38, correct.

Page 101

1    Q    Mr. Donohue was right. 6:40 you called
2    to Brickman?
3    A    Correct.
4    Q    Okay. So this -- and this would have
5    been a call directly to the cell phone of Adam
6    whatever -- pardon me, his name is?
7    A    Adam was my typical contact. I
8    don't -- I compared this to the numbers in the
9    roster, and I had multiple numbers for Adam, I
10   even had his home numbers. He was my typical
11   point of contact.
12       So I'm not saying that is his cell
13   phone number, because I have -- I had a pager, I
14   had a cell phone, I had his home phone, probably
15   even have his wife or girlfriend's phone number,
16   just so I could get ahold of him.
17   Q    How long did he have to get out there?
18   I mean, was there a requirement that he report,
19   bring a crew out within a certain time?
20   A    Well, in our Navy contract, refer to
21   our technical -- you have different requirements,
22   but all snow and ice personnel are required to

## Capital Reporting Company

Page 102

1  report within one hour. But, more importantly,
2  all parking lots and roadways will be cleared
3  within three hours.
4      Q    Okay.
5      A    So if I had to say that was the initial
6  response, which was approximately 6:40, from that
7  time, they would have, per our Government contract
8  standards, three hours to have the parking lots
9  cleared.
10     Q    Okay. How long would it generally take
11  for them to get out from the time you would make
12  the phone call?
13     A    Again, most of the time they could
14  anticipate whether or not we were going to call
15  them just based on conditions and they would be
16  there. They would have somebody there, Adam
17  wasn't that far away. They would have somebody
18  within that one hour.
19     Q    Within an hour?
20     A    Um-hum.
21     Q    For this particular snowfall, what
22  would they have to bring with them, I mean how

Page 103

1  would they know?
2        I mean, would you have to tell them you
3  want eight men, three loaders and this and that
4  and the other, and would they decide what was
5  needed?
6      A    Based on -- based on -- they were the
7  only contractor we used out there, so they were
8  familiar with the site, they were familiar with
9  work that had already been performed that year and
10  in years previous.
11       So, no, they would bring out whatever
12  they needed. We didn't tell them in the contract
13  how many people to have there. We just told them
14  to remove the snow.
15       So whether or not it took one or 50
16  people, that was their responsibility.
17     Q    That would, I guess, depend upon the
18  conditions?
19     A    Correct.
20     Q    Okay. And would you sometimes discuss
21  that with them when you called them?
22       MS. WHELIHAN: Objection.

Page 104

1       You can answer.
2      A    You know, we were talking back and
3  forth about snow removal, I'm sure it came up.
4  It's not something that we directed them and said
5  I want you to have X out here because, again, then
6  we would be directing them.
7        And if we -- obviously, in that
8  scenario, we would always request 50 trucks and 50
9  front end loaders just to make sure and they
10  could -- contract wouldn't last long like that.
11  BY MR. SAMET:
12     Q    I see here that your conversation was
13  two minutes 21 seconds.
14       Would that suggest to you that it was
15  more than simply snow and ice removal plan
16  activation, you've got to get out here?
17     A    Depends. I mean, if you're splitting
18  hairs, it's only two minutes. If you're splitting
19  hairs, the first ten seconds -- ten or 15 seconds
20  of that with a Nextel could just be the fun in the
21  tower and dialing out and -- but yeah, we had a
22  approximately two minute 21 second conversation.

Page 105

1      Q    Okay. You didn't have any other
2  incoming calls on your cell phone that morning,
3  did you?
4      A    I don't see anything else, no, I
5  didn't, actually. That was it. I did not. Which
6  is what leads me to believe that -- was the
7  combination that Brickman was my next call, was
8  that was the start of snow removal.
9      Q    Franklin, West Virginia, couple calls
10  there, is that personal?
11     A    Those are personal telephone calls.
12     Q    All right.
13       (Whereupon, there were discussions off
14  the record.)
15  BY MR. SAMET:
16     Q    Did you tell Mr. Donohue that the
17  services -- that the work order, Exhibit 10, was
18  not called in on the 25th or the Department of
19  Defense Police, or did you just tell him you can't
20  tell when it was called?
21     A    No, I'm telling him -- yeah, I told him
22  that it's possible it wasn't called in on that

27 (Pages 102 to 105)

# Capital Reporting Company

|  | Page 106 |
|---|---|
| 1 | day, correct. |
| 2 | Q    Okay.  All right. |
| 3 | MR. SAMET:  I don't have any other |
| 4 | questions. |
| 5 | MS. WHELIHAN:  Okay.  He's reading. |
| 6 | (Signature having not been waived, the |
| 7 | deposition of JEREMY L. HARMAN was concluded at |
| 8 | 12:01 p.m.) |

Page 108

1    E R R A T A   S H E E T
2    IN RE:  Michael J. Philbin v. The Wackenhut
3    Corporation, et al
4    RETURN BY:
5    _____
6    PAGE    LINE    CORRECTION AND REASON

Page 107

ACKNOWLEDGMENT OF DEPONENT

3    I, Jeremy L. Harman, do hereby
4    acknowledge that I have read and examined the
5    foregoing testimony, and the same is a true,
6    correct and complete transcription of the
7    testimony given by me and any corrections
8    appear on the attached Errata sheet signed by
9    me.

12    (DATE)            (SIGNATURE)

Page 109

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2    I, Sheri C. Stewart, the officer before
3    whom the foregoing proceedings were taken, do
4    hereby certify that the foregoing transcript is a
5    true and correct record of the proceedings; that
6    said proceedings were taken by me stenographically
7    and thereafter reduced to typewriting under my
8    supervision; and that I am neither counsel for,
9    related to, nor employed by any of the parties to
10    this case and have no interest, financial or
11    otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set
13    my hand and affixed my notarial seal this 26th day
14    of March, 2007 .
15    My commission expires:
16    October 14, 2009

20    NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA

28 (Pages 106 to 109)

**Capital Reporting Company**

Page 109

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2           I, Sheri C. Stewart, the officer before

3    whom the foregoing proceedings were taken, do

4    hereby certify that the foregoing transcript is a

5    true and correct record of the proceedings; that

6    said proceedings were taken by me stenographically

7    and thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to

10    this case and have no interest, financial or

11    otherwise, in its outcome.

12           IN WITNESS WHEREOF, I have hereunto set

13    my hand and affixed my notarial seal this 26th day

14    of March, 2007  .

15    My commission expires:

16    October 14, 2009

17

18

19

20    NOTARY PUBLIC IN AND FOR

21    THE DISTRICT OF COLUMBIA

22

## A

**able** 8:5,9 9:13 11:20 13:22 37:20 63:18
**absolutely** 83:14
**abut** 74:6
**accessible** 36:12
**accident** 18:1 19:19 21:16 25:5,8,10,14 27:21 47:17 49:5,10 57:1,3,21 65:6,9 91:5 91:11 95:3
**accomplished** 71:6
**account** 74:5 85:3
**accounting** 77:14,16 84:21 85:14
**accumulation** 24:14 55:14,21
**accurate** 7:18
**acknowledge** 107:4
**ACKNOWLEDGM...** 107:1
**action** 49:15
**activation** 104:16
**actively** 23:21 40:4
**activities** 82:8,10
**actual** 71:9
**Adam** 99:1,2,7 101:5,7 101:9 102:16
**addition** 67:20
**additional** 36:12 37:5
**address** 5:9,11
**admiral's** 29:6
**affixed** 109:13
**agreement** 4:9,10,13 9:3 10:18,20 63:10 78:13
**ahead** 50:16
**ahold** 101:16
**al** 1:7 108:3
**alert** 22:13
**allowed** 21:9 50:8 53:11
**allows** 66:18
**amendment** 28:8
**amount** 66:15,18 67:16 84:21 88:22
**analysis** 11:19 13:21
**and/or** 21:2 45:15 62:1
**answer** 10:17,19 23:2 23:14,14 24:3 37:20

