**Capital Reporting Company**

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT FOR THE

2                     DISTRICT OF COLUMBIA

3     ----------------------------------:

4    MICHAEL J. PHILBIN                 :

5                     Plaintiff         : At Law No.

6            v.                         : CL05-1389

7    THE WACKENHUT CORPORATION, ET AL   :

8                     DEFENDANTS        :

9     ----------------------------------:

10                            Washington, D.C.

11                            Friday, March 9, 2007

12   Deposition of:

13                GREGORY LEWANDOWSKI,

14   called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the law Office

16   of Jordan, Coyne & Savits, 1100 Connecticut

17   Avenue, N.W., Suite 600, Washington, D.C., before

18   Sheri C. Stewart, Registered Professional

19   Reporter and Notary Public in and for the

20   District of Columbia, beginning at 12:14 p.m.,

21   when were present on behalf of the respective

22   parties:
```

DEFENDANT'S
EXHIBIT
C

**Capital Reporting Company**

Page 2

1       APPEARANCES:

2

3   ON BEHALF OF PLAINTIFF:

4       ROBERT G. SAMET, ESQUIRE

5       ASHCRAFT & GEREL

6       One Central Plaza

7       11300 Rockville Pike, Suite 1002

8       Rockville, Maryland 20852

9       (301)770-3737

10

11

12   ON BEHALF OF DEFENDANT WACKENHUT SERVICES, INC:

13       DEBORAH MURRELL WHELIHAN, ESQUIRE

14       JORDAN, COYNE & SAVITS, LLP

15       1100 Connecticut Avenue, N.W.

16       Washington, D.C. 20036

17       (202)496-2810

18

19

20

21

22

Page 4

1       C O N T E N T S

2

3   EXAMINATION BY                    PAGE

4       Mr. Samet            5

5       Ms. Whelihan            34

6

7   LEWANDOWSKI DEPOSITION EXHIBITS:    *      PAGE

8   13  SNOW REMOVAL SITE VISIT REPORTS        10

9

10

11

12   (*EXHIBITS RETAINED BY COUNSEL)

13

14

15

16

17

18

19

20

21

22

Page 3

1       A P P E A R A N C E S  (Continued)

2

3   ON BEHALF OF DEFENDANT BRICKMAN:

4       H. PATRICK DONOHUE, ESQUIRE

5       ARMSTRONG, DONOHUE, CEPPOS & VAUGHAN

6       204 Monroe Street, Suite 101

7       Rockville, Maryland 20850

8       (301)251-0440

9

10

11   ALSO PRESENT: JAY HARMAN

12

13       * * * * *

14

15

16

17

18

19

20

21

22

Page 5

1       P R O C E E D I N G S

2   Whereupon,

3       GREGORY LEWANDOWSKI,

4   called as a witness, and having been first duly

5   sworn, was examined and testified as follows:

6       EXAMINATION BY COUNSEL FOR PLAINTIFF

7   BY MR. SAMET:

8       Q    State your full name and address for

9   the record, sir.

10      A    Gregory Lewandowski. Home address?

11      Q    Please.

12      A    2940 New Rover Road, West Friendship,

13   Maryland, 29794.

14      Q    Okay. And by whom are you employed

15   now?

16      A    The Brickman Group, LTD.

17      Q    Okay. And is that who you were

18   employed by in February of 2003?

19      A    Yes.

20      Q    All right. And your position in

21   February 2003 was?

22      A    Branch manager.

2 (Pages 2 to 5)

## Capital Reporting Company

Page 6

1    Q    And what is your position today?
2    A    Branch manager.
3    Q    Okay. If I mispronounce your name,
4    please forgive me.
5    A    That's fine; everyone does.
6    Q    I've been thinking of you as
7    Lewandowski, and I didn't realize that it was
8    Lewandowski.
9          Mr. Lewandowski, were you physically
10   present at the Nebraska Avenue complex at any time
11   between February 14 of 2003 and February 26 of
12   2003?
13   A    I do not recall.
14   Q    Okay.
15   A    Specifically that time frame.
16   Q    Okay.
17   A    I was there in the winter.
18   Q    All right.
19   A    Various points.
20   Q    I understand. But you were not there
21   on the day that Mr. Philbin, the plaintiff in this
22   case, was injured; is that correct?

Page 7

1    A    I was not.
2    Q    You don't recall whether you were there
3    within two weeks before the day Mr. Philbin was
4    injured; is that correct?
5    A    Correct.
6    Q    All right. Did you -- strike that.
7          Do you recall the snowstorm, the huge
8    snowstorm that took place on February 14, 15 and
9    16 of 2003?
10   A    Yes.
11   Q    Okay. Am I correct that you don't
12   remember the dates, but you do recall the big
13   snowstorm?
14   A    I do.
