**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MICHAEL J. PHILBIN | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Civil Action No. 06-0242(AK) |
| | * | |
| THE WACKENHUT CORPORATION, <u>et al.</u> | * | |
| | * | |
| Defendants | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT, THE BRICKMAN GROUP, LTD.'S MOTION FOR SUMMARY JUDGMENT</u>

Comes now the Plaintiff, Michael J. Philbin, by and through his attorneys, Jerry Spitz, Robert G. Samet, Kelly E. Cook, and Ashcraft & Gerel, LLP, for reasons set out fully in the attached Memorandum of Points and Authorities, hereby Opposes the Defendant, The Brickman Group, Ltd.'s Motion for Summary Judgment and for grounds therefore states as follows:

1.     The Defendant, The Brickman Group, Ltd., have failed to establish that no material facts are in dispute.

2.     The Defendant is not entitled to judgment as a matter of law.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to deny the Defendants' Motion for Summary Judgment,

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP


_____/s/___Jerry Spitz_____
Jerry Spitz #413137


_____/s/___Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


MICHAEL J. PHILBIN                                      \*

               \*

               Plaintiff                          \*

               \*

               vs.                                    \*        Civil Action No. 06-0242(AK)

               \*

THE WACKENHUT CORPORATION, <u>et al.</u>      \*

               \*

               Defendants                  \*

               \*

          \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT, THE BRICKMAN GROUP, LTD.'S MOTION FOR
SUMMARY JUDGMENT**</u>

**I.**       **Introduction**

On February 26, 2003 Mr. Philbin slipped on black ice that had formed on the parking lot

of the Nebraska Area Complex ("NAC"), in Washington D.C., where he worked for the United

States Navy ("the Navy"), causing serious injury.  <u>See</u> Statement of Disputed Facts ("SDF") 4.

Wackenhut Services, Inc., ("WSI") was present on the premises as a property manager for the

Navy.  <u>See</u> SDF 1.  WSI had a contract with the Navy to provide for snow and ice removal,

"ensure passable navigation of . . . parking lots. . ." and " ensure the safety of NAC pedestrians . .

."  <u>See</u> SDF 1. WSI sub-contracted with the Brickman Group, Ltd. ("Brickman") for snow and

ice removal services.  <u>See</u> SDF 1, 2.  Brickman's subcontract recited that it would provide "all

labor, materials, supplies, and equipment to perform snow and ice removal services to keep . . .

parking areas . . passable and safe to navigate."  <u>See</u> SDF at 18.  WSI passed all its duties under

its contract with the Navy on to Brickman in WSI and Brickman's sub-contract.  <u>See</u> SDF at 18.

On February 14th to the 18th, the D.C. area was hit with a tremendous snow storm that deposited over 18 inches of snow. See SDF 11. In the days prior to Mr. Philbin's fall, he had observed large piles of snow on the parking lot from this storm. See SDF 6. He observed that the snow would melt during the day, and he saw water when he left work. See SDF 7. He also saw that same water, frozen, as black ice in the mornings. See SDF 7, 8. These conditions persisted for several days leading up the 26th of February. See SDF 6-9. Just the day before the accident, Mr. Philbin had observed snow piles, melting and re-freezing. See SDF 9.

On February 26th, a light snow had started to fall. See SDF 8. There was a thin layer of snow on the parking lot where Mr. Philbin had parked. See SDF 4. As Mr. Philbin crossed the snowy lot, he was careful and acted to avoid the ice he had seen previously. See SDF 15. But the thin coat on snow obscured the black ice hidden underneath, and he ultimately slipped on the ice beneath the snow, sustaining serious injury to his ankle. See SDF 4, 14.

Brickman had been to the premises for snow and ice abatement following the large snow storm of February 14th to 18th. See SDF 13. At the end of that storm, 1 ½ tons of salt was used on the entire complex. See id. Since that time no more salt was employed until the morning of Mr. Philbin's fall. See id. On that day, no salt had been applied to the parking lot where Mr. Philbin fell by the time he arrived at work. See SDF 16. The large parking lot was the last area salt was spread. See SDF 19.

The facts are more fully set forth in the attached Statement of Disputed Material Facts.

**ARGUMENT**

**I.        Standard for Summary Judgment and Choice of Law**

Summary judgment is only proper when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  See Anderson v. Liberty Lobby, Inc., 744 U.S. 242 (1986).   The Supreme Court has held that the standard for granting summary judgment is essentially the same as granting a directed verdict, i.e., "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251.  In making this determination, the Court does not weigh the evidence or make credibility determinations.  Id. at 249, 255.  The evidence submitted by the non-moving party is to be believed, and all inferences are to be drawn in the non-moving party's favor.  Id. at 255.  The facts, and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

This Court's jurisdiction over this claim arises due to the diversity of the parties.  As such, this Court will apply the substantive tort law of the District of Columbia to this case.  See Joy v. Bell Helicopter Textron, Inc, 999 F.2d 549, 553 (D.C. Cir. 1993).

