**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL J. PHILBIN                                    *
                                                              *
                          Plaintiff                    *
                                                              *
vs.                                                          *          Civil Action No. 06-0242(AK)
                                                              *
THE WACKENHUT CORPORATION, <u>et al.</u>   *
                                                              *
                          Defendants                 *
                                                              *
          ***************************************************

# PLAINTIFF'S ANSWER TO DEFENDANT WACKENHUT SERVICES INC.'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, Michael J. Philbin, by and through his attorneys, Jerry Spitz,

Robert G. Samet, Kelly E. Cook, and Ashcraft & Gerel, LLP, for reasons set out fully in the

attached Memorandum of Points and Authorities, hereby Opposes the Defendant Wackenhut

Service's Inc's Motion for Summary Judgment.

1.    The Defendant, Wackenhut Services, Inc., have failed to establish that no material

facts are in dispute.

2.    The Defendant is not entitled to judgment as a matter of law.

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to deny the Defendants'

Motion for Summary Judgment,

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP


_____/s/____Jerry Spitz_____
Jerry Spitz #413137


_____/s/____Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL J. PHILBIN                    *
                                     *
            Plaintiff                *
                                     *
vs.                                  *      Civil Action No. 06-0242(AK)
                                     *
THE WACKENHUT CORPORATION, et al.    *
                                     *
            Defendants               *
                                     *
        **************************************************

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S ANSWER TO DEFENDANT WSI'S MOTION FOR SUMMARY JUDGMENT

**I.      Introduction**

On February 26, 2003 Mr. Philbin slipped on black ice that had formed on the parking lot of the Nebraska Area Complex ("NAC"), in Washington D.C., where he worked for the United States Navy ("the Navy"), and as a result sustained serious injury.  See Statement of Disputed Facts ("SDF") 4, 14.  Wackenhut Services, Inc., ("WSI") was present on the premises as a property manager for the Navy.  See SDF 1.  WSI had a contract with the Navy to provide for snow and ice removal, "ensure passable navigation of . . . parking lots. . ." and " ensure the safety of NAC pedestrians . . . ."  See SDF 1.  WSI sub-contracted with the Brickman Group, Ltd. ("Brickman") for snow and ice removal services.  See SDF 1, 2.

On February 14th to the 18th, the D.C. area was hit with a tremendous snow storm that deposited over 18 inches of snow.  See SDF 11.   In the days prior to Mr. Philbin's fall, he had observed large piles of snow on the parking lot from this storm.  See SDF 6.  He observed that snow melt during the day, seeing water when he left work.  See SDF 7.  He also saw that same

water, frozen into black ice in the mornings.  <u>See</u> SDF 7, 8.  These conditions persisted for days leading up the 26th of February.  <u>See</u> SDF 6-9.  Just the day before the accident, Mr. Philbin had observed snow piles, melting and re-freezing.  <u>See</u> SDF 9.

On February 26th, a light snow had started to fall. <u>See</u> SDF 8.  The snow formed a thin layer on the ground at the parking lot where Mr. Philbin parked.  <u>See</u> SDF 4.  As Mr. Philbin crossed the snowy lot, he was careful and acted to avoid the ice he had seen previously.  <u>See</u> SDF 15.  The thin layer of snow obscured the ice, and Mr. Philbin ultimately slipped on the ice hidden underneath the snow, sustaining serious injury to his leg.  <u>See</u> SDF 4, 14.

The facts are more fully set forth in the attached Statement of Disputed Material Facts.

## <u>ARGUMENT</u>

### <u>I.</u>     <u>Standard for Summary Judgment and Choice of Law</u>

The Defendant, WSI properly sets out the standard for summary judgment.  WSI also properly notes that this Court will apply the substantive law of the District of Columbia to this case.

The Defendant, WSI is not correct that it is entitled to summary judgment under Fed. R. Civ. P. 56 in this case because the Plaintiff can prove that WSI owed Plaintiff a duty of due care under District of Columbia law, that WSI breached that duty, and that Plaintiff was injured as a direct and proximate result of WSI's negligence.  The facts Plaintiff relies on to support these assertions are material to the issues and are in dispute between the parties.  As such WSI is not entitled to judgment as a matter of law.

2

## II.    Negligence: Duty of Care, Breach, Causation and Injury

WSI owed a duty of care to the Plaintiff, breached that duty and as a result the Plaintiff was injured.  WSI argues that, as a matter of law, the Plaintiff cannot prove a prima facie case of negligence.  Negligence is established when it is shown that a person or entity owes a duty of care, that duty is breached, and injury results.  See District of Columbia v. Cooper, 483 A.2d 317, 321 (D.C. 1984) (quoting Prosser, Handbook of the Law of Torts § 30 (4th ed. 1971)).  Plaintiff can prove that WSI owed him a duty of reasonable care due to its status on the land and its contract with the government, that it breached that duty by failing to remedy the dangerous conditions it should have known about and that as a result the Plaintiff suffered injury.

### A. Duty of Care

> 1.    **WSI Owed Plaintiff a Duty of Care As an Occupier of Land With Control Over The Land, Or As a Person Acting On Land On Behalf Of The Possessor.**

WSI, is the property manager and an occupier of the NAC, and therefore owed Plaintiff a duty of reasonable care.  Further, WSI was on the land carrying out activities at the direction, consent and under the authority of the landowner, and thus owed the same duty of care to persons on the land as landowner itself.  See e.g. SDF 16.  The duty of reasonable care to visitors on land  is not one that is solely and exclusively borne by the owner of the land, as suggested by WSI in their Memorandum.  Rather, "[a] party who operates the premises but is neither the owner nor the lessee may also have a duty of reasonable care."  Smith v. Washington Sheraton Corp., 135 F.3d 779 (D.C. Cir. 1998).  Indeed, the duties of reasonable care do not follow the title of the land, but are owed by the party having control of the condition of the land.  See Husovsky v. U.S., 590 F.2d 944, 953 (D.C. Cir. 1978).

