EXHIBIT E

**Capital Reporting Company**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2                  DISTRICT OF COLUMBIA

 3   ---------------------------------:

 4   MICHAEL J. PHILBIN                :

 5              Plaintiff             : At Law No.

 6         v.                         : CL05-1389

 7   THE WACKENHUT CORPORATION, ET AL :

 8              DEFENDANTS             :

 9   ---------------------------------:

10                       Washington, D.C.

11                       Friday, March 9, 2007

12   Deposition of:

13              JEREMY L. HARMAN,

14   called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the law Office

16   of Jordan, Coyne & Savits, 1100 Connecticut

17   Avenue, N.W., Suite 600, Washington, D.C., before

18   Sheri C. Stewart, Registered Professional

19   Reporter and Notary Public in and for the

20   District of Columbia, beginning at 9:42 a.m.,

21   when were present on behalf of the respective

22   parties:
```

## Capital Reporting Company

Page 18

1    this accident for February 2003.

2         Because the 11/26/03 one is clearly

3    after February, and I don't think the

4    10/18/02 was the operative contract, I think

5    it was March '02, but I can verify that with

6    Bill, Bill Guy.

7         But that's what he told me, so that's

8    my understanding.

9         MR. SAMET:  So you're telling me that a

10   document I have here today that I'm prepared

11   to question the witness about is not

12   applicable to this case?

13        MS. WHELIHAN:  No, no, no.  I gave you

14   all the contracts we had between Brickman.

15        MR. SAMET:  These aren't contracts at

16   all.

17        MS. WHELIHAN:  Subcontracts.

18        MR. SAMET:  These aren't subcontracts,

19   just snow and ice removal.

20        MS. WHELIHAN:  Removal plans, the snow

21   and ice removal plans for 10/18/02 and

22   11/26/03 I gave you.

**Capital Reporting Company**

Page 19

1          My understanding is that at least with

2      respect to Exhibit 4, that is not applicable.

3          MR. SAMET:  Well, I wouldn't think it

4      would be.

5          MS. WHELIHAN:  Right.

6          MR. SAMET:  It was written afterwards,

7      modified in November of '03.

8          MR. DONOHUE:  Yeah, Deb, I misspoke.

9          MS. WHELIHAN:  I think 3 counts, I'm

10     sorry.  I've confused myself.

11         MR. DONOHUE:  We're cool.  Three

12     counts.

13         MR. SAMET:  All right.

14         MS. WHELIHAN:  Write that down on your

15     list of things about your crappy lawyer.

16 BY MR. SAMET:

17     Q    Exhibit 3 would be the snow and ice

18 removal plan of Wackenhut for the Nebraska Avenue

19 complex in effect at the time of this accident,

20 February of 2003; is that correct, Mr. Harman?

21     A    To the best of my knowledge, yes.

22     Q    All right.  Now, you've already

## Capital Reporting Company

Page 20

1    indicated that you did not take part in drafting

2    either Exhibit 3 or 4; is that correct?

3        A    I don't remember.

4        Q    So you may have, you just don't

5    remember either way?

6        A    I don't remember if I did or not.

7        Q    Okay.  And my question dealt with

8    drafting.

9             Do you remember whether you were

10   involved in the development of the snow and ice

11   removal plans?  Not necessarily the document

12   itself, but the plan that was incorporated into

13   the document.  If you remember?

14       A    I would have, I would have had input

15   into this.

16       Q    Okay.  You don't remember specifically

17   what parts you had input on or whether you input

18   on all of the parts, or you don't remember any of

19   the details; is that correct?

20       A    Yes, I don't remember.

21       Q    Okay.  Was there, at Wackenhut, a kind

22   of regular program to do inspections of the

## Capital Reporting Company

Page 40