39:9 42:10 54:21 77:13 84:15 86:22 104:1
**answered** 77:10,15
**anticipate** 102:14
**anybody** 49:9,16 51:8 57:6 65:12 66:11 69:2,16 92:7,7
**anymore** 15:17
**anytime** 65:14 81:3 94:13
**Apparently** 63:7
**appear** 10:4 11:6 12:5 12:15 30:3 68:10 70:10 107:8
**appears** 9:11 28:12 71:17
**applicable** 17:22 18:12 19:2
**applications** 36:13 37:5
**applied** 36:14 37:7 45:7
**appreciate** 17:20
**appropriate** 92:17
**approval** 65:17,22 66:11,12 68:19 70:15
**approve** 92:9
**approved** 70:20 71:15 71:15 73:2
**approximately** 7:9,16 7:17 8:4,11 24:19 95:1 102:6 104:22
**area** 54:18 55:13,13,21 61:12 68:4
**areas** 36:1,11,12 37:4 39:4 52:19 55:20 58:17 59:1,3,13 60:16
**ARMSTRONG** 3:5
**arrive** 47:19 48:3
**arrived** 48:5
**Article** 12:2,3,3,7
**ascertain** 9:13
**ASHCRAFT** 2:5
**asked** 58:8,10 63:2 65:8 68:11 73:6 76:11 77:19 82:1 87:6,11 91:9
**asking** 21:12 38:1 53:6 53:22

**assessment** 92:21
**assign** 79:13,18 81:17 81:19 89:19
**assigned** 72:6,18 77:8 78:5 84:20 85:1
**assigning** 75:6,8,12
**assist** 98:3,8
**assistant** 43:16
**associated** 81:13 86:4
**assume** 30:12 86:20 89:19 90:19 91:14 99:11,16
**assumed** 49:14
**assuming** 86:18
**assumption** 39:22 94:21
**attached** 11:16 27:8 29:6 30:8 63:7 107:8
**attachments** 11:2,4,5 11:16 15:8
**attention** 23:10 35:21 39:17 45:16
**authority** 68:19
**authorized** 66:8
**automatically** 93:19
**available** 92:14
**Avenue** 1:17 2:15 6:10 7:4,15 16:12 19:18 21:1 23:7 26:6,10 27:3 28:21 29:2,8 31:19,20 32:19 45:3 45:7 51:3 52:19 61:6 78:3 79:5
**aware** 25:10 47:9
**a.m** 1:20 64:10,10 97:2 97:8 100:17

## B

**baby-sit** 79:11
**back** 5:19 6:5 11:2 24:10 38:5,13 48:9 48:12 65:10 68:12 75:19 87:7 91:1,15 104:2
**barriers** 36:7
**based** 15:20 41:10 98:2 98:12 102:15 103:6,6
**basis** 68:7
**bear** 80:17
**beginning** 1:20

**begins** 35:22 39:3
**behalf** 1:21 2:3,12 3:3
**believe** 33:22 46:4 49:11 57:7 58:15,15 60:1 61:13 105:6
**best** 19:21 51:12
**better** 60:20
**beyond** 30:21 67:18
**big** 61:10 69:14
**biggest** 93:15
**Bill** 18:6,6
**bins** 61:10
**bit** 31:6
**blizzard** 48:20
**Bob** 9:17 13:10 17:21 27:1,4,5 46:18 54:5 65:16 69:12,18 85:9
**bottom** 33:2,14
**branch** 14:18
**breadth** 55:8,12
**break** 56:17 64:8,9 76:20
**Brickman** 3:3 9:4 10:18,20 18:14 21:6 21:8,9,18,19 22:6,11 26:9 32:4 38:22 40:17,19 41:3,8,18,21 42:7,18 43:2 44:6,11 45:11 46:7 50:13,15 51:20 57:6 58:14 61:2,3 62:3 72:8,10 72:19,21 73:7,13,17 74:19,22 75:1,5,10,14 75:17 77:21,22,22 78:11,15,17,19 79:2,4 79:7 80:1 82:12,16 82:18 90:5 91:9 97:11 98:14,18,21 99:14 100:1 101:2 105:7
**Brickman's** 14:22 15:7 22:2,10 45:21 46:3 46:10 61:15 75:7,18 76:14 77:8 79:14,19 79:20 97:17 99:20
**brief** 25:22
**briefly** 9:14
**bring** 73:15 101:19 102:22 103:11
**brings** 25:5

**Capital Reporting Company**

Page 2

broken 58:2
buckets 62:1
**Building** 61:12
built 61:11
bulk 61:10
burdensome 67:7

**C**

**C** 1:18 2:1 3:1 4:1 5:1
   109:2
call 21:19 22:6 23:10
   23:17 35:20 45:15
   49:9 50:8,12,13,14,15
   50:20,21 51:9,12,20
   57:8 58:2 66:2,11
   69:2,3,3,17 71:19
   79:2 90:20 92:7
   96:18,21 97:1,4,5,5,7
   97:8,10,19 98:4
   100:5,16 101:5
   102:12,14 105:7
called 1:14 5:4 28:20
   49:6,12 50:6 51:15
   51:15 57:11 60:18
   68:2 70:5,11,12 71:4
   71:11 98:6,14 99:5
   101:1 103:21 105:18
   105:20,22
calling 51:13
calls 36:17 49:2,19
   67:16 74:9 90:20
   95:15,19 105:2,9,11
capped 67:15
car 69:18
care 23:12 57:18 78:12
case 11:9 18:12 68:1
   69:5 109:10
cell 50:6 95:22 96:2,3,4
   101:5,12,14 105:2
center 51:5 90:20
Central 2:6
**CEPPOS** 3:5
certain 66:18,19 83:16
   101:19
**CERTIFICATE** 109:1
certify 109:4
chance 10:10
change 41:14
changes 88:20
charge 79:15,22 81:4

82:2
charged 73:1 74:9
   84:10 85:5
**Chatham** 5:12,14
chloride 38:19 40:14
chose 78:2 79:9
claim 15:21 57:2
clarification 55:7
classification 7:8
clear 68:11
cleared 102:2,9
clearly 14:12 18:2
   41:20
click 93:13,18
client's 32:3
clock 66:2
close 76:21
**CL05-1389** 1:6
code 59:11 66:2 83:11
   83:13,13
cold 21:1
color 59:9,11,15 62:6
**Columbia** 1:2,20
   109:21
combination 52:15
   105:7
come 21:19 29:13
   46:20 50:4 56:5,6
   65:20 66:13 75:4
   78:20 90:21
comes 66:15 83:4
commission 109:15
communication 51:6
comp 88:4
company 78:1 100:2
compared 101:8
competent 79:8
complaining 69:13
complete 88:7 90:10,13
   107:6
completed 71:2 88:16
   89:3 92:17 93:9
   94:16,17
completion 71:9,10
   80:21 81:11 92:4,20
   94:4,9
complex 6:10 7:4,15
   16:12 19:19 21:1
   23:8 26:6,10 27:3
   28:21 29:2,8 31:19

31:20 32:19 45:3,7
   51:3 52:19 61:6 78:3
   79:5
complicated 11:9
compound 29:7
computer 89:19
concerns 72:20,21
concluded 106:7
concrete 38:20 40:15
   60:9,13
condition 23:6 48:12
   48:15
conditions 23:22 26:5
   102:15 103:18
confirm 29:19
confused 11:22 19:10
**Connecticut** 1:16 2:15
connection 86:16 87:2
constant 51:6
contact 51:5 95:2 98:20
   99:7 101:7,11
**Continued** 3:1
contract 4:16,17 9:11
   13:19 18:4 21:4,7,13
   23:9 27:15 28:8 29:9
   29:11 31:11,13,15,16
   32:8,19,20,21 33:6,15
   33:19,20 34:13,16,20
   35:2,3,12 41:22
   42:17 44:2,10,11,15
   52:4 63:19 66:6,16
   66:17 67:3,7,11
   75:19 78:9,13,18
   79:10 89:7 101:20
   102:7 103:12 104:10
contracted 87:5
contractor 79:9 103:7
contractors 14:15
contracts 17:22 18:14
   18:15
contractural 63:10
control 36:13 37:6
conversation 57:20
   98:9,12 104:12,22
conversations 57:2
**COOK** 15:7 37:1 62:6
cool 19:11
copy 10:18 31:14,16
   63:18 64:1 95:9 96:7
corporate 32:3

**Corporation** 1:7 7:22
   108:3
correct 6:11 7:1 11:13
   14:5 15:9 16:13
   19:20 20:2,19 22:11
   24:1,11 25:6,11,14
   28:8,9,15,21 30:22
   31:1 33:3,4 34:14
   40:10,18 43:7 48:1
   49:5,21,22 53:4
   57:13 61:16 62:4
   65:3,4,6 67:6 68:7,8
   70:17 71:20 74:16
   75:7 79:14 82:14
   87:4,16 89:14,21
   95:20 96:1,16 99:4
   100:22 101:3 103:19
   106:1 107:6 109:5
**CORRECTION** 108:6
corrections 107:7
corrosive 59:16 60:5
counsel 1:14 4:22 5:6
   90:5 100:14 100:8
**Counsel's** 96:7
count 8:5
counts 19:9,12
couple 10:9 90:7 105:9
**COURT** 1:1
cover 76:19
coverage 8:9
**Coyne** 1:16 2:14
crappy 19:15
create 46:9 66:10 76:18
   90:13,15
created 27:8 72:14
   74:3 75:22 76:7,13
   76:16 77:4 79:15,21
   80:17 81:10 82:1
   90:14 92:6
crew 101:19
cure 60:10
cured 60:14
curing 60:11,14
curious 58:21
currently 10:8
**C-H-A-T-H-A-M** 5:15
**C-O-M-P** 88:5