15   Q    Okay. And do you recall whether or not
16   you had any conversations with anybody at
17   Wackenhut in between the date of that snowstorm
18   and the date that Mr. Philbin was injured?
19   A    I believe, I don't recall who it was,
20   probably either Jim Whidden or Dave or Jay Harman.
21   I'm sorry.
22   Q    And you think that those conversations

Page 8

1    took place somewhere between the time of the big
2    snowstorm and the date that Mr. Philbin was
3    injured; is that correct?
4    A    I know that they took place at that
5    point.
6    Q    What were the conversations about?
7    A    It was regarding the relocation of the
8    piles of snow.
9    Q    Okay. And you remember how many
10   conversations there were?
11   A    One, maybe two.
12   Q    Okay. And who's Jim Whidden?
13   A    Jim Whidden, to my knowledge, was Jay
14   Harman's boss.
15   Q    Okay. And where did he work? I mean,
16   besides Wackenhut?
17   A    He had an office on the base.
18   Q    What was his specific position?
19   A    I'm not quite sure.
20   Q    Okay.
21   A    Facility manager, something like that.
22   Q    I think Mr. Harman said that he was the

Page 9

1    facility manager. All right.
2          And do you remember what the exchange
3    was about between either you and Mr. Whidden or
4    you and Mr. Harman?
5    A    The request was to bring in extremely
6    heavy equipment to move the piles of snow.
7    Q    You were asked to bring in extremely
8    heavy equipment?
9    A    I wouldn't call it asked; I was
10   instructed.
11   Q    When was it, do you remember?
12   A    Probably within 48 hours of all of the
13   clearing that we could possibly do with our own,
14   you know, regular pieces, the call was put out.
15   Q    So you're saying it was probably within
16   48 hours of the big snowstorm ending?
17   A    I would say within 48 hours of us doing
18   everything that we could with the standard
19   equipment to get every inch of pavement we could
20   on the base clear.
21   Q    All right. Let me do some housekeeping
22   before we go further.

3 (Pages 6 to 9)

## Capital Reporting Company

Page 22

1  plan in place and that the people were on the same
2  page.
3      Q    Do you know who drafted that plan?
4      A    I do not.
5      Q    Did you have any input into the
6  drafting of that plan?
7      A    Not directly, not to my knowledge.
8      Q    Okay. At that meeting, to the extent
9  that that plan called for any action on the part
10 of Brickman, did you concur that it was
11 acceptable?
12     A    I'm sorry, say that again.
13     Q    To the extent that there might have
14 been anything in that plan that would have
15 required Brickman to --
16     A    Right.
17     Q    -- do something, at that meeting did
18 you agree that it was okay with you?
19     A    Yes, from what I recall.
20     Q    Under what circumstances was Brickman
21 required to do any salting or sanding of any
22 surface areas at the Nebraska Avenue complex?

Page 23

1          MR. DONOHUE: I object. The document
2      will speak for itself but --
3  BY MR. SAMET:
4      Q    Let me rephrase it.
5          What was your understanding as to under
6  what circumstances Brickman was required to do any
7  salting or sanding of the surface areas at the
8  National -- at the Nebraska Avenue complex?
9      A    We essentially did whatever the client
10 requested. Understand that came -- that message
11 or communication came through the voice of a
12 Wackenhut employee.
13     Q    Was Brickman ever -- to your
14 recollection, up to February 26, 2003, was
15 Brickman ever requested by Wackenhut to come out
16 solely for the purpose of sanding or salting any
17 surface areas, not in connection with actual snow
18 removal?
19         MS. WHELIHAN: Objection.
20     A    I don't know.
21 BY MR. SAMET:
22     Q    Do you recall any such instances prior

Page 24

1  to February 26 of 2003 in which Brickman may have
2  ever been asked to come out solely for the purpose
3  of sanding or salting surfaces?
4      A    Once again, I don't know. I don't
5  remember.
6      Q    Okay. As you sit here today, do you
7  recall Brickman ever being called by Wackenhut to
8  come out and sand or salt any surfaces at the
9  Nebraska Avenue complex solely for that purpose
10 and not also at the same time in connection with
11 snow removal?
12     A    I would just simply rely in referencing