The Defendant, Brickman is not entitled to summary judgment under Fed. R. Civ. P. 56 in this case because the Plaintiff can prove that Brickman owed Plaintiff a duty of due care under District of Columbia law, that Brickman breached that duty, and that Plaintiff was injured as a direct and proximate result of Brickman's negligence.  The facts Plaintiff relies on to support these assertions are material to the issues and are in dispute between the parties.  As such Brickman is not entitled to judgment as a matter of law.

3

## II.    Negligence: Duty of Care, Breach, Causation and Injury

Brickman owed a duty of care to the Plaintiff, breached that duty and as a result the

Plaintiff was injured.  Negligence is established when it is shown that a person or entity owes a

duty of care, that duty is breached, and injury results.  See District of Columbia v. Cooper, 483

A.2d 317, 321 (D.C. 1984) (quoting Prosser, Handbook of the Law of Torts § 30 (4th ed. 1971)).

Brickman appears to be arguing that as a subcontractor without a site presence at NAC it cannot

have had a duty to the Plaintiff, either to conduct inspections, or warn of dangerous conditions

on the premises.  See Defendant Brickman's Memorandum in Support of Motion for Summary

Judgment at 5.  It also seems to argue that it complied with the "industry standards" in its

contract and thus did not breach any duty it may have had.  See id.  However, the law in the

District of Columbia is clear that a subcontractor, like Brickman, owes persons lawfully on land

in which the subcontractor performs work at the direction of the possessor a duty of due care to

conduct its operations in a reasonable manner and refrain from creating unreasonably dangerous

conditions on the land.  Further, Brickman owes a duty arising from its subcontract with WSI to

exercise reasonable care to protect pedestrians on the NAC property from the exact hazard that

injured the Plaintiff.

### A. Duty of Care

### 1.    Brickman Owed Plaintiff a Duty of Care As to Conduct Its Operations In a Reasonable Manner and To Refrain From Creating An Unreasonably Dangerous Condition On The Land.

Brickman owed Plaintiff a duty to conduct its operations with reasonable care and to

refrain from creating unreasonably dangerous conditions on the land.  Contractors have a duty

arising under the common law to protect the public from hazards created by their work.  Bostic v.

4

Henkels & McCoy, Inc., 748 A.2d 421, 424 (D.C. 2000). That duty is to take reasonable safety measures to protect the public. Id. "One who creates a dangerous condition is responsible for his acts regardless of legal control over the area." Id. at 424 (quoting Goodman v. Sears Roebuck, Co., 129 A.2d 405, 406 (D.C. App. 1957)). The Court noted that the contractor's duty was the same as any *"owner or occupier* of land" i.e., to exercise "reasonable care under all the circumstances" to "a person lawfully upon his premises." Bostic 748 A.2d at 425, (quoting Croce v. Hall, 657 A.2d 307, 310 (D.C. 1995)) (emphasis in original). To prevail on a premises liability claim, the Plaintiff must show that the land owner either created the hazard that caused Plaintiff's injuries, or knew or should have known of a hazard that the land owner suffered to exist without correction. See Thomas v. Grand Hyatt Hotel, 749 F. Supp. 313, 314 (D.D.C. 1990); Paylor v. Safeway Stores, Inc., 225 A.2d 312, 314 (D.C. 1967). A land owner is responsible for risks created by himself or his employees. See Seganish v. District of Columbia Safeway Stores, Inc., 406 F.2d 653, 655 (1968) (holding that premises liability will apply against grocer for conditions created by himself or employees). Issues of notice are irrelevant when the defendant creates the hazard. See id. at 655. Also, logically, if the defendant created the hazard he would be aware of it. As Brickman owes the Plaintiff the same duty as the land owner, Brickman is liable if it created an unreasonably hazardous condition.

There can be no dispute that Brickman was the subcontractor hired to performed the snow removal and remediation on the NAC parking lot and campus during February 2003. See SDF 18. Nor that between February 14th and 18th, 2003 over 16 inches of snow fell on the D.C. area. See SDF 11. Brickman's Site visit reports indicate that NAC saw 20 inches of snow. See SDF 13. Brickman responded to this tremendous volume of snow by piling it into huge piles

in the parking lot during its snow clearing operations during and after the storm.  <u>See</u> SDF 13.