3

In the case of <u>Bostic v. Henkels & McCoy, Inc.</u>, the Court determined that a contractor working for Washington Gas owned a duty of due care to pedestrians lawfully walking on a sidewalk, and the temporary covering the contractor erected to cover a trench it had dug.  748 A.2d 421, 425 (D.C. 2000).  The Court noted that the contractor's duty was the same as any *"owner or occupier* of land" i.e., to exercise "reasonable care under all the circumstances" to "a person lawfully upon his premises."  <u>Id</u>. at 425 (quoting <u>Croce v. Hall</u>, 657 A.2d 307, 310 (D.C. 1995)) (emphasis in original).  The Court went on to state that any limits imposed on the contractor by the contract, in terms of its ability to take reasonable precautions to protect plaintiffs, would only serve as a defense and would not defeat the Plaintiff's claim as a matter of law.  <u>Bostic</u>, 748 A.2d at 425.  Thus WSI, as an occupier of the land exercising control over the land, assumed the duty common to all occupants of land: reasonable care to those lawfully on the premises.  <u>Sandoe et al. v. Lefta Assoc.</u>, 559 A.2d 732, 739 (D.C. 1998).

Further support for the proposition that non-possessors of land can be liable in tort for their actions on the land, can be found in the Restatement (Second) of Torts § 383 (1965), which states that:

> One who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were a possessor of the land.

The comments to the Restatement make clear that whether the non-possessing actor is an employee or independent contractor is irrelevant as to the non-possessor's liability.  The distinction may be critical as to liability of the actual landowner, but it is not relevant as to the liability of the non-possessing actor.  <u>id.</u>, comment. a.

4

In this case, WSI is not entitled to summary judgment because it cannot show that it did not exercise control over the parking lot where the Plaintiff was injured or act on the land at the direction of the owner. <u>See</u>, <u>e.g.</u>, <u>Smith</u> 135 F.3d at 783. Control over the land, especially the ability to detect and remedy the dangerous situation that injured the Plaintiff, is a material fact that is in dispute between the parties. <u>See</u>, <u>e.g.</u>, SDF 2. Further, WSI did carry out activity on the land, namely property management and snow removal, and thus had a duty to do so reasonably. <u>See</u> <u>id</u>.

The Defendant does not deny that it was the property manager of the Nebraska Avenue Complex. <u>See</u> <u>id.</u> Nor that one aspect of this management was responsibility for snow and ice removal. <u>See</u> <u>id.</u> The Navy contracted for the snow and ice removal services to be provided by WSI. <u>See</u> <u>id.</u> Moreover, WSI's control over the property and over snow and ice removal operations at the NAC is demonstrated by the fact that WSI sub-contracted with Brickman to provide the snow and ice control services that WSI had undertaken by its contract with the Federal Government. <u>See</u> SDF 17. Obviously, WSI could not sub-contract out responsibilities and duties it did not have itself.

Further evidence of the extent of WSI control is provided by the fact that WSI created the Snow and Ice Removal Plan, which acted as a "operational manual" for snow and ice removal. <u>See</u> SDF 1. WSI held a meeting for Brickman that reviewed that plan. <u>See</u> SDF 3. WSI retained and exercised supervisory responsibility over the sub-contractor. <u>See</u> SDF 2.. If, for example, inadequate ice removal, <u>i.e.</u>, sand or salt, were used on the land, WSI would call that fact to Brickman's attention. <u>See</u> <u>id.</u> Decisions as to how snow would be removed and ice treated were made by WSI's facilities manager, Jay Harmen, although he might "lean on" the

advice of the subcontractor. <u>See</u> <u>id.</u> WSI would instruct the sub-contractor to, for example, remove the piles of snow that had accumulated following the large snow storm in early February 2003. <u>See</u> <u>id.</u> WSI inspected the work of the subcontractor before the sub-contractor was allowed to leave. <u>See</u> <u>id.</u> In fact Brickman insisted it was working under the sole direction of WSI. <u>See</u> <u>id.</u> In addition, WSI claims to have routinely inspected the parking lot where Plaintiff fell. <u>See</u> <u>id.</u> WSI, as it was present on the complex, could and would advise the owner of the land of conditions of the land and advise when the conditions should be treated. <u>See</u> <u>id.</u>

There is ample evidence to conclude that WSI was an occupier of land with control over the land, especially in regard to snow and ice removal. Therefore, under <u>Smith</u>, WSI does owe the Plaintiff a duty of due care. The duty is the same as the owner of the land, reasonable care under the circumstances to those lawfully on the premises. <u>See</u> <u>Sandoe</u>, 559 A.2d at 739 (D.C. 1998) (quoting <u>Smith v. Arbaugh's restaurant, Inc.</u>, 469 F.2d 100, 100-01 (D.C. Cir. 1972)). Further, it is clear that WSI undertook for consideration to conduct snow and ice removal on the land, on behalf of the landowner, placing it squarely into the liability described by the Restatement at § 383.

## 2. WSI Contractually Undertook A Duty To Plaintiff.

By entering into a contract to perform services within its expertise, WSI acquired a duty to foreseeable Plaintiffs to perform those services with reasonable care. WSI breached that duty and as a result Mr. Philbin was injured. Mr. Philbin was a foreseeable Plaintiff as a pedestrian walking on the NAC parking lot. Indeed WSI contracted to "ensure the safety of NAC pedestrians." <u>See</u> SDF 1. Thus it is proper to impose liability on WSI for its failure to exercise reasonable care in its property management services to the Navy.

6

In the <u>Long v. District of Columbia et al.</u>, case it was held that when a party enters into a contract in which it performs services within its field of expertise, it owes a duty in tort to foreseeable Plaintiffs to perform those services reasonably. 820 F.2d 409, 418-19 (D.C. Cir. 1978), (citing <u>Caldwell v. Bechtel, Inc.</u>, 631 F.2d 989 (D.C. Cir. 1980)). In <u>Long</u>, the Court found that the Potomac Electric Power Company (PEPCO) had contracted with the District of Columbia to maintain traffic signals, and in so doing it was obligated to foreseeable Plaintiffs to perform that service with reasonable care. <u>Id</u>. The Court in holding, noted that this aligned with the majority of state courts and that its holding was consonant with the Restatement (Second) of Torts § 324A. <u>Id</u>. That section of the Restatement is directly applicable to this case:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care in the undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement of Torts (2nd) § 324A (1965).