1    was an obligation of Wackenhut to make these

2    inspections?

3        A    Again, as I stated earlier, we didn't

4    actively go out and look for snow and ice.  The

5    Navy directed us when they wanted snow removal

6    services to begin.

7        Q    All right.  So then would it be fair to

8    say that in February 2003 you didn't interpret

9    that to require Wackenhut to make inspections,

10    correct?

11        A    I don't remember how I interpreted that

12    in 2003.

13        Q    Okay.  You said that language above

14    that, "Magnesium chloride will only be used to

15    remove ice on concrete surfaces" --

16        A    Yes.

17        Q    -- you said that pertains to Brickman?

18        A    Correct.

19        Q    Is Brickman mentioned anywhere in this

20    document?

21        A    Yes.

22        Q    Can you tell me where?  I'm referring

## Capital Reporting Company

Page 41

1    now to Exhibit No. 3.

2        A    They're mentioned on page 6 under

3    "subcontract of personnel, Brickman."

4        Q    But other than that, in any of the

5    narrative portions of this that have the

6    obligations and what will be done, does it

7    anywhere say that any of these things will be done

8    by Brickman as opposed to Wackenhut?

9            MR. DONOHUE:  May I have a standing

10           objection just on the -- based on the

11           document speaks for itself.  May I have a

12           standing objection?

13           MR. SAMET:  You can.  Maybe you want to

14           change hats and defend Wackenhut.  Why you

15           would object, I can't imagine, but sure.

16           MR. DONOHUE:  The document speaks for

17           itself.

18       A    This document, Brickman isn't mentioned

19   anywhere else in there, but in our technical we

20   clearly state that Wackenhut Services has selected

21   the Brickman Group to perform portions of snow

22   removal, portions of the contract.

**Capital Reporting Company**

1    BY MR. SAMET:

2        Q    No, I understand.

3             Would it be fair to say that this snow

4    and ice removal plan that's been marked as Exhibit

5    No. 3 is a recitation of Wackenhut's obligations

6    which Wackenhut then subcontracted out to

7    Brickman; is that fair?

8             MS. WHELIHAN:  Objection.

9             MR. DONOHUE:  Same objection.

10       A    Do I answer?  I don't understand the

11   question.

12   BY MR. SAMET:

13       Q    Would it be fair to say that this

14   document that's been marked as Exhibit No. 3 and

15   described as the snow and ice removal plan, is a

16   recitation of Wackenhut's obligations under its

17   contract with the U.S. Government which Wackenhut

18   then subcontracted out to Brickman to perform;

19   would that be fair to say?

20            MS. WHELIHAN:  Objection.

21       A    This was more an operational manual

22   than requirements.  The requirements were in our

**Capital Reporting Company**

Page 43

1    technical proposal where we stated that we're

2    going to subcontract to Brickman.

3            This was more of an operation guide to,

4    you know, to list phone numbers, so on, so forth.

5    BY MR. SAMET:

6        Q    Now, section four of this plan talks

7    about responsibilities, correct?

8        A    Yes.

9        Q    And whose responsibility is that

10   referring to?

11           MS. WHELIHAN:  Objection.

12           MR. DONOHUE:  Objection.

13       A    It's the responsibility of WSI

14   personnel to establish guidelines and procedures.

15           It's the responsibility of the Navy,

16   NAC, facilities manager, or his assistant to

17   initiate snow removal, all snow removal.

18           That's the responsibility -- WSI's

19   responsibility to follow up with guidelines, it's

20   the Navy's responsibility to initiate snow

21   removal.

22   BY MR. SAMET:

**Capital Reporting Company**

Page 44

1    Q    Did Wackenhut ever itself perform any

2   physical work at all under its contract with the

3   U.S. Government in terms of snow or ice removal or

4   treatment?

5            MS. WHELIHAN:  Objection.

6    A    Only if Brickman failed to deliver

7   their services.

8            Again, this is a pass -- the snow

9   removal was a pass-through for us.  We had a

10   contract with the Navy, and we put those same

11   requirements in the contract with Brickman to

12   perform it and paid them to do snow removal

13   services.

14   BY MR. SAMET:

15    Q    Does the contract between Wackenhut and

16   the U.S. Government require periodic inspections

17   by Wackenhut?

18            MS. WHELIHAN:  Objection.

19    A    I don't recall if that language is in

20   there.

21   BY MR. SAMET:

22    Q    Okay.  Do you remember whether there

**Capital Reporting Company**

Page 45

1    was any problem in between the period February 15

2    and 16 and February 25th of 2003 with snow melting

3    at the Nebraska Avenue complex, melting during the

4    day and refreezing at night, do you recall?

5        A    I don't recall.  I don't remember.

6        Q    All right.  Was any sand or salt ever

7    applied anywhere at the Nebraska Avenue complex

8    between February 19 and February 25th, 2003?

9        A    I don't recall the dates.

10       Q    Did you exercise supervisory

11   responsibility over Brickman and its performance

12   of the subcontract with Wackenhut?

13       A    Yes.

14       Q    All right.  So if inadequate salt

15   and/or sanding was taking place, would you call it

16   to their attention?

17            MS. WHELIHAN:  Objection.

18       A    Yes.

19   BY MR. SAMET:

20       Q    All right.  Do you have records of the

21   inspections of Brickman's work that Wackenhut

22   performed?

**Capital Reporting Company**

Page 46

1        A        No.

2        Q        Did Wackenhut keep records of their

3    inspections of Brickman's work?

4        A        I don't believe so.

5        Q        All right.

6        A        Again, we did a joint inspection with

7    the Navy before Brickman left after each event,

8    but was that documented, no, not to my knowledge.

9        Q        So you didn't -- did you create a

10   record of your inspection of Brickman's work

11   before they left?

12       A        No.

13       Q        Would you just look it over and say

14   looks good and they would go, and it would never

15   be memorialized anywhere in writing?

16       A        Yeah, actually the -- most of that

17   responsibility was on the Navy, they were the one

18   using their hours up, so Bob Yuenger, the

19   gentleman you saw in that e-mail, would physically

20   come out and do inspection and say okay, look

21   goods to me.

22       Q        All right.  Now, when did you first

**Capital Reporting Company**

Page 52

1    ice treatment?

2         A    I don't recall a special plan for ice

3    treatment.

4         Q    Was there any contract or plan under

5    which there would be treatments for ice or

6    traction at times when there wasn't a need for

7    snow removal?

8              MS. WHELIHAN:  Objection.

9         A    No, snow or ice removal was the same

10   thing.  If they wanted something done, they would

11   let us know.

12   BY MR. SAMET:

13        Q    Okay.

14        A    It was treated the same whether it was

15   snow or ice removal, or both, combination of both.

16   It was an event and would be treated the same.

17        Q    Okay.  Do you recall, were there ever

18   any occasions where Wackenhut recommended that any

19   areas of the Nebraska Avenue complex be sanded or

20   salted, not at the same time that there was going

21   to be any snow removal?

22             MS. WHELIHAN:  Objection.

**Capital Reporting Company**

Page 53