**D**

**D** 5:1

**Capital Reporting Company**

daily 55:2,5,11
damage 60:11,13
database 76:12
date 71:5,6,8,9,10
  80:20,21,22 84:13
  93:4,4,12,14,19,22
  94:4,10 99:7 107:12
dated 65:2 95:18
dates 24:13 45:9 91:12
Dave 51:3 54:5 65:16
  68:18 69:4,18 95:2
  98:5,6 100:16
day 21:21 22:10 25:22
  45:4 48:4,5,16 49:1
  50:4 56:3,12 65:5,9
  71:13 74:19 80:3,5
  80:18 81:10,10,15
  93:9,22 97:2 98:16
  99:15 106:1 109:13
days 26:1 56:5,6,17
  87:7 88:16 89:3,6
  91:12 93:17
day-to-day 54:16
dealt 20:7
Deb 19:8
Deborah 2:13 12:21
decide 103:4
decks 59:2
defend 41:14
DEFENDANT 2:12
  3:3 90:5
defendants 1:8 8:2
Defense 105:19
definitely 24:5 98:15
deliver 44:6
demonstrate 76:11
Department 105:18
depend 92:8 103:17
Depends 7:8 104:17
DEPONENT 107:1
deposition 1:12 4:8
  8:21 9:10 14:13 96:6
  106:7
described 42:15
description 81:5 94:1
  94:11
description's 64:19
designated 59:7,8
desk 90:19
detailed 11:19 13:21

details 20:19
detect 21:15
detecting 21:2
determine 23:21 36:12
  37:5 96:15
develop 31:8
development 20:10
dialing 104:21
difference 11:1,15,19
  16:2 29:21 30:2
differences 9:12,15
  10:21 11:21 17:3
different 6:21 10:3
  12:5,15 13:14 30:12
  30:14 60:8 68:5 70:2
  84:18 94:6 101:21
difficulty 99:19
direct 21:6 77:13
directed 40:5 104:4
directing 104:6
direction 55:17
directly 10:7 29:7 75:3
  78:8 101:5
discuss 103:20
discussed 57:5
discussing 39:3
discussions 8:14 11:10
  12:9 26:15 34:4 62:9
  64:5 87:22 96:10
  105:13
dispatcher 90:21
distributed 95:6
District 1:1,2,20
  109:21
divided 67:6
document 8:22 16:7
  18:10 20:11,13 34:1
  37:13,17 39:19 40:20
  41:11,16,18 42:14
  49:18 72:3 75:22
  77:17,18 80:17 84:1
  95:13 96:8 97:3 98:3
  98:8
documentation 76:6
documented 46:8
documents 15:12 30:3
  32:21 33:1,5,8 35:1
  76:7 85:11,12,13,17
DOD 49:12 57:17
  65:11 68:10,17 69:16

70:11 71:19 90:18
doing 37:19 73:13,14
  74:11,19 76:14 77:19
  78:6 79:7,11,20
  82:19
Donohue 3:4,5 4:5 7:5
  10:1 13:3 14:17 15:1
  16:16 19:8,11 22:17
  22:19 32:1 36:17
  37:12,16 41:9,16
  42:9 43:12 53:6,9
  55:1,7,9 59:21 64:4
  71:21 77:9,16 84:5
  90:4,6 91:19,21
  92:10 94:19 96:5,14
  100:6,18 101:1
  105:16
door 51:5
drafted 17:8,18
drafting 20:1,8
Drawing 39:17
duly 5:4
duties 6:5 54:17 55:3,6
  55:12
D.C 1:10,17 2:16 14:19
  51:8

---
**E**
---

E 2:1,1 3:1,1 4:1 5:1,1
  108:1,1,1
earlier 40:3
Echo 57:12
effect 19:19 23:16
  60:12
effects 59:17 60:5
eight 74:9 76:6 103:3
either 20:2,5 48:9
emergency 88:14,21
  94:2,9
employed 5:16,19
  109:9
employee 72:17 75:13
  76:5
employees 7:14 76:8
encompassing 36:7
  39:4
engage 22:8,14
ensure 36:8
entered 30:17
entire 32:20,21 33:15

34:19 56:7 76:19
Errata 107:8
ESQUIRE 2:4,13 3:4
essentially 73:9 75:9
establish 13:15 43:14
estimated 80:21
et 1:7 108:3
event 46:7 52:16 76:18
  77:2 81:6,8 84:2
  85:21 98:15 100:2
events 24:12
exact 24:13 48:2,5 95:4
  98:12
exactly 56:14 58:22
  80:4 81:22 84:1
examination 1:14 4:3
  5:6 90:5 100:14
examined 5:5 107:4
Excuse 17:13
exercise 45:10
exhibit 8:16,20 9:6,9
  10:6,13 12:3,3 13:1
  14:13,20 15:5 16:6
  16:15 19:2,17 20:2
  26:13,19 29:18 31:3
  32:11,15 34:2,8,12
  35:18,21 36:21 41:1
  42:4,14 49:18 58:13
  62:12 64:11 68:9
  70:16,19 72:2 73:20
  74:15 77:6 83:12
  88:3 89:8,17 92:22
  96:6,12,15 105:17
exhibits 4:8,22 10:22
  13:18,20 17:8,14
  29:17 30:7 34:18
  64:15 90:11
exist 10:22
expect 100:5
expected 55:22
expensive 60:21
expires 109:15
explained 82:10
e-mail 4:14,15 27:1
  46:19

---
**F**
---

face 84:17
facilities 6:2,6,14,15
  23:5 43:16 51:2

**fact** 92:22 98:13
**failed** 44:6
**fair** 36:20 37:10 38:11
40:7 42:3,7,13,19
92:21 94:14,20,21
**fairly** 24:9 27:18 37:21
**fall** 11:8 25:19 57:21
**fallen** 57:15,16
**familiar** 17:2 39:18
103:8,8
**familiarity** 97:15
**far** 85:22 87:8 102:17
**February** 5:20,22 6:6
7:15 18:1,3 19:20
21:17 22:22 24:10
27:12 28:10,11,12
30:9 39:18,19,22
40:8 45:1,2,8,8 47:20
48:13 56:11 57:9
65:3,4,4,5 68:15
71:20 74:20 79:13
80:7 81:17 82:7 91:2
96:20
**Federal** 33:12
**feel** 54:8
**fell** 57:22 69:21
**fields** 83:16
**file** 9:19 12:22 13:2,8
14:3,9,10,14,18,22
15:4,7,21
**filed** 15:19 87:13,15,18
**files** 10:7 31:16
**fill** 83:17 92:14
**filled** 91:22
**fills** 93:13,19
**final** 12:17 13:19
**financial** 109:10
**find** 21:12,13 24:7
75:21
**fine** 96:9
**finish** 80:22 89:6
**first** 5:4 46:22 50:20
65:18,18 69:5 70:5
91:7 97:1,8 104:19
**five** 7:9,12
**flag** 29:5
**folks** 69:2 73:16
**follow** 43:19
**following** 30:22 92:3
99:20

**follows** 5:5
**follow-up** 85:12,17
**foot** 55:14,22 58:3
69:14
**force** 65:12 68:11
72:18
**foregoing** 107:5 109:3
109:4
**form** 70:13 71:18
**formatting** 10:3
**forth** 43:4 69:22 104:3
**found** 49:4
**four** 7:9,12 16:16,17
43:6 89:5 94:6
**frame** 22:20 48:2
**Franklin** 105:9
**free** 36:8
**Friday** 1:11
**front** 86:21 104:9
**full** 5:8 6:12 55:8,12
**fun** 104:20
**function** 75:15
**further** 90:2 100:14

### G
**G** 2:4 5:1
**Gate** 57:12
**gates** 36:8
**gather** 15:12
**gathered** 15:13,14,20
**general** 99:13
**generally** 48:6 102:10
**generated** 92:2 94:15
**gentleman** 27:5 46:19
51:4 99:2
**George** 5:12
**GEREL** 2:5
**getting** 24:6 77:13,13
**girlfriend's** 101:15
**give** 10:10 48:1 64:1
**given** 58:14 89:2 107:7
**go** 24:6,6 30:18 38:13
40:4 46:14 50:16
65:19 69:4,11,14
75:2 78:8,19 79:19
83:15 87:21
**going** 7:17 8:19,21 9:5
12:2 16:5 26:18 34:7
35:17,20 43:2 50:15
52:20 55:1 63:18,21