13 these papers.
14     Q    I'm not asking you that. I'm asking
15 you based upon your --
16     A    No, I don't recall.
17     Q    Okay. When Brickman sanded or salted
18 parking lots, how was that done, was it done with
19 a spreader?
20     A    A Ford Super Duty with a ball hopper
21 spreader mounted on the back of it which can hold
22 up to three tons of bulk rock salt or de-icer.

Page 25

1      Q    And this would be broadcast over a
2  large area?
3      A    Yes.
4      Q    Okay. Was it ever -- were parking lots
5  ever salted and sanded by hand?
6      A    No.
7      Q    All right. What was your
8  understanding, if any, as to whether Brickman was
9  required or had an obligation to perform any
10 visual inspections of surface areas at the
11 Nebraska Avenue complex for conditions that either
12 already had or were likely to produce ice
13 formation?
14         MR. DONOHUE: Objection to the form and
15     other substantive reasons.
16         I don't instruct you not to answer.
17     A    My impression, that's the best I can
18 give you, is that I was -- it was not part of my
19 responsibility to make any decision that the work
20 looks good or we need to do more.
21         We were there to be told what to do,
22 and that's what we did. We didn't offer our

7 (Pages 22 to 25)

## Capital Reporting Company

Page 34

1  you testified that Exhibit No. 3, you don't know
2  whether you ever did come away from that meeting
3  with your own copy of this document?
4          MS. WHELIHAN:  Objection.
5      A   I don't know.
6          MR. SAMET:  Okay.  I don't have any
7  other questions.
8          MS. WHELIHAN:  I have just a couple.
9      EXAMINATION BY COUNSEL FOR DEFENDANT
10           WACKENHUT SERVICES, INC.
11  BY MS. WHELIHAN:
12     Q   Correct me if I'm wrong, but would it
13  be fair to say that it was your understanding that
14  the Navy would communicate its orders regarding
15  snow and ice treatment and removal to Wackenhut
16  who would then communicate those orders to you?
17     A   Correct.
18     Q   And would it be fair to say that
19  Wackenhut would act as a conduit between the Navy
20  and Brickman?
21         MR. SAMET:  Objection.
22     A   I would assume.

Page 35

1  BY MS. WHELIHAN:
2      Q   Okay.  I don't want you to assume.
3          Well, Wackenhut wouldn't stand over
4  Brickman while it performed its work at the Naval
5  complex, right?
6          MR. SAMET:  Objection, leading.
7      A   Once again, I wasn't there during the
8  services, but the feedback that I got didn't
9  indicate to me from my guys that people were
10  riding in the truck with us all the time and
11  checking to see if we weren't sleeping on the job,
12  that kind of thing.
13  BY MS. WHELIHAN:
14     Q   Okay.  And WSI, Wackenhut, didn't
15  control how Brickman did its work, right?
16         MR. SAMET:  Objection, leading.
17     A   Depends on how you define "control."
18  BY MS. WHELIHAN:
19     Q   Well, in other words, Wackenhut
20  wouldn't tell you how to remove snow or how to
21  treat the snow, that was your province or
22  Brickman's province, right?

Page 36

1          MR. SAMET:  Objection.
2      A   Once again, I don't have personal
3  knowledge of exact direction that came from
4  Wackenhut to us.
5  BY MS. WHELIHAN:
6      Q   Okay.  Would it be fair to say that
7  Brickman was an independent contractor?
8      A   Yes.
9      Q   And would it also be correct that
10  Brickman was a professional company involved in
11  snow and ice treatment and removal?
12     A   Yes.
13     Q   Okay.
14         MS. WHELIHAN:  I don't have any other
15  questions.
16         MR. DONOHUE:  You sure?  Speak now or
17  forever hold your peace.
18         We'll waive signature.
19         (Signature having been waived, the
20  deposition of GREGORY LEWANDOWSKI was concluded at
21  12:54 p.m.)
22

Page 37

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2          I, Sheri C. Stewart, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10  this case and have no interest, financial or
11  otherwise, in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set
13  my hand and affixed my notarial seal this 26th day
14  of March, 2007 .
15  My commission expires:
16  October 14, 2009
17
18
19
20          _____
21          NOTARY PUBLIC IN AND FOR
22          THE DISTRICT OF COLUMBIA

10 (Pages 34 to 37)