Brickman has been doing snow removal for years, and WSI hired Brickman for the NAC contract based on Brickman's expertise.  <u>See</u> SDF 1.  Given Brickman's experience and expertise it is reasonable that Brickman knew, or should have known, that in late February, temperatures could rise above freezing during the day, only to go below freezing at night.  With those weather conditions, huge piles of snow such as those created by Brickman would begin melting at times during the day and the resultant water would freeze into dangerous ice when the temperature dropped below freezing.  Thus a jury could easily conclude that Brickman, by piling large piles of snow in the parking lot, created an unreasonably dangerous risk that melting and re-freezing of the snow would occur and impair the parking lot.

Nor can Brickman defeat Plaintiff's claim as a matter of law by arguing that it was unable under its contract to take appropriate precautions.  The <u>Bostic</u> Court stated that any limits imposed on the contractor by the contract, in terms of its ability to take reasonable precautions to protect plaintiffs, would serve as a defense, but would not defeat the Plaintiff's claim as a matter of law.  <u>Bostic</u>, 748 A.2d at 425.

## 2. Brickman Contractually Undertook A Duty To Plaintiff.

By entering into a contract to perform services within its expertise, Brickman acquired a duty to foreseeable Plaintiffs to perform those services with reasonable care.  Brickman breached that duty and as a result Mr. Philbin was injured.  Mr. Philbin was a foreseeable Plaintiff as a pedestrian walking on the NAC parking lot.  Indeed Brickman contracted to "perform snow and ice removal services to keep . . . parking areas . . . ***passable and safe to navigate***" (emphasis added); <u>see also</u> SDF 1.  Thus it is proper to impose liability on Brickman for its failure to

6

exercise reasonable care in snow removal services.

In the <u>Long v. District of Columbia et al.</u>, case it was held that when a party enters into a contract in which it performs services within its field of expertise, it owes a duty in tort to foreseeable Plaintiffs to perform those services reasonably.  820 F.2d 409, 418-19 (D.C. Cir. 1978) (citing <u>Caldwell v. Bechtel, Inc.</u>, 631 F.2d 989 (D.C. Cir. 1980)).  In <u>Long</u>, the Court found that the Potomac Electric Power Company (PEPCO) had contracted with the District of Columbia to maintain traffic signals, and in so doing it was obligated to foreseeable Plaintiffs to perform that service with reasonable care.  <u>Id.</u>  The Court in holding, noted that this aligned with the majority of state courts and that its holding was consonant with the Restatement (Second) of Torts § 324A.  <u>Id.</u>  That section of the Restatement is directly applicable to this case:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care in the undertaking, if
>
>      (a) his failure to exercise reasonable care increases the risk of such harm, or
>
>      (b) he has undertaken to perform a duty owed by the other to the third person, or
>
>      (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement of Torts (2nd) § 324A. (1965).

Here the evidence is clear that Brickman undertook, for consideration, to render services to the WSI, and ultimately the Navy, namely snow and ice removal services, in order to "keep . . . parking areas . . . passable and safe to navigate."  <u>See</u> SDF 1.  Considering, § 324A(b) especially, Brickman performed its services in discharge of the duties, owed by both WSI and the Navy to

7

the Plaintiff.  There is no dispute that land owner would owe a duty of reasonable care to pedestrians in the parking lot.  See Sandoe v. Lefta Assocs., 559 A.2d 732, 742 (D.C.1988).  Nor can there be reasonable objection to the conclusion that leaving twenty inches of snow on the parking lot over a long period of time would not meet the land owner's burden of reasonable care.  Thus the Navy owed Plaintiff a duty to remove the snow.  WSI assumed that duty.  See SDF 1; Memorandum in Support of Plaintiff's Opposition to Defendant WSI's Motion for Summary Judgment.  WSI obtained the duty by being an occupier of the land, exercising control over it, and specifically relevant in this case, exercised control over the snow and ice removal. See Husovsky v. U.S., 590 F.2d 944, 953 (D.C. Cir. 1978); Smith v. Washington Sheraton Corp., 135 F.3d 779 (D.C. Cir. 1998).  Further, WSI assumed the duty by virtue of its contract with the Navy.  See Long 820 F.2d 409.

Brickman was performing the snow and ice removal obligation of the Navy and WSI.  See SDF 1.  WSI maintains that Brickman's contract was to perform all of its obligations and duties under the contract WSI had with the Navy.  See SDF 18.  In fact, Brickman was mentioned as the entity to perform the snow and ice removal in WSI's contract with the Government.  See id. Thus under Long and the Restatement § 324A, Brickman owed the Plaintiff a duty in tort to perform its services under the contract with reasonable care.