Here the evidence is clear that WSI undertook, for consideration, to render services to the Navy, namely property management and snow and ice removal services, in order to "ensure the safety of NAC pedestrians." <u>See</u> SDF 1. It is conceded by WSI that the land owner owed a duty to Mr. Philbin to maintain a safe premises. <u>See</u>, <u>e.g.</u>, WSI's Memorandum in Support of its Motion for Summary Judgment at 3. That duty is to exercise reasonable care to keep the

property safe, and his obligation includes reasonable supervision and inspection of the premises. <u>Sandoe</u>, 559 A.2d at 740. WSI was performing that duty on behalf of the Navy. <u>See</u> SDF 1. Thus under <u>Long</u> and the Restatement § 324A, WSI owed a duty to perform its services with reasonable care. WSI's own Snow and Ice Removal Plan document establishes its duty to conduct periodic inspections to detect dangerous ice formation. See SDF 3. This is entirely consistent with the apparent intent by WSI to adopt the duties of the Navy, and its contractual obligation to fulfil the duty of the landowner, which includes conducting reasonable inspections. <u>See</u> SDF 1, 3; <u>Sandoe</u>, 559 A.2d at 740.

Another informative case on the duty of contractors is <u>Frederick v. TGP Hospitality, Inc.</u>, 56 F. Supp. 2d 76 (D.D.C. 1999), in which the duty of a hotel security provider to a member of the public under its contract was considered. The Court refused to find a duty to the public grounded in the contract between the hotel owner and the security company. <u>Id.</u> The contract with the security provider stated only that the security company would provide security officers at a set rate. <u>Id.</u> at 79. The owner decided how many guards to request, their duties, patrols, routes, and instructed the guards orally in what to do. <u>Id.</u> at 79. The Court concluded that the security company and its contract did nothing to assume the owner's duty of providing security, and the language of the contract did not provide that the security company was assuming such a duty. <u>Id.</u> at 79-80. Nor was there any language in the contract to support a finding that the plaintiff was an intended third party beneficiary of the contract so as to sue for breach of contract. <u>Id.</u> at 80.

<u>Frederick</u> is easily distinguishable and provides a telling contrast to the case at bar. In <u>Frederick</u>, there was no language in the contract concerning the duty of the security company.

Id. at 79.  However, here WSI's contract with the landowner states "we will ensure the safety of NAC pedestrians . . ." which is, in fact, a duty of the landowner.  See SDF 1.  The guards in Frederick were supplied by the security company but where wholly controlled and directed by the landowner.  56 F.Supp.2d at 79.  WSI, by contrast, took a direct hand in how snow and ice removal was conducted including creating guidelines for the work, holding meetings with the subcontractor, and inspecting the site routinely and after snow and ice removal was completed.  See SDF 1-3.  Unlike the security company in Frederick, WSI actively and affirmatively assumed the duty of the landowner to provide safe premises for pedestrians.  See SDF 1.

### B.  Breach of the Duty of Care

WSI breached its duty of reasonable care by failing to detect and remedy the melting and re-freezing snow that created the unreasonably dangerous sheet of ice on which the Plaintiff fell.  The issue that breach turns on, in this case, is notice, actual or constructive to the Defendant that the large piles of snow on the parking lot were melting during the day and re-freezing at night, causing a dangerous condition on the parking lot. The Court of Appeals of the District of Columbia has stated that "[c]onstructive notice is but a shorthand way of saying that shopkeepers are under a duty to police their premises with enough frequency to prevent the existence of dangerous conditions for unreasonably prolonged periods."  Hines v. Safeway Stores, Inc., 379 A.2d 1174, 1175 (D.C. 1978).  Shopkeepers owe this duty as landowners inviting the public onto their land, and as has been discussed, supra this is the same duty owed by WSI to the Plaintiff.   This includes a duty of reasonable inspection. Sandoe, 559 A.2d at 740.

Generally, constructive notice is "peculiarly within the province of the jury" Marinopoliski v. Irish et al., 445 A.2d 339, 341 (D.C. 1982) [citations omitted].  Constructive

notice can be shown where a dangerous condition has persisted for so long that the property

owner can be charged with knowing about it. Id. at 341. In this case, the Plaintiff can produce

evidence sufficient to persuade a reasonable juror that the melting and re-freezing of piles of

snow on the parking lot where he fell caused his injury and that the existence of the re-freezing

snow and ice was, or should have been, known to WSI as a condition that had persisted for

numerous days without remedy.

The Plaintiff testified that slipping on the ice under the snow caused his fall. He had been

walking without difficulty in the snow before encountering the ice. See SDF 4. When he tried to

push himself up from the ground, he could see a thin layer of shiny ice where his body had

brushed away the snow. See SDF 4. He could see and feel the slick ice underneath the snow.

See SDF 4. There is no evidence that anything other than the ice on the parking lot caused his

fall. Although Mr. Philbin had a second fall that day, it was only minutes after the fall on the

parking lot, and was caused by his already injured leg giving way. See SDF 5.

Plaintiff testified that piles of snow were present in the parking lot in the days leading up

to the accident on February 26, 2003. See SDF 6. Specifically, Mr. Philbin had observed several

large piles of snow on February 25, 2003, although he did not recall *exactly* where they were. See

See SDF 6. However, he did testify that on the 25th, some of the piles were inside the parking lot

itself, but in places that didn't take up parking spots. See SDF 6. Every evening as he was

leaving work in the days leading up to the accident, Mr. Philbin recalled seeing water from the

melting snow piles on the parking lot. See SDF 7. Mr. Philbin would see ice from the snow-melt

freezing in the morning as he came to work, and would see the ice melted and the lot wet with

water in the afternoons as he was leaving work. See id. The ice would form "down from where

the piles [of snow] were" and some of the piles were near light posts in the parking lot where they did not take up parking spaces. <u>See</u> <u>id.</u> He had seen the re-frozen water as shiny, glass-like black ice on the parking lot in the mornings leading up to the accident. <u>See</u> SDF 8.