```
 1        A    I don't recall.

 2   BY MR. SAMET:

 3        Q    All right.  That's something that you

 4   could do if you wanted to, correct?

 5             MS. WHELIHAN:  Objection.

 6             MR. DONOHUE:  Are you asking whether

 7        Wackenhut recommended or the Navy requested?

 8             MR. SAMET:  No, Wackenhut would.

 9             MR. DONOHUE:  Recommend?

10             MR. SAMET:  Recommend.

11        A    We were allowed to make

12   recommendations, yes.

13   BY MR. SAMET:

14        Q    Okay.  And did you periodically make

15   recommendations?

16             MS. WHELIHAN:  Objection.

17        A    I don't -- I don't recall specific

18   instances of making recommendations.

19   BY MR. SAMET:

20        Q    I didn't ask you if you recalled

21   specific instances.

22             What I'm asking you is, did you
```

**Capital Reporting Company**

Page 54

1    periodically make recommendations --

2              MS. WHELIHAN:  Objection.

3    BY MR. SAMET:

4    Q      -- to the Government?

5    A      Again, Dave Sears and Bob Yuenger had

6    been there for years, many years longer than we

7    had.  They pretty much knew what they wanted.

8    Q      So you didn't feel it was in your place

9    to make recommendations to them?

10   A      We could have --

11             MS. WHELIHAN:  Objection.

12   A      We could have made recommendations, but

13   99.9 or a hundred percent of the time they would

14   tell us we need to do this.

15   BY MR. SAMET:

16   Q      What would you do in the day-to-day

17   performance of your duties, Mr. Harman, if you

18   spotted an area of ice --

19   A      We --

20             MS. WHELIHAN:  Objection.

21             You can answer.

22   A      We again would --

## Capital Reporting Company

Page 55

1          MR. DONOHUE:  I'm going to object.

2      When you say daily performance of your

3      duties, are you talking now about the joint

4      inspection which is the only thing --

5          MR. SAMET:  I'm talking about the daily

6      performance of his duties.

7          MR. DONOHUE:  For clarification --

8          MR. SAMET:  Their full breadth.

9          MR. DONOHUE:  Okay.

10  BY MR. SAMET:

11      Q    What would you do if in the daily

12  performance of the full breadth of your duties you

13  spotted an area, a surface area where there would

14  be foot traffic, where there was ice accumulation?

15          MS. WHELIHAN:  Objection.

16      A    We would report it to the Navy for

17  direction.

18  BY MR. SAMET:

19      Q    Okay.  And did that ever occur, that

20  you ever spotted areas where there was ice

21  accumulation in an area where there would be --

22  expected to be foot traffic?

**Capital Reporting Company**

Page 56

1    A    I'm sure it did.

2    Q    Okay.  Did you walk the grounds every

3    day, you personally?

4    A    No.

5    Q    So there were days that you would come

6    and spend -- were there days that you would come

7    and spend your entire time in the office?

8    A    Possibly, yeah, if I had, you know,

9    enough paperwork to do.

10    Q    Okay.  Do you remember whether on

11    February 26, 2003, you got out of the office that

12    day?

13    A    I'm sure I got out of the office.  I

14    don't remember exactly where I went or what I did,

15    but I'm sure I got out of the office.

16    Q    All right.  So you're saying on most

17    days you would at least get out even for a break?

18    A    Yeah, yeah.

19    Q    Okay.  Did you ever have any -- other

20    than with your lawyers or with the representative

21    of the -- strike that.

22        Other than with your lawyers or any

## Capital Reporting Company

Page 57

1   other persons investigating this accident and

2   claim, did you ever have any conversations with

3   anyone else about the accident to Mr. Philbin?

4        A     No.

5        Q     All right.  So you have never discussed

6   this with anybody from Brickman?

7        A     I don't believe so.

8        Q     Okay.  When you received the call on

9   the morning of February 26, 2003, informing you

10  that somebody had been hurt, whoever it was who

11  called, told you that somebody had been hurt down

12  near Echo Gate?

13       A     Correct.

14       Q     All right.  Did that person tell you

15  that somebody had slipped and fallen?

16       A     They told me that they had fallen.

17  Again, from what I remember, that DOD Police was

18  there and they would take care of the situation.

19       Q     You don't recall whether it was your

20  understanding from that conversation that it was a

21  slip and fall accident?

22       A     I didn't know why they fell.

**Capital Reporting Company**

1   is a professional company that knows how to remove

2   snow, that's why we chose them for snow removal at

3   the Nebraska Avenue complex.

4   BY MR. SAMET:

5       Q     Why would Ronnell have been assigned to

6   oversee what they were doing?

7       A     Because the Government technically

8   can't go directly to our subcontractor.  Our

9   contract with the Navy was between WSI and the

10  Navy.  We subcontracted a portion of that; i.e.,

11  the snow removal, to Brickman.

12          Government doesn't care who we

13  contract -- subcontract it to.  Our agreement was

14  with them.

15          Now, we pass that to Brickman so you

16  see how -- we pass that responsibility to

17  Brickman.

18          The Navy has a contract with us,

19  they're not going to go to Brickman.  They're

20  going to come to us.

21      Q     When you say "us," you don't mean you

22  personally?

**Capital Reporting Company**

Page 79

1        A       WSI.   Hence, why when they initiated

2    snow removal they would call WSI and not Brickman.