64:7,14 69:9 73:1
78:19,20 100:9
102:14
**good** 46:14 79:20
**goods** 46:21
**Gorham** 72:7
**government** 21:22
22:14,16 23:9,10
31:4,9,15,18 33:12,21
34:14,16,20 35:12
42:17 44:3,16 54:4
63:19 67:8 68:4 70:7
70:14,15 71:16 73:1
73:3,18,20 74:22
75:1,2,9,14,16,19
77:21 78:7,12 80:1
82:13,14 92:8 102:7
**GREG** 3:13
**Gregory** 32:3
**grounds** 21:1 56:2
**Group** 32:4 41:21
**guards** 6:19
**guess** 8:5,10 48:1
103:17
**guide** 43:3
**guidelines** 43:14,19
**Guy** 18:6
**guys** 82:21
**guy's** 82:22

### H
**H** 3:4 108:1
**hairs** 104:18,19
**hand** 109:13
**handed** 32:14
**handwriting** 62:13,14
62:19,22 63:3
**hang** 66:2
**happened** 58:6,7
**happening** 49:17
**Harman** 1:13 3:12 4:8
5:3,10 8:19 10:12
13:18 16:5 19:20
26:18 30:9 32:14
54:17 64:14 86:3
88:3 90:7 100:16
106:7 107:3
**hats** 41:14
**headquarters** 14:16
**help** 14:9 85:10

**helps** 12:7
**hereunto** 109:12
**hey** 73:12 85:9
**He'll** 64:1
**historical** 14:3,9,10
**home** 101:10,14
**honestly** 11:20 48:14
**hour** 28:4 77:1 102:1
102:18,19
**hours** 27:2,14,14 28:5
28:11,13,19 29:1,12
29:14,15 30:11 46:18
50:10 66:7 67:3,4,5
67:10,15 69:9 74:8
74:10 76:5,7,10,12
77:1 89:6 102:3,8
**house** 29:6
**hundred** 28:4,11,14
54:13 76:22
**hung** 98:13
**hurt** 47:1 57:10,11

### I
**ice** 4:11,12 16:10,11
18:19,21 19:17 20:10
21:2,15 22:15 23:6
24:7 31:2,7 33:20
34:21 35:4,13 36:8
36:13,21 37:5 38:19
40:4,15 42:4,15 44:3
49:19 52:1,2,5,9,15
54:18 55:14,20 58:12
60:18 61:1 62:1,13
81:5 84:2 101:22
104:15
**identical** 29:18,20
**identification** 8:17
26:14 32:12 34:3
64:12 96:13
**identified** 35:18
**identify** 8:22 9:7 10:14
16:7,19 32:16 64:16
**imagine** 41:15
**immediately** 98:14
**importantly** 102:1
**improvement** 36:14
37:6
**inadequate** 45:14
**inches** 24:19
**incident** 47:2

**Capital Reporting Company**

include 6:18 61:22
incoming 95:15,19
  96:21 97:1,4,19
  105:2
incorporated 5:18,21
  7:21 20:12
indicate 70:4 73:2
indicated 20:1 73:4
  95:5
indicates 37:3
indicating 79:3 80:16
individual 39:13
information 15:20
  73:16 75:5,8 77:20
informed 49:12
informing 57:9
initial 102:5
initiate 43:17,20 50:1,7
  50:9,22 51:14,16,17
initiated 79:1
initiating 22:4
initiation 49:20 98:15
injury 58:6
input 20:14,17,17
inquiry 58:6
inspect 22:2,9 23:21
inspection 21:14,21
  22:1 35:22 38:12
  39:3 46:6,10,20 55:4
inspections 20:22
  21:10 22:6,9 36:6,10
  36:16 37:4 40:2,9
  44:16 45:21 46:3
instance 82:22
instances 53:18,21
interest 109:10
interface 72:19 73:8,14
  74:21 79:22
Interfacing 82:12
interpret 40:8
interpreted 40:11
investigate 69:19
investigating 57:1
involved 17:11 20:10
  58:3 73:21 87:14
isolated 85:14
issuing 67:21
i.e 78:10

**J**

J 1:4 11:2 108:2
Jay 3:12 9:19 10:5 13:4
  13:6,12 14:13 15:15
  15:16
Jay's 15:4
Jeremy 1:13 5:3,10
  106:7 107:3
job 6:5 79:20
joined 32:2
joint 46:6 55:3
Jordan 1:16 2:14
judging 38:10 39:12
June 87:12

**K**

keep 26:4,8 46:2 71:3
kind 20:21 21:14 22:1
  29:6 85:17
kinds 23:22
King 5:12
knew 11:8 51:7,9 54:7
  58:4 79:11 100:4
know 8:2,8 9:15,17
  10:2,21 11:18 12:17
  12:19 13:12,19 14:7
  15:11,18,18,19,22
  16:3 17:6,9,10,18
  22:6 24:5 27:11
  30:16 33:5 43:4
  48:19 49:12 52:11
  56:8 57:22 58:4,10
  60:4,7 62:16 70:1,21
  74:5,20 76:2,17 77:1
  77:12 80:4 85:20,21
  85:22 86:19 87:4
  91:4 97:12,15 98:17
  99:10 103:1 104:2
knowledge 19:21 26:7
  26:11 46:8
knows 63:3 78:1

**L**

L 1:13 5:3 106:7 107:3
labor 72:9,9
language 33:14 40:13
  44:19
large 24:9,15,17 25:1
lasted 97:5,8
law 1:5,15
lawyer 19:15

lawyers 56:20,22
leading 93:10 94:18
leads 105:6
learn 47:1
learned 47:7,12,14
leave 21:9
leaving 21:18,20
left 27:14 28:10,13
  46:7,11
leg 58:2
legal 36:18
legwork 79:22
Len 5:10
let's 14:12 32:10 50:21
  51:21 64:16
Lewandowski 3:13
  30:17 32:4
lieu 60:15
light 48:21 67:22
limit 60:6
limits 67:7
LINE 108:6
list 19:15 43:4
listed 84:12
little 31:5
LLP 2:14
loader 91:15
loaders 103:3 104:9
lobby 99:3
locate 85:18
long 91:13 98:11
  101:17 102:10
  104:10
longer 54:6
look 24:6 40:4 46:13,20
  68:20 69:16 83:18,22
looked 9:14 29:21
looking 9:13 68:9
  86:18
looks 46:14 65:11 68:1
lot 48:9,13 64:20 65:10
  68:3,12 73:13 77:14
  91:10,16 93:2
lots 48:9,11 102:2,8
loud 36:4

**M**

magnesium 38:18
  40:14 60:17 61:11
maintain 10:8

maintained 14:14
  27:13
maintenance 6:7,18
  8:12,12,13
majority 38:15 75:10
making 53:18
management 8:12 63:5
  63:9
manager 6:2,4,6,14 7:9
  23:5 43:16 51:2
managers 7:2,6
manager's 14:18
manual 42:21
man's 58:6
map 59:11 62:6
March 1:11 18:5 94:10
  109:14
mark 32:10
marked 8:17,20 9:6,18
  10:6,13 16:6 26:14
  26:19 29:17 31:3
  32:11,15 34:2,8
  35:17,18 36:21 42:4
  42:14 49:18 58:13
  64:12,15 96:6,12
Maryland 2:8 3:7 63:5
materials 62:2
Maximo 4:18 64:18,21
  64:22 83:15,15 84:18
  93:13,13,19
mean 13:8 14:12 15:12
  17:14 66:1 71:6,12
  76:18 77:5 78:21
  81:6 83:12 85:2,19
  88:6,11 91:13 100:4
  101:18 102:22 103:2
  104:17
means 28:5 74:13
  83:14 88:15,18,18
melting 45:2,3
memorialized 46:15
memory 98:8
men 103:3
mentioned 40:19 41:2
  41:18
Michael 1:4 47:1 108:2
middle 35:22
mind 71:3
minion 15:15
minute 97:6,8 104:22

**Capital Reporting Company**

Page 6

minutes 99:12 104:13
104:18
misspoke 19:8
mistake 29:16 63:6
mistakenly 30:7
modified 19:7
Monday 92:19
money 28:9 50:11
Monroe 3:6
morning 34:1,10 47:2
48:13 57:9 95:3
96:19 105:2
multiple 101:9
MURRELL 2:13