Another case concerning the duty of contractors is Frederick v. TGP Hospitality, Inc., 56 F.Supp.2d 76 (D.D.C. 1999), in which the duty of a hotel security provider to a member of the public under its contract was considered.  id.  The Court refused to find a duty to the public grounded in the contract between the hotel owner and the security company.  id.  The contract with the security provider stated only that the security company would provide security officers

8

at a set rate. id. at 79. The owner decided how many guards to request, their duties, patrols, routes, and instructed the guards orally in what to do. id. at 79. The Court concluded that the security company and its contract did nothing to assume the owner's duty of providing security, and the language of the contract did not provide that the security company was assuming such a duty. id. at 79-80. Nor was there any language in the contract to support a finding that the plaintiff was an intended third party beneficiary of the contract so as to sue for breach of contract. id. at 80.

Frederick is easily distinguishable and provides a telling contrast to the case at bar. In Frederick, there was no language in the contract concerning the duty of the security company. id. at 79. Brickman's duties, as spelled out in its subcontract, are to provide "all labor, materials, supplies, and equipment to perform snow and ice removal services to keep . . . parking areas . . passable and safe to navigate[,]" which is a duty of the landowner and WSI. See SDF 18. Although WSI exercised considerable control over Brickman, there is evidence that Brickman did have discretion in how to perform its activities. See SDF 17. More importantly, unlike the security company in Frederick, Brickman actively and affirmatively assumed the duty of the landowner, and WSI, to provide safe premises for pedestrians. See SDF 18.

## B.  Breach of the Duty of Care

Brickman breached its duty of reasonable care by piling snow in large piles, not removing them to a safe distance from the parking lot and not applying ice control to prevent the formation of black ice as a result of the foreseeable melting of the snow piles. As stated above, Plaintiff must show that the land owner either created the hazard that caused Plaintiff's injuries, or knew or should have known of a hazard that the land owner suffered to exist without correction. See

9

Thomas v. Grand Hyatt Hotel, 749 F.Supp. 313, 314 (D.D.C. 1990);  Paylor v. Safeway Stores,

Inc., 225 A.2d 312, 314 (D.C.1967).  A land owner is responsible for risks created by himself or

his employees.  See Seganish v. District of Columbia Safeway Stores, Inc., 406 F.2d 653, 655

(1968) (holding that premises liability will apply against grocer for conditions created by himself

or employees).  Issues of notice are irrelevant when the defendant creates the hazard.  See id. at

655.  Also, logically, if the defendant created the hazard he would be aware of it.  As Brickman

owes the Plaintiff the same duty as the land owner, Brickman is liable if it created an

unreasonably hazardous condition.  See Bostic 748 A.2d at 425, (quoting Croce 657 A.2d at 310).

There evidence is clear that Brickman created the large snow piles.  See SDF 13.  There is

evidence that some of these piles were found *inside* the parking lot on February 25th, 2003 . See

SDF 6.  There is evidence that Brickman is an experienced snow removal contractor.  See SDF 1.

A reasonable jury employing its common sense and ordinary reasoning could conclude that

Brickman knew or should have known that some of the snow from the large snow piles would

melt during the day, that water would collect in the parking lot, and that the meltwater would then

freeze overnight.  Brickman thus breached its duty to undertake its work in a reasonable manner

by placing the snow piles in the parking lot and not removing all the piles to a place where

meltwater would not collect on the parking lot and freeze in the path of pedestrians.  Although

not binding on this Court, the Court of Appeals of Maryland has held in the case of Honolulu

Limited v. Cain, a case with several similarities to this, that a land owner was chargeable with

negligence for allowing snow to be piled up on the grassy periphery of a parking lot in February

when it was known that the snow would melt onto the parking lot surface and freeze to become a

hazard. 244 Md. 590, 596, 224 A.2d 433, 436 (1966).

Further, there is evidence that Brickman employed no ice treatment from February 18, 2003 until the morning of the accident, on February 26th. See id. A jury can find that it was negligent to not apply ice treatment at some point prior to date of the accident, for example, on the 23rd of February when the large piles were moved around the lot. See id. There are questions raised by the documents as to whether or not Brickman employees were present at the site on the 23rd of February to observe the lot and apply salt or sand as needed. For example some of the Site Reports indicate when "subs" (subcontractors to Brickman) are being employed. See id. However, despite Brickman's claim that the loader used on February 23rd to move snow piles was driven by a subcontractor, there is no indication on the Site Visit report that the loader was actually driven by a subcontractor. id. Other Site Visit Reports make clear when subcontractors are being employed by Brickman, See id. Although the Brickman site supervisor denied having been there with the loader on the 23rd, the Site Visit does lists him as supervisor. See id.