   After his fall, Mr. Philbin stated that he could only see a patch of ice six to twelve inches in dimension, however he started quite clearly that it could have been larger because it was covered with snow. <u>See</u> SDF 4. The morning prior to the accident, when Mr. Philbin had walked to work he had encountered ice in nearly the same place, which was easily avoided because he could see it. <u>See</u> SDF 9. But that on the morning of the accident the ice extended further into the row, and Mr. Philbin's path, that it had been before. <u>See</u> <u>id.</u> Further, Mr. Philbin had observed meltwater from the snow piles in the evenings, as well as that same water having frozen overnight. <u>See</u> SDF 7. Philbin's fall was in the area where he recalled seeing mounds of snow, specifically one near a lamp post. <u>See</u> SDF 10. From this a reasonable juror could conclude that the actual ice sheet was much larger than the dimensions that the Plaintiff actually saw, and could infer that it came from the snow piles the Plaintiff had seen.

   From these facts alone a jury could conclude that WSI, who had undertaken to perform periodic inspections to determine if ice remedial treatment was needed (<u>See</u> SDF 1-3), should have determined that the overnight freezing of the snow melting from the piles was creating a dangerous surface condition on the parking lot. In addition, however, there are additional facts for a jury to rely upon. WSI stated that is conducted routine inspections of the site. <u>See</u> SDF 2. Weather records establish that almost 17 inches of snow fell in the D.C. region between February 14 and 18, 2003. <u>See</u> SDF 11. Large piles of snow were present on the parking lot, so much so that a special machine had to be brought in to move them. <u>See</u> SDF 12. Brickman's records

show 20 inches of snow falling at NAC, yet they only employed 1 ½ tons of salt. <u>See</u> SDF 13. After the snow of February 18, no more salt was until the morning of Plaintiff's fall, on February 26th. <u>Id.</u>  The visit reports also indicate that some of the snow piles were moved from the large lot on February 23rd.  <u>Id.</u>  These piles had been melting and re-freezing since the snow fall between the 14th and the 18th.  A reasonable jury could conclude that five days is more than sufficient time to detect the danger of melting and re-freezing snow piles.

Nor were the piles removed from the lot entirely.  Some were placed along the periphery. <u>See</u> SDF 12.  The goal was to open up parking spots.  <u>See id.</u> Mr. Philbin still saw the piles in the lot in the days right before his accident, including the day before.  <u>See</u> SDF 6, 12.  A jury could very well take these facts as bolstering Mr. Philbin's contention that the snow piles that were left on the lot but not in actual parking spots. <u>See</u> SDF 6.

Had WSI been acting with reasonable care, it could have advised the landowner of the need to apply salt and/or to remove snow piles from areas where people would be walking to get to work.  <u>See</u> SDF 2.  This would be consistent with the duty in its Snow and Ice Removal Plan to periodically conduct inspections to determine if more ice melting material was needed.  <u>See</u> SDF 1-3.  These would have been reasonable precautions under the circumstances to fulfil the duty WSI had undertaken to "ensure safety," and failing in these duties is negligent.  To the extent that WSI claims it could not act freely, under <u>Bostic</u> that is a defense for a jury, and does not defeat the Plaintiff's claim as a matter of law.  <u>See</u> 748 A.2d at 425.

Although not binding on this Court, the Court of Appeals of Maryland has decided a case with many factual similarities to this one.  In <u>Honolulu Limited v. Cain</u>, the Maryland high Court held that a land owner was chargeable with negligence for allowing snow to be piled up by its

snow removal contractor on the outside of a parking lot in February when it was known that the snow would melt onto the parking lot surface and freeze overnight to become a hazard. 244 Md. 590, 596, 224 A.2d 433, 436 (1966). One of the deciding issues in <u>Honolulu Limited</u> was the fact that the owner knew that because of the way the lot drained, the melted snow would go onto the parking lot and the owner should have known that meltwater would freeze overnight in February. <u>See</u> <u>id.</u> Similarly, WSI should have known that the snow piles that were actually on the parking lot would create a melting and re-freezing hazard. The Court in Maryland also held that the owner was negligent for not putting down sand or salt to prevent ice formation on the wet area. <u>Id.</u> The same can be said here, where WSI could have called in Brickman, or warned the owner and requested permission to remedy the dangerous condition.

The fact that snow was still falling at the time of the accident is a red herring in this case. Plaintiff did not fall as a result of the snow that was falling. <u>See</u> SDF 4, 6-10. He slipped on ice that had accumulated over night, and had been forming in nightly cycles for days. <u>See</u> <u>id.</u> That melting snow piles could create water that could freeze on the lot would have been known to WSI by virtue of simple common sense. Any inspection by WSI would have confirmed that the snow piles were melting and re-freezing on the parking lot, causing a hazard. Failing to anticipate the danger and inspect the lot to eliminate it is negligence. Had WSI done what was reasonable the piles could have been removed or the ice treated long before the snow began falling on February 26th, 2003. Plaintiff does not claim that WSI was negligent for failing to respond in a timely manner to the snow that began on February 26th, 2003. The Plaintiff is not claiming in this case that the Defendant had a duty to cure the snow that was falling at the time of the accident, Rather, Plaintiff argues that melting and re-freezing snow piles had persisted for days and yet the

ground remained untreated and the snow piles remained in the parking lot. This is the dangerous condition that WSI failed to correct in a reasonable time. For the reasons stated above, it is a condition that WSI is liable in tort for allowing to exist.

### C. Injury and Causation

The Defendant's Motion and Memorandum in Support thereof does not appear to contest the fact that Mr. Philbin was injured on February 26, 2003. See SDF 14, WSI's Memorandum in Support of Motion for Summary Judgment at 3-6. The Plaintiff has certainly put forth evidence that he was injured as a result of a fall in the parking lot in question on that date. See SDF 14.

### III.    Questions for a Jury: Contributory Negligence and Assumption of Risk

The Defendant is not entitled to judgment as a matter of law on the grounds of contributory negligence and assumption of risk. There are material facts are in dispute, and both issues are properly questions for the fact finder to decide.

### A. Contributory Negligence

Defendants cannot prove that the Plaintiff acted unreasonably and that his claim should be barred by contributory negligence as a matter of law. "The burden of proving contributory negligence is on the defendant, and the existence of contributory negligence is normally a question of fact for trial." Maalouf v. The Swiss Confederation, 208 F. Supp. 2d 31, 42-43 (D.D.C. 2002), (citing Lynn v. District of Columbia, 734 A.2d 168, 172 (D.C. 1999)). Only in an exceptional case, where the evidence is so one-sided as to admit no other conclusion, should summary judgment be granted on the grounds of contributory negligence. See id. at 42 (quoting Paraskevaides v. Four Seasons Washington, 292 F.3d 886, 891-92 (D. C. Cir. 2002)); Shu v. Basinger, 57 A.2d 295, 295-96 (D.C. 1948); Tilghman v. Johnson, 513 A.2d 1350, 1351 (D.C.