3        Q       Okay.   And so are you indicating that

4    every -- all of the work of Brickman that was

5    done out of the Nebraska Avenue complex required

6    somebody from WSI to oversee?

7        A       No.   Again, Brickman has been doing

8    snow removal for years, they're a very competent

9    snow removal contractor, that's why we chose them

10   for this contract.   They didn't need us to

11   baby-sit them, they knew what they were doing.

12       Q       On this particular occasion,

13   February 26, 2003, you did assign Ronnell to

14   oversee Brickman's work; am I correct?

15       A       I created a ticket for him to charge

16   his time to much like I did on all.

17       Q       I understand.

18       A       I didn't assign him to oversee

19   Brickman's work.   I didn't say Ronnell, go down

20   there and make sure Brickman's doing a good job.

21               I simply created a ticket for him to

22   charge his time to, his legwork, interface between

## Capital Reporting Company

Page 80

1    Brickman and the Government.

2        Q      Where was he, Ronnell, where was he

3    that day?

4        A      I don't know exactly where he was that

5    day.

6        Q      Where was Ronnell at 3:30 p.m. on

7    February 26th?

8        A      I couldn't tell you that.

9        Q      Pardon?

10       A      Where was Ronnell at 3:30?

11       Q      Um-hum.

12       A      I couldn't tell you where he was.

13       Q      Can you tell us where he would have

14   been at 3:40?

15       A      No.

16       Q      So are you indicating that this

17   document that you created may bear no relation at

18   all to anything that Ronnell did that day?

19              MS. WHELIHAN:   Objection.

20       A      The target start date on this was the

21   26th.  The target completion date, estimated

22   finish date, was 3/14.

**Capital Reporting Company**

Page 98

1        A       Yeah, in transit.

2        Q       And based on your review of that

3    document, do you have -- does that assist you in

4    remembering from whom you received a call at 6:38?

5        A       It would have been Dave Sears.  Yes,

6    Dave would have called.

7        Q       Okay.  And does your review of that

8    document assist your memory as to what the

9    substance of your conversation with Mr. Sears

10   would have been at that time?

11       A       Again, it's been a long time.  I don't

12   remember the exact conversation, but just based on

13   the fact that as soon as I hung up the phone with

14   him, I immediately called Brickman, that would

15   definitely be the initiation of the event for that

16   day.

17       Q       Do you know who you spoke to at

18   Brickman?

19       A       I do not.

20       Q       Did you have a typical contact person

21   at Brickman?

22       A       Yeah, typically it would have been --

**Capital Reporting Company**

1    typically it would have been Adam.

2        Q     Adam is the gentleman sitting out in

3    the lobby?

4        A     Correct.  Yeah, he would have been the

5    person that I called.

6        Q     Do you have a recollection of your

7    contact with Adam at that -- on that date?

8        A     I do not.

9        Q     Okay.

10       A     But I do know from this I spoke to

11   somebody, whom I would assume to be him, for about

12   two minutes 21 seconds.

13       Q     Just in general recollection, do you

14   recall that Brickman personnel presented to the

15   NAC that day?

16       A     I would have to assume so.  Yes.

17       Q     Okay.

18       A     Yeah.

19       Q     Did you ever have any difficulty with

20   the timeliness of Brickman's response following a

21   request from you to perform snow removal

22   procedures?

## Capital Reporting Company

Page 100

1      A      No.  Again, Brickman, very qualified

2    snow removal company.  If there was an event or

3    something, because of the years that we worked

4    together, I mean, they pretty much knew when to

5    expect a call from us.

6              MR. DONOHUE:  That's all I have.

7              MR. SAMET:  Do you have any questions?

8              MS. WHELIHAN:  No, I have no questions,

9        and he's going to read.

10             MR. SAMET:  Well, no, I have a

11       question.

12             MS. WHELIHAN:  I'm sorry.

13             MR. SAMET:  That's all right.

14    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

15    BY MR. SAMET:

16      Q    Mr. Harman, you got the call from Dave

17    Sears at 6:40 a.m.?

18             MR. DONOHUE:  Thirty-eight.

19      A    6:40, yes.

20    BY MR. SAMET:

21      Q    Oh, I see.  No, 6:30 --

22      A    I'm sorry, 6:38, correct.

**Capital Reporting Company**

Page 101

```
1        Q      Mr. Donohue was right.  6:40 you called

2    to Brickman?

3        A      Correct.

4        Q      Okay.  So this -- and this would have

5    been a call directly to the cell phone of Adam

6    whatever -- pardon me, his name is?

7        A      Adam was my typical contact.  I

8    don't -- I compared this to the numbers in the

9    roster, and I had multiple numbers for Adam, I

10   even had his home numbers.  He was my typical

11   point of contact.

12              So I'm not saying that is his cell

13   phone number, because I have -- I had a pager, I

14   had a cell phone, I had his home phone, probably

15   even have his wife or girlfriend's phone number,

16   just so I could get ahold of him.

17       Q      How long did he have to get out there?

18   I mean, was there a requirement that he report,

19   bring a crew out within a certain time?

20       A      Well, in our Navy contract, refer to

21   our technical -- you have different requirements,

22   but all snow and ice personnel are required to
```