**N**

N 2:1 3:1 4:1,1 5:1
NAC 43:16 99:15
name 5:8 15:19 101:6
narrative 41:5
narrow 94:7
narrowed 81:7
Naval 51:2
Navy 21:4,10,18 22:4
27:6,9 28:3 38:14,20
40:5 43:15 44:10
46:7,17 49:20 53:7
55:16 61:11 65:19
66:3 72:19,20 73:6
73:12 78:9,10,18
101:20
Navy's 43:20
near 36:7 57:12
Nebraska 6:10 7:4,15
16:12 19:18 21:1
23:7 26:5,10 27:2
28:21 29:1,7 31:19
31:20 32:19 45:3,7
51:3 52:19 61:5 78:3
79:5
necessarily 20:11 39:14
67:5 71:12 75:18
need 37:15 50:15 52:6
54:14 74:18 79:10
needed 23:22 36:14
37:7 103:5,12
neither 109:8
never 23:20 25:8 46:14
57:5
new 59:4,22 60:1,6

69:18 93:13,19
Nextel 95:15 104:20
Nextel's 95:14
night 45:4
nine 89:6
Nos 8:16 26:13 64:11
notarial 109:13
Notary 1:19 109:1,20
notice 1:15 72:11
noticeable 11:1
noticed 23:15
notified 49:15
notify 49:16
November 17:1 19:7
number 66:19 67:8
68:5 69:11 89:20
97:4,14,16,17 101:13
101:15
numbered 89:16
numbers 43:4 89:17
101:8,9,10
N.W 1:17 2:15

**O**

O 4:1 5:1
object 37:14 41:15 55:1
objecting 37:12
objection 22:17,18
23:1,13 24:2 25:7
36:17 37:8,11,15
38:21 39:8 41:10,12
42:8,9,20 43:11,12
44:5,18 45:17 50:17
51:1 52:8,22 53:5,16
54:2,11,20 55:15
59:21 68:13,16 71:21
77:9 80:19 84:14
92:5 93:10 94:18
103:22
obligated 66:7
obligation 36:15 39:7
40:1
obligations 41:6 42:5
42:16
obviously 23:16 48:22
76:20 104:7
occasion 27:19 79:12
occasions 52:18
occur 55:19
October 96:19 109:16

odd 71:2
office 1:15 56:7,11,13
56:15 74:1
officer 109:2
officially 58:8
Oh 30:16 88:8 93:3
100:21
okay 5:16 6:3,9,17,21
9:5,12,16 11:3,7
12:20 14:1 15:10
16:14 17:2 20:7,16
20:21 22:8,13 23:5
24:9,21 25:13,16,21
26:4,8 27:4,7,16,20
28:2,7,16,18 29:4,9
30:1,6 31:2,14,22
32:20 34:18 35:11
36:6,15 39:2,17
40:13 44:22 46:20
47:12,19 48:16 49:2
49:9,18 50:14 51:11
51:22 52:13,17 53:14
55:9,19 56:2,10,19
57:8 58:1,12 59:5
61:8,14,22 62:5,18
63:13 64:3 65:2,13
65:18 66:22 67:13
70:4,19 71:14,18
72:22 74:4,10,10,12
74:18 76:17 79:3
81:2,16 84:1,4 85:7
85:10 88:8 89:15
90:1,1 91:1,7 92:12
92:16,22 98:7 99:9
99:17 101:4 102:4,10
103:20 105:1 106:2,5
old 60:2,7
Once 60:14
ones 13:11 35:8 50:1
one's 13:13
operate 36:9
operating 39:21
operation 6:22 43:3
operational 42:21
operations 6:7,18 86:5
86:17
operative 18:4
opinion 36:18
opposed 41:8 94:16
option 76:19

oral 1:14
order 4:18 64:18,21
68:7 69:6,10,17 70:6
70:11,22 71:16 72:5
72:13 73:19 84:22
85:6 88:4,10,13 89:9
89:10,12,16,20 90:8
91:22 92:2,6,8,17
93:8 105:17
orders 66:4,5,8,9,16,19
67:6,8,11,17 69:20
70:2 86:4,7,16 87:2
92:14
original 30:13
originals 15:15,16
outcome 109:11
outcoming 95:19
outer 48:9
outgoing 95:15 97:10
outside 29:7 48:10
overhead 4:19 72:4,22
82:22
oversee 6:7,17 72:8,9
72:18 74:19 75:6,13
77:8 78:6 79:6,14,18
overseeing 75:18 76:14
77:22

**P**

P 2:1,1 3:1,1 5:1
page 4:3,8,16,17 8:1
30:6 32:17,18,22
33:2,14 34:9,12,13,15
35:21 38:8,9,10 41:2
62:18 108:6
pager 101:13
pages 33:8,9,11,19 35:2
35:11,14 85:14
paid 24:6 44:12 82:14
82:15
pails 62:1
paperwork 56:9
paragraph 35:21 39:2
39:4,13
pardon 80:9 86:13
101:6
park 48:7
parking 36:11 37:4
48:9,9,10,13 59:2
64:20 65:10 68:2,12

73:13 91:10,15 93:1
102:2,8
**part** 6:21 20:1 30:8,13
34:16 49:15 61:14
**particular** 50:4 73:19
76:18 79:12 102:21
**parties** 1:22 109:9
**parts** 20:17,18
**part-timers** 8:7
**pass** 44:8 73:7 78:15,16
**passed** 21:5,7
**pass-through** 44:9
**Pat** 9:22
**PATRICK** 3:4
**paying** 69:8 82:18
**payroll** 83:1
**people** 7:14 49:14 58:9
92:13 103:13,16
**percent** 54:13
**perform** 41:21 42:18
44:1,12 66:7 99:21
**performance** 45:11
54:17 55:2,6,12
**performed** 26:9 45:22
103:9
**performing** 82:8
**perimeter** 48:10
**period** 23:8 24:16,18
25:1,22 30:14 39:18
45:1 71:12 81:14
95:17
**periodic** 36:10 37:4
44:16
**periodically** 22:5 53:14
54:1 77:5
**periods** 26:6
**permission** 22:14 23:11
**permitted** 50:21
**person** 57:14 98:20
99:5
**personal** 51:4 96:2
105:10,11
**personally** 56:3 78:22
**personnel** 8:6 41:3
43:14 99:14 101:22
**persons** 57:1
**pertaining** 33:19 35:13
**pertains** 40:17
**Philbin** 1:4 25:4,18
47:1 57:3 108:2

**Philbin's** 27:21 91:5,11
95:3
**phone** 4:20 43:4 49:2
50:6 58:2 95:9,22
96:2,3,4,16 97:4,5,7,8
97:10,13,17 98:13
101:5,13,14,14,15
102:12 105:2
**physical** 44:2
**physically** 46:19
**piece** 69:13 83:1
**Pike** 2:7
**place** 45:15 54:8 69:1
**Plaintiff** 1:5,15 2:3 5:6
100:14
**plan** 4:11,12 16:10,11
16:22 19:18 20:12
31:2,7 36:21 42:4,15
43:6 49:19,20 50:9
51:17,22 52:2,4
58:12 62:13 104:15
**plans** 18:20,21 20:11
**Plaza** 2:6
**please** 26:20 32:16
64:17 72:3
**plumber** 83:7,8,10
**pocket** 82:17,20 83:4
**point** 25:13 62:7 77:7
101:11
**police** 49:13 57:17
65:11,12 68:11,17
69:17 70:5,11 71:19
90:18 105:19
**porches** 36:11
**portion** 32:18 78:10
**portions** 41:5,21,22
**position** 5:22 6:3 83:6
**possibilities** 94:7
**possible** 92:1,16 93:7
105:22
**possibly** 21:16 56:8
86:9
**posts** 8:8
**potentially** 85:21
**practical** 88:12
**precisely** 31:6
**premises** 23:7
**prepared** 18:10 70:6
70:13
**prepurchased** 66:5