The fact that snow was still falling at the time of the accident is a red herring in this case. Plaintiff did not fall as a result of the snow that was falling. See SDF 4, 6-10. He slipped on ice that had accumulated over night, and had been forming in nightly cycles for days. See id. That melting snow piles could create water that would freeze on the lot should have been known to Brickman. Leaving the piles in such a manner as to create the danger of ice on the parking lot was negligent. Plaintiff does not claim that Brickman was negligent for failing to respond in a timely manner to the snow that began on February 26th, 2003. The ice that harmed Plaintiff could have been prevented or treated long before the snow even began falling on February 26th, 2003. The Plaintiff is not claiming in this case that the Defendant had a duty to cure the snow that was falling at the time of the accident,   Rather, Plaintiff argues that melting and re-freezing

11

snow piles had persisted for days and yet the ground remained untreated and the snow piles remained in the parking lot and on its periphery.  This is the dangerous condition that Brickman created. For the reasons stated above, it is a condition that Brickman is liable in tort for creating.

**C. Injury and Causation**

The Defendant's Motion and Memorandum in Support thereof does not appear to contest the fact that Mr. Philbin was injured on February 26, 2003.  See SDF 14.  Nevertheless, the Plaintiff has certainly put forth evidence that he was injured as a result of a fall in the parking lot in question on that date. See SDF 14.

**III.    Questions for a Jury: Contributory Negligence and Assumption of Risk**

In the interest of judicial (and environmental) economy, Plaintiff would request that to the extent that the Defendant, by asserting that "Mr. Philbin's awareness of the morning's weather conditions, and the prospect of encountering an icy patch, was in no respect inferior to Brickman personnel[,]" is pressing for summary judgment on the affirmative defenses of contributory negligence and assumption of the risk as raised in its Answer, the Court read as incorporated herein as if set forth in its entirety Plaintiff's arguments on those issues in his Memorandum in Support of his Opposition to Defendant Wackenhut Services Inc.'s Motion for Summary Judgment.

**CONCLUSION**

For the reasons specified above, the Plaintiff hereby requests that this Honorable Court deny the Defendants' Motion for Summary Judgment.

12

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP


_____/s/____Jerry Spitz_____
Jerry Spitz #413137


_____/s/____Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL J. PHILBIN                          *
                                            *
            Plaintiff                       *
                                            *
    vs.                                     *          Civil Action No. 06-0242(AK)
                                            *
THE WACKENHUT CORPORATION, et al.           *
                                            *
            Defendants                      *
                                            *
    **************************************************

## STATEMENT MATERIAL OF FACTS IN DISPUTE

1.      Defendant Wackenhut Services, Inc. ("WSI") entered into a contract with the

Navy to provide property management services at the Nebraska Avenue Complex ("NAC").

Exhibit A, Wackenhut's Answer to the Complaint, at ¶ 2.  These services included snow and ice

removal.  See Exhibit B, a page from WSI contract with Navy; Exhibit C, WSI's Answers to

Interrogatories, # 18.  Under WSI's agreement with the Navy concerning snow removal, WSI

agreed to "ensure passable navigation of . . . parking lots  . . ." and "ensure the safety of NAC

pedestrians. . . ."  Exhibit B.  WSI also entered into a subcontract with the Brickman Group, Ltd.

(Brickman).  See Exhibit D, WSI's contract with Brickman, dated March 26, 2002.  Brickman did

provide snow and ice removal services all during February 2003.  See Exhibit D.  Brickman was

selected by WSI based on its skill and expertise.  See Exhibit E, Deposition Transcript of Jeremy

Harmen, at 79, 99-100.  Brickman is a professional snow removal company.  See Exhibit F,

Deposition Transcript of Adam Grasswick, at 65; Exhibit G, Deposition Transcript of Gregory

Lewandowski, at 36.  Brickman undertook to "perform snow and ice removal services to keep  .

. . parking areas . . . passable and safe to navigate." Exhibit D at 5.

2.      WSI retained and exercised supervisory responsibility over the sub-contractor

performing snow and ice removal services.  <u>See</u> Exhibit E at 45.  If inadequate ice removal, i.e.,

sand or salt, were used at the NAC, WSI would call that fact to Brickman's attention.  <u>See id</u>.

Decisions as to how snow would be removed and ice treated were made by WSI's facilities

manager, Jeremy (Jay) Harmen, although he might "lean on" the advice of the subcontractor.

Exhibit F at 57-58.  WSI would instruct the sub-contractor to, for example, remove the piles of

snow that had accumulated following the large snow storm in early February 2003.  Exhibit G at

7-9.  WSI inspected the work of the subcontractor before the sub-contractor was allowed to

leave.  <u>See</u> Exhibit F at 66.  In fact Brickman insisted it was working under the sole direction of

WSI. Exhibit G at 20.  In addition, WSI routinely inspected the parking lot.  Exhibit C, #10.  WSI,

as it was present on the complex, could and would advise the owner of the land of conditions of

the land and advise that the conditions be treated.  Exhibit E at 53-56.