14

1986).

Here the evidence put forward by Defendants does not permit only the single inference that the Plaintiff was negligent as a matter of law.   Parking on and walking across a parking lot covered by snow is not behavior so extraordinary and unreasonable as to be negligent as a matter of law. By way of example, in the case of <u>Dougherty v. Chas. H. Tompkins Co.</u>, 240 F.2d 34 (D.C. Cir. 1957), the Court held that the issue of contributory negligence of a person using a temporary sidewalk covered by snow was a question for the jury to decide.  Similarly, in <u>Bostic</u> conflicting testimony of the Plaintiff's behavior immediately prior to his fall, i.e. whether the plaintiff had been walking rapidly backwards or facing forwards when he fell, rendered contributory negligence "obviously a matter for the jury."  748 A.2d 421, 427 (2000).

Rather than deviating from a standard of reasonable care, the Plaintiff testified that he had been quite careful in light of the weather conditions on the morning of the accident.  He had selected a shoe that was suitable for the weather.  <u>See</u> SDF at 15.  Mr. Philbin testified that he was exercising caution as he walked in the parking lot. <u>Id</u>. The Plaintiff had encountered no difficulty until he reached the point of his fall.  <u>Id.</u> Like <u>Dougherty</u>, whether Plaintiff acted reasonable in walking on the snow covered parking lot is a question for the jury to decide.

## B. Assumption of Risk

The Defendant cannot prove that Mr. Philbin assumed the risk of the accident as a matter of law.  Like contributory negligence, the defense of assumption of the risk is "heavily fact-based, and summary judgment based on assumption of risk should therefore be granted only if no real dispute exists as to the Plaintiff's awareness of the relevant danger."  <u>Maalouf</u>, 208 F.2d at 42.  In this case there is a real dispute as to whether Plaintiff appreciated the danger he faced, and

15

whether he faced in voluntarily.

> "Assumption of risk is an available defense when a plaintiff voluntarily has incurred a known risk.." The key word is "voluntarily." "If a tenant, for example, has no reasonable alternative to remaining on the premises, he or she cannot be said, in fairness, to have made a voluntary decision to encounter the risk [of housing code violations] there."

District of Columbia v. Mitchell, 533 A.2d 629 (D.C. 1987) (quoting Scoggins v. Jude, 419 A.2d 999, 1004 (D.C.1980)) (internal citations omitted).  The District of Columbia Court of Appeals has quoted with approval the Restatement,  thus:

> The plaintiff's acceptance of the risk is not to be regarded as voluntary where the defendant's tortious conduct has forced upon him a choice of two courses of conduct which leaves him no reasonable alternative to taking his chances. A defendant who by his own wrong has compelled the plaintiff to choose between two evils cannot be permitted to say that the plaintiff is barred from recovery because he has made the choice.

Morrison v. MacNamara, 407 A.2d 555 (D.C. 1979) (quoting Restatement (Second) of Torts, § 496 E , cmt. c (1965)).  The parking lot at NAC was untreated on the morning of February 26, 2003.  See SDF 16.   A reasonable jury could conclude that the Plaintiff had no reasonable alternative to get to work, other than to cross the snow covered parking lot.  Since the Defendants failure to treat the lot gave Mr. Philbin no reasonable alternative, his claim cannot be barred by the assumption of risk doctrine because his actions cannot be said to be voluntary.  Just as the Plaintiff in Scroggins had no choice but to live in an apartment with dangerous defects, Mr. Philbin had no choice but to cross the parking lot in this case.

Further, the Defendant cannot show that the Plaintiff accepted the risk of walking on ice.  Assumption of risk is grounded on the subjective knowledge of the Plaintiff.  See Sinai v. Polinger Co., 498 A.2d 520 (D.C. 1985).  The Plaintiff did not see the ice under the thin blanket of

snow.  See SDF 4.  Nor did the ice betray itself by changing the elevation of the snow.  See id.  If

the Plaintiff could not perceive the ice, he could not have assumed the risk of walking on it.  This

is consistent with the decision in Maalouf which found that mere sledding was not itself the kind

of activity that is a "willful, wanton or reckless disregard for his own safety" required to prove

assumption of the risk.  See 208 F. Supp. 2d at 43.  Here, merely walking on snow is not a

willful, wanton or reckless disregard for safety and the actual instrumentality of Plaintiff's injury

was concealed form him.  Just as the Plaintiff in Maalouf could not have assumed the risk of an

unknown wire injuring him, Mr. Philbin could not assume the risk of walking on ice that was

unseen by him.  Even if the Plaintiff had perceived the ice and choose to walk on it regardless,

then it still would be for a jury to decide if he voluntarily accepted the risk of harm, but on the

facts of this case Defendant's argument as to assumption of the risk fails as a matter of law.

## IV.    Vicarious Liability of Defendants For Acts of Brickman

It is true that ordinarily, an employer is not liable for the acts of its independent

contractors.  However, in this case the is dispute as to the material fact of whether WSI exerted

sufficient control over Brickman to justify treating Brickman as a servant and not an independent

contractor.  Further, the duty owed to the Plaintiff by WSI, as it is identical to the duty of a land

owner, is non-delegable, and if failed in by Brickman, WSI can be held liable for that failure.

Looking first at determining whether a person is a contractor or a servant, "[t]he decisive

test . . .  is whether the employer has the right to control and direct the servant in the performance

of his work and the manner in which the work is to be done."  Safeway Stores, Inc. v. Kelly, 448

A.2d, 856, 860 (citing LeGrand v. Insurance Company of North America, D.C.App., 241 A.2d

734, 735 (1968) (internal citations omitted)).  In Safeway Stores the fact that the store manager

had control over the guard to the extent that the manager "had operational control over the guards" and "on occasion [the guard] would lock the doors at the manager's request or would act under the manager's general direction if he were having a problem with a customer," the manager provided specific instructions to "keep juveniles out of the doorway and to watch for shoplifters." Id. at 861. These facts were enough to render the guard an employee for purposes of vicarious liability. Id.