**present** 1:21 3:11
11:16,17
**presented** 99:14
**pretty** 54:7 100:4
**previous** 103:10
**primary** 75:15 77:19
**prior** 21:18,20 93:17
**priorities** 58:16,16
**priority** 88:11,13,15,17
88:18,20,21 89:1
94:3,8
**probably** 24:20 51:8
74:2 97:21 101:14
**problem** 45:1 73:12
83:11,13,13 84:6
**problems** 93:15
**procedure** 50:19
**procedures** 43:14
99:22
**proceed** 65:21
**proceedings** 109:3,5,6
**process** 17:11
**produce** 35:6 76:6
**produced** 85:19
**productive** 76:9
**productivity** 74:6
**professional** 1:18 78:1
**program** 6:4 20:22
21:14
**properly** 36:9
**property** 14:4
**proposal** 34:16 43:1
**provide** 21:5 61:18
82:15
**provided** 33:22 34:10
62:3 82:16
**provides** 66:17
**provisions** 63:20
**Public** 1:19 109:1,20
**purchase** 61:17 67:14
**purchased** 28:3 50:10
61:3 66:14 67:16
**purposes** 16:2 21:2
84:21 88:12
**pursuant** 1:15
**put** 44:10 67:8 74:2
81:9 86:8,8,16 89:20
90:21 93:18 94:1
**p.m** 71:8 80:6 106:8

**Q**
**qualified** 100:1
**quantities** 72:5,13
**quantity** 66:16 67:11
83:2
**quarters** 28:20 29:4,5,5
29:13
**question** 18:11 20:7
25:2 36:4 37:22 38:5
42:11 73:18 90:15
100:11
**questioned** 38:4
**questions** 10:10 90:3
100:7,8 106:4
**quick** 64:7

**R**
**R** 2:1 3:1 5:1 108:1,1
**ran** 81:10
**read** 12:11 36:3 38:5,7
39:5 100:9 107:4
**reading** 106:5
**reality** 77:17
**really** 8:3 30:8
**rear** 64:19 91:10,15
93:1
**reason** 93:18 108:6
**recall** 25:4,16 44:19
45:4,5,9 52:2,17 53:1
53:17 57:19 58:10
81:22 91:12 95:1
97:18 99:14
**recalled** 53:20
**receive** 58:17 59:1,3,14
59:20
**received** 57:8 95:2
96:18,21 97:1,19
98:4
**recitation** 42:5,16
**recognize** 62:21
**recollection** 26:2 51:12
91:8 99:6,13
**Recommend** 53:9,10
**recommendations**
53:12,15,18 54:1,9,12
**recommended** 52:18
53:7
**record** 4:20 5:9 8:15
11:11 12:10,11 13:16
26:16 27:7,8 32:1,2

**Capital Reporting Company**

34:5 37:13 38:7 39:5
46:10 47:5 62:10
64:4,6 87:21 88:1
95:5,9,18 96:11,16
105:14 109:5
**records** 26:4,9 45:20
46:2 85:4
**reduced** 109:7
**refer** 39:6 101:20
**reference** 17:14 33:15
35:3
**references** 13:4,6 34:19
**referring** 7:3 13:20
33:20 38:20,22 40:22
43:10 62:12 74:15
82:4 83:12
**refers** 93:1
**reflect** 32:2 97:13
**reflects** 95:11
**refreezing** 45:4
**refuse** 63:11
**regard** 81:18,20,21
**Registered** 1:18
**regular** 20:22 21:14
**regularly** 27:18
**relate** 93:8
**related** 82:4 85:20
109:9
**relating** 82:8
**relation** 80:17
**relay** 72:21 73:16 75:5
75:8,17 77:20
**relaying** 75:19
**remember** 17:19 20:3
20:5,6,9,13,16,18,20
23:3 24:12,13,15,17
24:21 25:3,15,21
31:10,10,13 40:11
44:22 45:5 47:3,4,13
47:15,16,21,22 48:2
48:14,15,18,20,21,22
49:4,6,7,8 56:10,14
57:17 91:6 95:4
98:12
**remembering** 98:4
**removal** 4:11,12 16:10
16:11 18:19,20,21
19:18 20:11 21:5,20
22:5,15 27:14 28:4,6
31:2,7 33:16,20

34:21 35:4,13 36:21
40:5 41:22 42:4,15
43:17,17,21 44:3,9,12
49:19,20 50:9 51:21
52:7,9,15,21 58:12
62:1,13 66:7 67:14
67:18 68:2,6 69:9,21
78:2,11 79:2,8,9
81:18,20,21 82:4,9,15
82:17 83:9,14 86:4
86:17 87:2 91:9 93:1
99:21 100:2 104:3,15
105:8
**remove** 21:16 38:19
40:15 63:11,22 64:18
64:19 73:6,8 78:1
103:14
**removed** 65:9
**remover** 60:18 61:1
**removing** 21:3
**rephrase** 96:22
**report** 23:16 49:13
55:16 75:14 93:12
95:14 101:18 102:1
**reported** 65:15 71:5,8
93:4
**Reporter** 1:19 109:1
**reporting** 27:2 72:12
**reports** 74:7 84:18
**represent** 14:17 94:15
**representative** 32:3
56:20
**represented** 73:20
**request** 65:19,20 99:21
104:8
**requested** 31:12 53:7
73:22 90:18
**require** 40:9 44:16
**required** 21:13 31:8
50:20 61:17 79:5
83:16 91:3 101:22
**requirement** 31:11
101:18
**requirements** 21:7
42:22,22 44:11 89:7
101:21
**respect** 19:2
**respective** 1:21
**respond** 88:22 89:1
**responded** 84:2

**response** 99:20 102:6
**responsibilities** 38:14
43:7
**responsibility** 28:6
38:15 39:12,15 43:9
43:13,15,18,19,20
45:11 46:17 51:9
72:7 73:7 75:4,11
77:20 78:16 103:16
**responsible** 22:4
**rest** 74:11 86:3
**RETAINED** 4:22
**RETURN** 108:4
**review** 98:2,7
**reviewing** 48:19
**revised** 4:12 16:22 17:6
**right** 7:2,11 15:6 19:5
19:13,22 23:20 26:12
35:16 36:3 39:21
40:7 45:6,14,20 46:5
46:22 49:14,16 51:5
51:19 53:3 56:16
57:5,14 65:8 68:5,9
71:14 72:2 87:10
88:10 91:20 100:13
101:1 105:12 106:2
**roadways** 102:2
**ROBERT** 2:4
**Rockville** 2:7,8 3:7
**Ronnell** 72:6,15,16,17
73:10,16 74:3,7
75:12 76:13 77:7
78:5 79:13,19 80:2,6
80:10,18 81:16,17
82:7 83:7 84:1,21
**Ronnell's** 72:9 76:4
83:6
**roof** 84:6
**room** 30:17
**roster** 101:9
**routine** 27:16
**run** 84:18

**S**

**S** 2:1 3:1 4:1 5:1 108:1
**salt** 45:6,14 58:18 59:2
59:4,14,17,20 60:11
60:15,21,22 61:9,10
61:11,22
**salted** 52:20

**Samet** 2:4 4:4,6 5:7 7:7
7:10 8:18 10:9,11
11:12 12:1,12 13:7
13:15,17 14:8 15:2,6
15:10 16:4,18 17:16
17:17,20 18:9,15,18
19:3,6,13,16 22:21
23:4,19 24:8 25:9
26:17 30:5,20 32:7
32:10,13 33:13 34:6
35:6,10 36:19 37:2,9
37:14,19 38:2,17
39:1,16 41:13 42:1
42:12 43:5,22 44:14
44:21 45:19 47:8,11
50:18 52:12 53:2,8
53:10,13,19 54:3,15
55:5,8,10,18 59:12
60:3 62:11 63:4,12
63:17 64:3,7,13
68:14 72:1 77:12
78:4 81:1 84:8,19
86:2 87:9,14,18 88:2
90:2 92:5 93:10
94:18 100:7,10,13,15
100:20 104:11
105:15 106:3
**sand** 45:6
**sanded** 52:19
**sanding** 45:15
**Savits** 1:16 2:14
**saw** 23:6 24:4 46:19
**saying** 51:11 56:16
76:22 94:11 101:12
**says** 33:2 37:17,18
58:17 59:6 71:1,1
81:5 83:19 88:4
**scenario** 69:5 104:8
**scene** 47:17
**seal** 109:13
**search** 24:7 86:11,14
86:15
**Sears** 51:4 54:5 65:16
68:18 69:18 95:2
96:19 98:5,9 100:17
**second** 104:22
**seconds** 97:6,9 99:12
104:13,19,19
**section** 11:2 43:6
**secured** 61:9