3.      WSI created a Snow and Ice Removal Plan.  Exhibit H, Wackenhut Services Snow

and Ice Removal Plan, dated October 18, 2002.  The Plan served as an operations manual for

WSI.  Exhibit E at 42.  The Plan was in effect at the time of the accident at issue in this case.

Exhibit E at 19.  "It is WSI policy for all personnel involved with snow removal to read and

adhere to the procedures in [the snow removal plan]."  Exhibit H at 2.   The Plan was reviewed by

Brickman's Branch Manager and Supervisor in a meeting with Wackenhut in the autumn of

2002.  Exhibit G at 21; Exhibit F at 68-71.  The plan states that "[i]nspections will be made of

areas encompassing the barriers at near [sic] the gates to ensure they are free of ice and snow and

operate properly.  Periodic inspections will be made of streets, parking areas, sidewalks, steps,

porches, and inaccessible areas to determine if additional applications of ice control and traction

improvement substances will be applied as needed." Exhibit H at 4. Under the Plan, snow piles were to be piled up at the edges of parking lots, and large piles removed from the base. However, if melting was expected then the piles could remain." Id. at 5.

    4.    Mr. Philbin fell on the NAC parking lot on February 26, 2003, due to slipping on black ice. Exhibit I, Deposition of Michael Philbin, at 36, 62-63. Mr. Philbin was a civilian contract worker for the Navy, and worked inside the NAC. Id. at 21. He had been walking without difficulty in a light dusting of snow on the parking lot until he encountered the black ice. Id. at 61-62. He did not see the ice before slipping on it, because it, and the rest of the lot, was covered with a thin layer of snow. Id. at 61, 68. When he tried to push himself up from the ground, he could see a thin layer of shiny ice where his body had brushed away the snow. Id. at 63-64. He could see and feel the slick ice underneath the snow. Id. at 63, 67-68. The part of the ice sheet that was visible to Mr. Philbin measured about six to twelve inches in dimension, but the whole area of ice was larger and could not be seen because it was covered with snow. Id. at 68. The ice did not change the elevation of the snow. Id. at 68.

    5.    Although Mr. Philbin had a second fall shortly after the fall in the parking lot, the second fall was occasioned by his already injured leg giving way. See id. at 60-61, 115.

    6.    In the days leading up to the accident on February 26, 2003 there were large piles of snow present in the parking lot at NAC. Id. at 44-45; Exhibit F at 47-48. Mr. Philbin had observed several large piles of snow in the main area of the parking lot as late as February 25, 2003. Exhibit I at 44-45. Although he does not recall *exactly* where in the lot they were. Id. at 44-45. On February 25th he does recall that some of the large piles were inside the parking lot itself, in places that didn't take up parking spots. Id. at 45, 126-127.

7.      Every evening as Mr. Philbin was leaving work, in the days leading up to the accident, he would see water coming from snow piles on the parking lot melting.  Id. at 45.  Mr. Philbin would see ice from the snow-melt having frozen overnight in the morning as he came to work, and would see the ice melted and the lot wet with water in the afternoons as he was leaving work.  Id. at 46-47.  The ice would form "down from where the piles [of snow] were" and some of the piles were near light posts in the parking lot where they did not take up parking spaces.  Id. at 46.

8.      The re-frozen water formed shiny, glass-like black ice on the parking lot in the mornings leading up to the accident.  Id. at 46-47.  The ice formed as a result of the snowmelt freezing when the temperature declined. Id. at 122.  Sometime during the night of February 25th into the morning of the 26th it had started snowing.  See Exhibit F at 10.  Brickman's snow captain was already on his way to the sight by 6:40 because of the snow falling at that hour.  Id.

9.      The morning prior to the accident, Mr. Philbin had encountered ice in about  the same place as he fell the next day, which he easily avoided because he could see it.  Id. at 119.  But that on the morning of the accident the ice extended further into the row, and Mr. Philbin's path, than it had been before.  Id. at 119.

10.      Mr. Philbin fell in the same area where he recalled seeing mounds of snow, specifically one near a lamp post.  Id. at 126.