In this case the evidence available raises a jury question as to whether Brickman was controlled to a similar degree by WSI. For example, Brickman's Branch Manager testified that with regard to bringing in heavy equipment "I wouldn't call it asked; I was instructed." See SDF 17. Wackenhut called Brickman and ordered that snow be removed. See id. Brickman acted "under the sole direction from Wackenhut." See id. Brickman "did whatever the client requested. Understand that came – that message or communication came through the voice of a Wackenhut employee." See id. Brickman had little control over how it acted: "it was not part of my responsibility to make any decision that the work looks good or we need to do more. We were there to be told what to do, and that's what we did. We didn't offer our opinion unless it was requested." See id. Wackenhut would direct Brickman what areas were priority. See id. WSI told Brickman where they wanted work done and in what order. See id. When Mr. Philbin was injured Mr. Harmen called the "snow captain" from Brickman and told him to go check the gate area again. See id. Grasswick also describes Jay Harmen being able to call and direct his work. See id. Of course, the detailed instructions for exactly how Brickman was to perform is contained in the Snow and Ice Removal Plan. See id. Thus WSI had significant control over Brickman, and if Brickman is found to be negligent then WSI is vicariously liable without regard

18

to their own negligence, which has previously been shown.

Second, just as was stated in the Restatement, a person who conducts activity on the land of another for his benefit has the exact same liabilities as the land owner. See Restatement of Torts (Second) § 383 (1965). Liability of a land owner for actions by an independent contractor is based on whether the land owner owes a duty to the injured person. See Bailey v. Zlotnick, 149 F.2d 505, 506 (D.C. Cir. 1945). It has been shown that WSI owes the same duty to the Plaintiff as the land owner himself. If such a duty is breached as an actual result of the work of the independent contractor, the WSI is liable because liability for non-performance of a duty may not be shifted to another. Id. at 506. Taken together, these principles establish that WSI is vicariously liable for the acts of Brickman, if the duty to protect the Plaintiff was actually breached by Brickman in its work.

**CONCLUSION**

For the reasons specified above, the Plaintiff hereby requests that this Honorable Court deny the Defendants' Motion for Summary Judgment.

19

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP


_____/s/\_\_\_\_Jerry Spitz_____
Jerry Spitz #413137


_____/s/\_\_\_\_Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

20

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL J. PHILBIN                              *
                                               *
              Plaintiff                        *
                                               *
       vs.                                     *        Civil Action No. 06-0242(AK)
                                               *
THE WACKENHUT CORPORATION, et al.              *
                                               *
             Defendants                        *
                                               *
       ****************************************************

# STATEMENT MATERIAL OF FACTS IN DISPUTE

1.      Defendant Wackenhut Services, Inc. ("WSI") entered into a contract with the
Navy to provide property management services at the Nebraska Avenue Complex ("NAC").
Exhibit A, Wackenhut's Answer to the Complaint, at ¶ 2.  These services included snow and ice
removal.  See Exhibit B, a page from WSI contract with Navy; Exhibit C, WSI's Answers to
Interrogatories, # 18.  Under WSI's agreement with the Navy concerning snow removal, WSI
agreed to "ensure passable navigation of . . . parking lots  . . ." and "ensure the safety of NAC
pedestrians. . . ."  Exhibit B.  WSI also entered into a subcontract with the Brickman Group, Ltd.
(Brickman).  See Exhibit D, WSI's contract with Brickman, dated March 26, 2002.  Brickman did
provide snow and ice removal services all during February 2003.  See Exhibit D.  Brickman was
selected by WSI based on its skill and expertise.  See Exhibit E, Deposition Transcript of Jeremy
Harmen, at 79, 99-100.  Brickman is a professional snow removal company.  See Exhibit F,
Deposition Transcript of Adam Grasswick, at 65; Exhibit G, Deposition Transcript of Gregory
Lewandowski, at 36.  Brickman undertook to "perform snow and ice removal services to keep  .
. . parking areas . . . passable and safe to navigate." Exhibit D at 5.

2.      WSI retained and exercised supervisory responsibility over the sub-contractor performing snow and ice removal services.  <u>See</u> Exhibit E at 45.  If inadequate ice removal, i.e., sand or salt, were used at the NAC, WSI would call that fact to Brickman's attention.  <u>See</u> <u>id</u>. Decisions as to how snow would be removed and ice treated were made by WSI's facilities manager, Jeremy (Jay) Harmen, although he might "lean on" the advice of the subcontractor. Exhibit F at 57-58.  WSI would instruct the sub-contractor to, for example, remove the piles of snow that had accumulated following the large snow storm in early February 2003.  Exhibit G at 7-9.  WSI inspected the work of the subcontractor before the sub-contractor was allowed to leave.  <u>See</u> Exhibit F at 66.  In fact Brickman insisted it was working under the sole direction of WSI. Exhibit G at 20.  In addition, WSI routinely inspected the parking lot.  Exhibit C, #10.  WSI, as it was present on the complex, could and would advise the owner of the land of conditions of the land and advise that the conditions be treated.  Exhibit E at 53-56.

3.      WSI created a Snow and Ice Removal Plan.  Exhibit H, Wackenhut Services Snow and Ice Removal Plan, dated October 18, 2002.  The Plan served as an operations manual for WSI.  Exhibit E at 42.  The Plan was in effect at the time of the accident at issue in this case. Exhibit E at 19.  "It is WSI policy for all personnel involved with snow removal to read and adhere to the procedures in [the snow removal plan]."  Exhibit H at 2.   The Plan was reviewed by Brickman's Branch Manager and Supervisor in a meeting with Wackenhut in the autumn of 2002.  Exhibit G at 21; Exhibit F at 68-71.  The plan states that "[i]nspections will be made of areas encompassing the barriers at near [sic] the gates to ensure they are free of ice and snow and operate properly.  Periodic inspections will be made of streets, parking areas, sidewalks, steps, porches, and inaccessible areas to determine if additional applications of ice control and traction

2

improvement substances will be applied as needed." Exhibit H at 4. Under the Plan, snow piles

were to be piled up at the edges of parking lots, and large piles removed from the base. However,

if melting was expected then the piles could remain." Id. at 5.