security 6:19 8:5,6
see 25:13 29:21 30:2
    49:15 60:11 68:21
    69:12,19 72:19 78:16
    86:15 89:15 90:12
    100:21 104:12 105:4
seek 22:14 23:11
seen 35:11
selected 41:20
send 69:12
sending 27:17
sent 27:11,17,19,21
sentence 38:18
separate 29:9 67:12
separately 29:12
sequence 89:20
service 7:21 65:15
    66:16 67:16 69:9
    74:9 89:10,11,12
services 2:12 5:18,21
    21:5,20 22:5 40:6
    41:20 44:7,13 67:14
    67:19 68:2,6 69:21
    82:15,17 105:17
set 30:9 67:16 88:22
    109:12
Seventeen 8:13
sheet 107:8
Sheri 1:18 109:2
shifts 8:8
SHORTHAND 109:1
show 8:19 9:5 12:2
    16:5 26:18 34:7
    35:16,17 59:9,13
    64:14 97:3
showing 10:12 62:18
sidewalks 36:11 58:17
    59:4,19,22 60:1,6,7
Signature 106:6
    107:12
signed 13:13,13 107:8
similar 10:4
simple 37:22
simply 28:4 79:21
    104:15
single 81:7
sir 5:9
sit 86:22
site 6:8,9 14:14 103:8
sitting 99:2

situation 57:18
slightly 10:3 12:5,15
slip 11:8 57:21
slipped 57:15
snow 4:11,12 16:10,11
    18:19,20 19:17 20:10
    21:3,5,15,19 22:5,15
    23:6 24:7,22 27:2,14
    28:4,6 31:2,7 33:16
    33:20 34:21 35:4,13
    36:8,20 40:4,5 41:21
    42:3,15 43:17,17,20
    44:3,8,12 45:2 48:21
    49:19,20 50:9 51:21
    52:7,9,15,21 58:12
    62:13 63:22 64:19
    65:8 66:6 67:14,18
    68:2,6,11 69:8,13,21
    73:7,8 78:2,2,11 79:2
    79:8,9 81:6,18,20,21
    82:4,8,15,17 83:9,14
    84:2 86:4,17 87:2
    91:9 93:1 99:21
    100:2 101:22 103:14
    104:3,15 105:8
snowfall 24:10,16,17
    25:1,17,18 102:21
snowing 48:16,22
software 85:15
somebody 13:14 49:6
    57:10,11,15 63:9
    65:15 68:10 69:3
    70:5,8,10 75:6,8 79:6
    99:11 102:16,17
Somebody's 62:13
soon 98:13
sorry 7:5 17:16 19:10
    96:20 100:12,22
sought 23:21
speak 37:13
speaking 37:15
speaks 37:17 41:11,16
special 52:2
specialist 83:10
specific 50:19 51:22
    53:17,21 93:22
specifically 20:16
    58:10 76:3
specify 22:19
spelled 5:14

spend 50:11 56:6,7
    74:11
spent 76:22,22 77:1
spilled 61:12
splitting 104:17,18
spoke 98:17 99:10
spotted 54:18 55:13,20
spreadsheet 27:8,13
    30:9 91:18
stage 60:14
stand 89:8
standards 102:8
standing 41:9,12
start 51:21 64:16 80:20
    105:8
state 5:8 38:11 39:14
    41:20
stated 12:21 40:3 43:1
    75:18
statement 22:12 38:11
    94:14
STATES 1:1
stationed 6:12
status 70:22 88:4
stayed 51:8
stenographically 109:6
step 69:14
steps 36:11
Stewart 1:18 109:2
store 61:5
stored 61:8,10,12
Street 3:6
streets 36:11
strike 25:3 31:5 49:3
    56:21 67:1
structure 83:19,20,20
    84:3
subcontract 4:9,10,13
    9:3 10:18,19 21:6,8
    41:3 43:2 45:12
    61:15 78:13
subcontracted 42:6,18
    78:10 82:16
subcontractor 23:11
    75:1,10 78:8
subcontracts 18:17,18
subject 28:7
submit 31:9 66:19
submitted 31:4 70:7,13
substance 36:14 60:8

98:9
substances 37:6
substantive 16:1
subtract 28:5 72:5,13
subtracting 83:2
suggest 70:8 77:6,7
    82:3,6 104:14
suggestions 75:16
suit 15:19 87:13,15,19
Suite 1:17 2:7 3:6
Sunday 91:10,16
Sundays 92:13
supervision 109:8
supervisory 45:10
supplied 60:22
support 83:3
sure 41:15 56:1,13,15
    58:8 76:8 79:20 90:8
    104:3,9
surface 55:13
surfaces 26:5 38:20
    40:15
sworn 5:5
system 64:22 72:12
    93:18
S-E-R-V-I-C-E 89:13

**T**

T 4:1,1 108:1,1
take 11:19 20:1 23:12
    57:18 64:7 96:7
    102:10
taken 109:3,6
takes 60:9 89:5
talk 77:14
talking 7:19,20 25:18
    38:8 55:3,5 70:16
    104:2
talks 43:6
tapered 24:22
target 71:9 80:20,21
    81:11 94:4,9
task 81:17,19 94:15
technical 32:17,18
    34:15 41:19 43:1
    101:21
technically 78:7 81:3
    89:3
telephone 105:11
tell 11:20,20 12:4,6

**Capital Reporting Company**

Page 10

13:10,16,22 14:2
17:3 26:19 39:12
40:22 54:14 57:14
59:9,13 63:21 64:17
70:19 71:14,18 72:3
73:3,21 80:8,12,13
81:14 86:6,9 90:17
103:2,12 105:16,19
105:20
**telling** 18:9 105:21
**ten** 26:1 64:18 88:15
89:3 104:19,19
**tenants** 66:1
**ten-day** 94:8
**terms** 44:3
**testified** 5:5
**testimony** 39:6,11
107:5,7
**Thank** 17:20 32:5
**Thanks** 94:22
**thing** 49:16 52:10 55:4
**things** 19:15 28:20
38:15 41:7 67:12
70:3 89:15 90:8
**think** 12:8 14:18 16:1
16:14 18:3,4 19:3,9
29:17 30:6,10,11
32:7 38:3 59:2 60:19
67:1 85:19 87:12
90:14
**Thirty-eight** 100:18
**thought** 37:21
**Thousands** 33:7,10,11
**three** 13:18 19:11 37:1
77:11 94:6,11 102:3
102:8 103:3
**thrown** 94:5
**ticket** 4:19 65:1,2 69:3
72:4,14 73:10 79:15
79:21 81:12,14 82:1
82:22 83:19 84:17
94:3,8,15
**tickets** 76:19
**time** 6:12,16 13:22
19:19 21:16 22:19
24:13,22 25:1,16
30:14 47:3,6,19 48:2
48:3,5,6 51:3,13
52:20 54:13 56:7
58:5 60:9 66:14,18

66:22 67:2 72:15
73:5,11 74:3,7,11,14
76:1,4,8 77:4,18
79:16,22 81:4,9,13
82:2,4 84:9,21 85:3,5
86:8 88:22 89:2
91:13 92:11 95:1,5
95:18 96:18 98:10,11
101:19 102:7,11,13
**timeliness** 99:20
**times** 52:6 77:11
**today** 18:10 25:5 77:2
86:10
**told** 18:7 21:19 57:11
57:16 103:13 105:21
**top** 51:8
**total** 7:2,5 30:11
**tower** 83:11,13,13,21
84:3 104:21
**track** 27:14 29:11 65:1
72:9,15 73:5,10 74:3
74:13 76:1,4,7 77:4
77:18 81:13 86:8
**tracking** 88:19 92:11
**traction** 36:13 37:6
52:6
**traffic** 55:14,22
**transcript** 109:4
**transcription** 107:6
**transit** 97:22 98:1
**treated** 52:14,16
**treatment** 22:15 23:22
44:4 52:1,3
**treatments** 52:5
**trouble** 90:19
**trucks** 104:8
**true** 22:12 107:5 109:5
**try** 74:8
**trying** 21:11,13 75:21
**Tuesday** 92:19
**two** 8:2 17:4 28:20
29:17 48:10 67:11
69:11 73:8 85:12,13
87:18 88:11,15 89:1
93:9 94:9 99:12
104:13,18,22
**type** 89:9
**typed** 72:11 92:19
**types** 70:12
**typewriting** 109:7

**typical** 98:20 101:7,10
**typically** 67:21 98:22
99:1
**typo** 84:7

**U**

**ultimate** 68:18
**Ultimately** 69:18
**Um-hum** 61:19 80:11
83:9 93:6 95:12 96:1
102:20
**um-um** 49:11
**understand** 21:11 25:2
42:2,10 58:1,22 69:7
79:17 83:5 90:9
92:11 95:7
**understanding** 17:21
18:8 19:1 57:20
**UNITED** 1:1
**unusual** 77:4
**use** 64:22 66:3,8 69:6
69:20 73:16 81:7
**usually** 48:8,8
**U.S** 31:15,17 33:21
34:14 35:12 42:17
44:3,16