11.      There was a large winter storm from February 14, 2003 through February 18, 2006.  Exhibit J, NOAA Weather Reports, at 1.  There was a snow accumulation of 16.7 inches during that period.  Id.  There was 2.5 to 3 inches of rain on the evening of February 22, 2003 and the early morning of February 23, 2003.  Id. at 2.  A series of low pressure systems dropped "light

4

snow" on the morning of February 26, 2003. <u>Id</u>. at 3; Exhibit I at 40.  Between February 19,

2003 and February 26, 2003 temperatures would go above freezing during the day, and dip below

freezing at night.  <u>See</u> Exhibit I at 38, 122.

      12.     Brickman contracted to have large piles of snow removed by "Pogo."  Exhibit F at

47.  This removal was done on February 23, 2003.  <u>Id</u>.  Removal of the large piles involved a

special, very heavy machine.  <u>Id</u>.  However, after some were move, some of the snow piles were

still present on the base.  <u>See</u> Exhibit I at 44-45, Exhibit F at 48.  Some of the piles were moved to

the perimeter. Exhibit F at 48.  Some were left in the main body of the lot, for example near light

poles where there were parking spots on either side, as can be seen in Exhibit M.  Exhibit I at 45,

126-127, Exhibit M, Photo of the parking lot. The purpose of moving the snow piles was to open

up all available parking.  <u>See</u> Exhibit G at 14, 16-17; Exhibit F at 47.  Brickman did not inspect the

lot after Pogo's removal of the snow piles.  Exhibit F at 48.  It is not known if WSI ever inspected

the removal work performed by  Pogo.

      13.     Upon working at NAC, Brickman would generate a Site Visit Report. Exhibit G at

11.  Twenty inches of snow fell at NAC by February 16, 2003.  Exhibit K, Site Visit Reports of

Brickman.  On February 16, 2003, no salt, sand or ice treatment was used.  <u>Id</u>.  On February 16,

2003 employed three plows, a "big loader", a bobcat loader, and three walk-behind snow plows.

<u>Id</u>.  On February 17, 2003, Brickman employed a similar force at NAC, but no salt, sand or ice

treatment was used on the lot.  <u>Id</u>.  On February 18, 2003 Brickman was again working at NAC,

again with a large group of labors and machinery, and did employ 1 ½ ton of salt.  <u>Id</u>.  On

February 19, 2003 the parking area was "cleaned up" by Brickman with a bobcat loader, but other

areas were still "somewhat covered."  <u>Id</u>.  No salt, sand or other ice treatment was used on

February 19, 2003.  Id.  Brickman's employees had piled the snow into large piles all over the parking lots.  See Exhibit I at 44-45; Exhibit F at 47-48; Exhibit G at 15-17; Exhibit K.  The piles were so large, an extremely heavy loader was needed to move them.  See Exhibit G at 12-13.  On February 23, the extremely large loader was employed to move the snow piles, which obstructed parking.  See Exhibit K; Exhibit G at 14, 16-17; Exhibit F at 47.  Snow piles were taken from all over the base to the edge of the parking lot where Mr. Philbin fell.  Exhibit G at 15-17; Exhibit F at 48.  No sand, salt or ice treatment was used after the piles were moved.  Exhibit K.  Adam Grasswick denied being at NAC on February 23, 2003 with the loader, however the Site visit does have his name on it as "supervisor" and there are no notations in the documentation that a subcontractor was employed on that date.  See Exhibit F at 45; Exhibit K.  Earlier Site Visit Reports had indicated that some vehicles belonged to sub-contractors of Brickmen, for example the reports from February 16th and 17th, 2003.  See Exhibit K.  On February 26, 2003 the date of the accident, 1 inch of snow fell at NAC and 2 ½ tons of salt were employed.  Id.

14.     As a result of falling on the ice in the parking lot, Mr. Philbin sustained serious injury to his ankle.  See Exhibit L, Plaintiff's Answers to Interrogatories of WSI, # 8.

15.     On the morning of the accident Plaintiff had selected a shoe that was suitable for the weather.  Exhibit I at 42.  He was exercising caution as he walked in the snowy parking lot because he had seen ice on the lot in the mornings prior to the 26th.  Id. at 61.  The Plaintiff had encountered no difficulty until he reached the point of his fall.  Id. 62.

16.     At the time the Plaintiff arrived to the parking lot on February 26, 2003, it had not been treated.  See Exhibit I at 56.  The Plaintiff saw no one plowing snow or treating the surface.  Id.