    4.    Mr. Philbin fell on the NAC parking lot on February 26, 2003, due to slipping on

black ice. Exhibit I, Deposition of Michael Philbin, at 36, 62-63. Mr. Philbin was a civilian

contract worker for the Navy, and worked inside the NAC. Id. at 21. He had been walking

without difficulty in a light dusting of snow on the parking lot until he encountered the black ice.

Id. at 61-62. He did not see the ice before slipping on it, because it, and the rest of the lot, was

covered with a thin layer of snow. Id. at 61, 68. When he tried to push himself up from the

ground, he could see a thin layer of shiny ice where his body had brushed away the snow. Id. at

63-64. He could see and feel the slick ice underneath the snow. Id. at 63, 67-68. The part of the

ice sheet that was visible to Mr. Philbin measured about six to twelve inches in dimension, but

the whole area of ice was larger and could not be seen because it was covered with snow. Id. at

68. The ice did not change the elevation of the snow. Id. at 68.

    5.    Although Mr. Philbin had a second fall shortly after the fall in the parking lot, the

second fall was occasioned by his already injured leg giving way. See id. at 60-61, 115.

    6.    In the days leading up to the accident on February 26, 2003 there were large piles

of snow present in the parking lot at NAC. Id. at 44-45; Exhibit F at 47-48. Mr. Philbin had

observed several large piles of snow in the main area of the parking lot as late as February 25,

2003. Exhibit I at 44-45. Although he does not recall *exactly* where in the lot they were. Id. at

44-45. On February 25th he does recall that some of the large piles were inside the parking lot

itself, in places that didn't take up parking spots. Id. at 45, 126-127.

7.      Every evening as Mr. Philbin was leaving work, in the days leading up to the accident, he would see water coming from snow piles on the parking lot melting.  Id. at 45.  Mr. Philbin would see ice from the snow-melt having frozen overnight in the morning as he came to work, and would see the ice melted and the lot wet with water in the afternoons as he was leaving work.  Id. at 46-47.  The ice would form "down from where the piles [of snow] were" and some of the piles were near light posts in the parking lot where they did not take up parking spaces.  Id. at 46.

8.      The re-frozen water formed shiny, glass-like black ice on the parking lot in the mornings leading up to the accident.  Id. at 46-47.  The ice formed as a result of the snowmelt freezing when the temperature declined. Id. at 122.  Sometime during the night of February 25th into the morning of the 26th it had started snowing.  See Exhibit F at 10.  Brickman's snow captain was already on his way to the sight by 6:40 because of the snow falling at that hour.  Id.

9.      The morning prior to the accident, Mr. Philbin had encountered ice in about the same place as he fell the next day, which he easily avoided because he could see it.  Id. at 119.  But that on the morning of the accident the ice extended further into the row, and Mr. Philbin's path, than it had been before.  Id. at 119.

10.     Mr. Philbin fell in the same area where he recalled seeing mounds of snow, specifically one near a lamp post.  Id. at 126.

11.     There was a large winter storm from February 14, 2003 through February 18, 2006.  Exhibit J, NOAA Weather Reports, at 1.  There was a snow accumulation of 16.7 inches during that period.  Id.  There was 2.5 to 3 inches of rain on the evening of February 22, 2003 and the early morning of February 23, 2003.  Id. at 2.  A series of low pressure systems dropped "light

4

snow" on the morning of February 26, 2003. Id. at 3; Exhibit I at 40. Between February 19, 2003 and February 26, 2003 temperatures would go above freezing during the day, and dip below freezing at night. See Exhibit I at 38, 122.

12.    Brickman contracted to have large piles of snow removed by "Pogo." Exhibit F at 47. This removal was done on February 23, 2003. Id. Removal of the large piles involved a special, very heavy machine. Id. However, after some were move, some of the snow piles were still present on the base. See Exhibit I at 44-45, Exhibit F at 48. Some of the piles were moved to the perimeter. Exhibit F at 48. Some were left in the main body of the lot, for example near light poles where there were parking spots on either side, as can be seen in Exhibit M. Exhibit I at 45, 126-127, Exhibit M, Photo of the parking lot. The purpose of moving the snow piles was to open up all available parking. See Exhibit G at 14, 16-17; Exhibit F at 47. Brickman did not inspect the lot after Pogo's removal of the snow piles. Exhibit F at 48. It is not known if WSI ever inspected the removal work performed by Pogo.

13.    Upon working at NAC, Brickman would generate a Site Visit Report. Exhibit G at 11. Twenty inches of snow fell at NAC by February 16, 2003. Exhibit K, Site Visit Reports of Brickman. On February 16, 2003, no salt, sand or ice treatment was used. Id. On February 16, 2003 employed three plows, a "big loader", a bobcat loader, and three walk-behind snow plows. Id. On February 17, 2003, Brickman employed a similar force at NAC, but no salt, sand or ice treatment was used on the lot. Id. On February 18, 2003 Brickman was again working at NAC, again with a large group of labors and machinery, and did employ 1 ½ ton of salt. Id. On February 19, 2003 the parking area was "cleaned up" by Brickman with a bobcat loader, but other areas were still "somewhat covered." Id. No salt, sand or other ice treatment was used on

5

February 19, 2003.  Id.  Brickman's employees had piled the snow into large piles all over the parking lots.  See Exhibit I at 44-45; Exhibit F at 47-48; Exhibit G at 15-17; Exhibit K.  The piles were so large, an extremely heavy loader was needed to move them.  See Exhibit G at 12-13.  On February 23, the extremely large loader was employed to move the snow piles, which obstructed parking.  See Exhibit K; Exhibit G at 14, 16-17; Exhibit F at 47.  Snow piles were taken from all over the base to the edge of the parking lot where Mr. Philbin fell.  Exhibit G at 15-17; Exhibit F at 48.  No sand, salt or ice treatment was used after the piles were moved.  Exhibit K.  Adam Grasswick denied being at NAC on February 23, 2003 with the loader, however the Site visit does have his name on it as "supervisor" and there are no notations in the documentation that a subcontractor was employed on that date.  See Exhibit F at 45; Exhibit K.  Earlier Site Visit Reports had indicated that some vehicles belonged to sub-contractors of Brickmen, for example the reports from February 16th and 17th, 2003.  See Exhibit K.  On February 26, 2003 the date of the accident, 1 inch of snow fell at NAC and 2 ½ tons of salt were employed.  Id.