**V**

**v** 1:6 108:2
**vague** 63:22
**value** 84:17
**various** 26:6 36:7
**VAUGHAN** 3:5
**verify** 18:5
**version** 12:18
**Village** 5:12
**Virginia** 5:13 105:9

**W**

**Wackenhut** 1:7 2:12
5:18,21 7:3,14,20,20
7:21 14:7 19:18
20:21 21:15 22:2,8
22:13 23:6 26:4,8
31:8,14,17 33:21
34:13,20 35:2,12
37:3 39:7 40:1,9 41:8
41:14,20 42:6,17
44:1,15,17 45:12,21
46:2 52:18 53:7,8
61:15 68:11 70:6,6

70:12,12 75:13 84:20
108:2
**Wackenhut's** 16:11
42:5,16 85:3
**wait** 89:4,6
**waived** 106:6
**walk** 56:2
**want** 13:15 23:17
35:16 36:4 41:13
50:16 66:3 68:22
69:17 74:18 76:20
87:21 90:8 91:17
96:7,8 103:3 104:5
**wanted** 40:5 50:22
52:10 53:4 54:7
69:19 83:22 92:9
**wants** 69:6
**warehouse** 61:12
**Washington** 1:10,17
2:16
**wasn't** 30:8,13 50:11
52:6 73:1 77:4 83:9
87:4 102:17 105:22
**waste** 63:5,9 69:9
**way** 20:5 48:7 60:22
63:16 72:8 73:5 74:3
87:1 94:10 97:21
**weather** 21:2 51:5,7
**Wednesday** 91:11
**week** 74:8,10 76:5,7,11
**weekdays** 92:3
**weekend** 91:4 92:4,18
93:17
**weekends** 91:1
**weeks** 93:11
**went** 47:16 56:14 85:22
**weren't** 87:14
**West** 105:9
**we're** 7:19,20 8:1 19:11
25:18 37:19 43:1
64:7 70:16 82:18,19
83:1,19 88:19
**we've** 32:2
**WHELIHAN** 2:13
7:19 9:17 10:2 11:8
11:22 12:6 13:1,5,10
14:2,6,11,20 15:4,9
15:11 16:17 17:13,21
18:13,17,20 19:5,9,14
22:18 23:1,13 24:2

25:7 30:4 32:6 33:12
35:7 37:8,11 38:9,21
39:8 42:8,20 43:11
44:5,18 45:17 47:7
50:17 51:1 52:8,22
53:5,16 54:2,11,20
55:15 59:10,22 62:8
63:2,6,15 64:1 68:13
68:16 80:19 84:14
85:9 87:6,10,16,20
91:17,20 96:9 100:8
100:12 103:22 106:5
**WHEREOF** 109:12
**wife** 101:15
**window** 94:7
**winter** 30:22 86:5 87:3
**witness** 5:4 14:5 18:11
32:9 37:21 38:6 84:7
109:12
**witnessed** 25:8
**words** 11:3 71:7
**work** 4:18 22:3,10 26:9
44:2 45:21 46:3,10
47:19 48:3 64:18,21
65:1,1,2,21 66:4,5,8,9
66:19 67:6,8,11,16,22
68:7 69:6,17,20 70:2
70:6,11,22 71:1,6,15
71:16 72:5,10,11,13
72:18 73:19 75:7,13
76:10,14 77:8 79:4
79:14,19 81:13 83:1
84:17,22 85:5 86:4,7
86:16 87:1 88:4,4,7
88:10,13 89:3,9,16,20
90:8 91:1,15,22 92:2
92:4,6,8,14,16,17,20
93:8,8,16 94:16 96:3
96:4 97:21 103:9
105:17
**worked** 7:14 81:15
91:4 100:3
**working** 23:8 76:5
83:17,19 88:15
**works** 27:5 60:20
**wouldn't** 8:5,9 13:22
19:3 38:11 65:21
72:12,12 73:2 75:2
94:4 104:10
**Write** 19:14

**writing** 46:15
**written** 19:6
**wrong** 12:8
**WSI** 8:3 21:10 38:12
43:13 78:9 79:1,2,6
**WSI's** 43:18
**W-O-R-K** 88:4

**X**

X 104:5

**Y**

**yeah** 7:7,17 19:8 28:9
30:10,16,18,18 35:7
46:16 48:6 56:8,18
56:18 58:19 60:20
62:8 77:3,11 84:7
86:12 87:20 88:9
93:3 96:9 97:17 98:1
98:22 99:4,18 104:21
105:21
**year** 30:21 60:2 76:19
77:1 103:9
**years** 54:6,6 79:8 87:18
100:3 103:10
**Yep** 72:4
**Yuenger** 27:1,4,5
46:18 54:5 65:16

**Z**

**zero** 88:17,18

**0**

**02** 18:5
**03** 17:1 19:7 91:2 96:20

**1**

**1** 4:9 8:20 9:21 10:22
10:22 11:3,17 12:7
13:20 14:17,18,20
**1-5** 8:16
**10** 4:18 64:11,15,16,17
68:10 70:16,20 89:9
89:16 90:10,11,15,15
92:22 105:17
**10/18/02** 18:4,21
**100** 4:6
**1002** 2:7
**101** 3:6
**11** 4:19 64:11,15 72:2
73:20 74:15 77:7

83:12 89:17 90:10,11
90:14 94:10
**11/26/03** 18:2,22
**11:09** 64:10
**11:17** 64:10
**1100** 1:16 2:15
**11300** 2:7
**12** 4:20 96:12,15
**12:01** 106:8
**14** 109:16
**15** 24:10 45:1 104:19
**16** 24:10 45:2 89:17
**17** 8:4,11
**19** 45:8

**2**

**2** 4:10 9:6,9,18 10:6,22
10:22 11:3,17 12:2,3
12:3,3,7,8 13:1,20
14:2,13 15:5 17:8,15
88:3
**2/25/02** 93:5
**2/26/03** 81:6 84:3
**2:28** 71:8
**20** 8:13 24:19 96:19
**20-inch** 25:17
**200** 28:17,18,19 29:1
29:13 67:3,4,5,10,15
**2003** 5:20 6:1,5,6 18:1
19:20 21:17 22:22
24:10 27:12 28:10,11
30:9 39:18,19,22
40:8,12 45:2,8 56:11
57:9 71:20 79:13
81:17 82:7 86:5 87:3
**20036** 2:16
**2004** 7:15 9:22 13:11
14:7,16,21 15:13
85:11,16 87:7,11,12
**2007** 1:11 13:12 109:14
**2009** 109:16
**202)496-2810** 2:17
**204** 3:6
**20850** 3:7
**20852** 2:8
**21** 99:12 104:13,22
**22485** 5:13
**24/7** 8:9
**25** 87:7
**25th** 45:2,8 65:4,5

68:15 71:8,20 105:18
**26** 4:14,15 17:1 56:11
57:9 79:13 87:7,7
**26th** 47:20 48:13 65:3
74:20 80:7,21 96:20
109:13
**28** 27:12 28:11,12
**28th** 30:19,21

**3**

**3** 4:11 16:6 17:8,14,15
17:16,18,22 19:9,17
20:2 31:3 35:19,21
36:22 41:1 42:5,14
49:18 58:13 62:12
87:9,9,9
**3/11/03** 94:5
**3/14** 80:22 81:11
**3:30** 80:6,10
**3:40** 80:14
**301)251-0440** 3:8
**301)770-3737** 2:9
**32** 4:16 76:11
**34** 4:17
**36** 97:6,8

**4**

**4** 4:12 16:19 17:14,16
17:18,22 19:2 20:2
35:21 38:9,10
**40** 74:8 76:5,10
**4173** 5:12

**5**

**5** 4:4,13 10:13,22,22
11:1,17 12:3,7 13:20
14:6
**50** 103:15 104:8,8
**500** 67:6

**6**

**6** 4:14 13:13 26:13,19
29:18 30:7 41:2
62:18
**6:30** 100:21
**6:38** 97:2,8,19 98:4
100:22
**6:40** 97:11 100:17,19
101:1 102:6
**600** 1:17
**64** 4:18,19

**Capital Reporting Company**

**65** 33:3,15

**7**

**7** 4:15 26:13 29:18 30:7
**74.5** 28:13
**77402** 89:16
**77418** 89:17

**8**

**8** 4:9,10,11,12,13,16
  32:11,15 34:18

**9**

**9** 1:11 4:17 34:2,8,12
  34:18
**9:42** 1:20
**90** 4:5
**96** 4:20
**98** 61:13
**99.9** 54:13