17.     Brickman's Branch Manager testified that with regard to bringing in heavy equipment "I wouldn't call it asked; I was instructed [by Harmen]." Exhibit G at 9. Wackenhut called Brickman and ordered that snow be removed. Id. at 17. Brickman acted "under the sole direction from Wackenhut." Id. at 20. Brickman "did whatever the client requested. Understand that came – that message or communication came through the voice of a Wackenhut employee." Id. at 23. Brickman claims it had little control over how it acted: "it was not part of my responsibility to make any decision that the work looks good or we need to do more. We were there to be told what to do, and that's what we did. We didn't offer our opinion unless it was requested." Id. at 25-26. Wackenhut would direct Brickman what areas were priority. Id. at 27. WSI told Brickman where they wanted work done and in what order. Id. at 27. When Mr. Philbin was injured Mr. Harmen called the "snow captain" from Brickman and told him to go check the gate area again. Exhibit F at 8. Grasswick also describes Jay Harmen being able to call and direct his work. See id. at 38. Of course, the detailed instructions for exactly how Brickman was to perform is contained in the Snow and Ice Removal Plan. See Exhibit H.. However, WSI "didn't tell [Mr. Grasswick, Brickman's supervisor] how to do your job." See Exhibit F at 65.

18.     Brickman's subcontract with WSI passed all of the duties of WSI onto Brickman. See Exhibit E at 44. WSI's contract with the Navy specifically named Brickman as the entity that would perform snow and ice removal required. See Exhibit B. The subcontract between WSI and Brickman required Brickman to provide "all labor, materials, supplies, and equipment to perform snow and ice removal services to keep . . . parking areas . . passable and safe to navigate." See Exhibit D at 5. This was the contract in effect during February 2003. See Exhibit D at 2.

19.     At the time of Plaintiff's fall, Brickman had treated other areas on the premises but had not yet treated the area where Plaintiff fell.  Exhibbit F at 13-19, 24-33, 34-35,  Exhibit I at 56. In fact, the lot where Plaintiff fell was the very last area to be treated by Brickman with salt. Exhibit F at 34-35.  Before treating that lot, the Brickman employee would salt every other lot, and all interior roads in the expansive NAC campus.  See id. at 13-19, 24-33, 34-35.

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP

_____/s/___Jerry Spitz_____
Jerry Spitz #413137


_____/s/___Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHAEL J. PHILBIN                    *
                                      *
          Plaintiff                   *
                                      *
     vs.                              *          Civil Action No. 06-0242(AK)
                                      *
THE WACKENHUT               *
CORPORATION, <u>et al.</u>            *
                                      *
          Defendants                  *
                                      *
          *************************************************

## **INDEX TO EXHIBITS**

A        WSI's Answer to Complaint

B        Page 174 of WSI's Contract with the Navy

C        Wackenhut Answers to Interrogatories

D        Subcontract between WSI and Brickman

E        Deposition Transcript of Jeremy Harmen

F        Deposition Transcript of Adam Grasswick

G        Deposition Transcript of Gregory Lewandowski

H        WSI Snow and Ice Removal Plan, Dated October 18, 2002

I        Deposition Transcript of Michael Philbin

J        NOAA Weather Reports

K        Brickman Site Visit Reports

L        Plaintiff's Answers to Interrogatories of WSI

M        Photo of the Parking Lot

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the above Plaintiff's Answer to Defendants' Motion for Summary Judgment and accompanying Memorandum of Points and Authorities, Exhibit List, Statement of Disputed Facts and Exhibits, Proposed Order, and Request for Hearing were served upon Defendants by placing a copy of the same in the U.S. Mail, postage prepaid, this <u>13th</u> day of April, 2007 and addressed as follows:

H. Patrick Donohue
Armstrong, Donohue, Ceppos & Vaughan
204 Monroe Street, Suite 101
Rockville, MD 20850

Deborah Murrell Whelihan
Jordan, Coyne & Savits, LLP
1100 Connecticut Avenue, N.W.
Suite 600
Washington, DC 20036

/s/  Kelly E. Cook

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHAEL J. PHILBIN                              *
                                                *
              Plaintiff                         *
                                                *
       vs.                                      *       Civil Action No. 06-0242(AK)
                                                *
THE WACKENHUT CORPORATION, <u>et al.</u>         *
                                                *
              Defendants                        *
                                                *
       *************************************************

**<u>REQUEST FOR HEARING</u>**

Plaintiff, Michael J. Philbin, by and through his attorneys, Jerry Spitz, Robert G. Samet,

Kelly E. Cook and Ashcraft & Gerel, LLP, requests a hearing on Defendants' Motion for

Summary Judgment and Plaintiffs' Answer thereto.


                              RESPECTFULLY SUBMITTED,

                              ASHCRAFT & GEREL, LLP


                              _____/s/____Jerry Spitz_____
                              Jerry Spitz #413137


                              _____/s/____Kelly E. Cook_____
                              Kelly E. Cook, *pro hac vice*
                              11300 Rockville Pike, Suite 1002
                              Rockville, Maryland 20852
                              (301) 770-3737

                              Attorneys for Plaintiff