14.	As a result of falling on the ice in the parking lot, Mr. Philbin sustained serious injury to his ankle.  See Exhibit L, Plaintiff's Answers to Interrogatories of WSI, # 8.

15.	On the morning of the accident Plaintiff had selected a shoe that was suitable for the weather.  Exhibit I at 42.  He was exercising caution as he walked in the snowy parking lot because he had seen ice on the lot in the mornings prior to the 26th.  Id. at 61.  The Plaintiff had encountered no difficulty until he reached the point of his fall.  Id. 62.

16.	At the time the Plaintiff arrived to the parking lot on February 26, 2003, it had not been treated.  See Exhibit I at 56.  The Plaintiff saw no one plowing snow or treating the surface.  Id.

6

17.    Brickman's Branch Manager testified that with regard to bringing in heavy equipment "I wouldn't call it asked; I was instructed [by Harmen]."  Exhibit G at 9.  Wackenhut called Brickman and ordered that snow be removed.  Id. at 17.  Brickman acted "under the sole direction from Wackenhut." Id. at 20.  Brickman "did whatever the client requested.  Understand that came – that message or communication came through the voice of a Wackenhut employee." Id. at 23.  Brickman claims it had little control over how it acted: "it was not part of my responsibility to make any decision that the work looks good or we need to do more.  We were there to be told what to do, and that's what we did.  We didn't offer our opinion unless it was requested."  Id. at 25-26.  Wackenhut would direct Brickman what areas were priority.  Id. at 27.  WSI told Brickman where they wanted work done and in what order.  Id. at 27.  When Mr. Philbin was injured Mr. Harmen called the "snow captain" from Brickman and told him to go check the gate area again. Exhibit F at 8.  Grasswick also describes Jay Harmen being able to call and direct his work.  See id. at 38.  Of course, the detailed instructions for exactly how Brickman was to perform is contained in the Snow and Ice Removal Plan.  See Exhibit H..  However, WSI "didn't tell [Mr. Grasswick, Brickman's supervisor] how to do your job." See Exhibit F at 65.

18.    Brickman's subcontract with WSI passed all of the duties of WSI onto Brickman. See Exhibit E at 44.  WSI's contract with the Navy specifically named Brickman as the entity that would perform snow and ice removal required.  See Exhibit B.  The subcontract between WSI and Brickman required Brickman to provide "all labor, materials, supplies, and equipment to perform snow and ice removal services to keep . . . parking areas . . passable and safe to navigate."  See Exhibit D at 5.  This was the contract in effect during February 2003.  See Exhibit D at 2.

7

19.     At the time of Plaintiff's fall, Brickman had treated other areas on the premises but had not yet treated the area where Plaintiff fell.  Exhibbit F at 13-19, 24-33, 34-35,  Exhibit I at 56. In fact, the lot where Plaintiff fell was the very last area to be treated by Brickman with salt. Exhibit F at 34-35.  Before treating that lot, the Brickman employee would salt every other lot, and all interior roads in the expansive NAC campus.  See id. at 13-19, 24-33, 34-35.

RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP

_____/s/____Jerry Spitz_____
Jerry Spitz #413137

_____/s/____Kelly E. Cook_____
Kelly E. Cook, *pro hac vice*
11300 Rockville Pike, Suite 1002
Rockville, Maryland 20852
(301) 770-3737

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHAEL J. PHILBIN                              *
                                                *
                    Plaintiff                   *
                                                *
         vs.                                    *          Civil Action No. 06-0242(AK)
                                                *
THE WACKENHUT                                   *
CORPORATION, <u>et al.</u>                      *
                                                *
             Defendants                         *
                                                *

         *************************************************

**<u>INDEX TO EXHIBITS</u>**

A          WSI's Answer to Complaint

B          Page 174 of WSI's Contract with the Navy

C          Wackenhut Answers to Interrogatories

D          Subcontract between WSI and Brickman

E          Deposition Transcript of Jeremy Harmen

F          Deposition Transcript of Adam Grasswick

G          Deposition Transcript of Gregory Lewandowski

H          WSI Snow and Ice Removal Plan, Dated October 18, 2002

I          Deposition Transcript of Michael Philbin

J          NOAA Weather Reports

K          Brickman Site Visit Reports

L          Plaintiff's Answers to Interrogatories of WSI

M          Photo of the Parking Lot

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the above Plaintiff's Answer to Defendant

Wackenhut Services Corporation's  Motion for Summary Judgment and accompanying

Memorandum of Points and Authorities, Exhibit List, Statement of Disputed Facts, Exhibit Index

and Exhibits, Proposed Order, and Request for Hearing were served upon Defendants by placing

a copy of the same in the U.S. Mail, postage prepaid, this <u>13th</u> day of April, 2007 and addressed

as follows:

| | |
|---|---|
| H. Patrick Donohue | Deborah Murrell Whelihan |
| Armstrong, Donohue, Ceppos & Vaughan | Jordan, Coyne & Savits, LLP |
| 204 Monroe Street, Suite 101 | 1100 Connecticut Avenue, N.W. |
| Rockville, MD 20850 | Suite 600 |
| | Washington, DC 20036 |

<u>         /s Kelly E. Cook         </u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHAEL J. PHILBIN        *
                              *
         Plaintiff           *
                              *
      vs.                 *       Civil Action No. 06-0242(AK)
                              *
THE WACKENHUT CORPORATION, et al.    *
                              *
        Defendants       *
                              *

            **************************************************

<u>**REQUEST FOR HEARING**</u>

      Plaintiff, Michael J. Philbin, by and through his attorneys, Jerry Spitz, Robert G. Samet,

Kelly E. Cook and Ashcraft & Gerel, LLP, requests a hearing on Defendants' Motion for

Summary Judgment and Plaintiffs' Answer thereto.

                         RESPECTFULLY SUBMITTED,

                         ASHCRAFT & GEREL, LLP

                                  /s/     Jerry Spitz
                         Jerry Spitz #413137

                                  /s/     Kelly E. Cook
                         Kelly E. Cook, *pro hac vice*
                         11300 Rockville Pike, Suite 1002
                         Rockville, Maryland 20852
                         (301) 770-3737

                         Attorneys for Plaintiff