EXHIBIT G

**Capital Reporting Company**

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                      DISTRICT OF COLUMBIA

3    ----------------------------------:     ORIGINAL

4    MICHAEL J. PHILBIN                 :

5                    Plaintiff         : At Law No.

6              v.                       : CL05-1389

7    THE WACKENHUT CORPORATION, ET AL  :

8                   DEFENDANTS          :

9    ----------------------------------:

10                      Washington, D.C.

11                   Friday, March 9, 2007

12   Deposition of:

13          GREGORY LEWANDOWSKI,

14   called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the law Office

16   of Jordan, Coyne & Savits, 1100 Connecticut

17   Avenue, N.W., Suite 600, Washington, D.C., before

18   Sheri C. Stewart, Registered Professional

19   Reporter and Notary Public in and for the

20   District of Columbia, beginning at 12:14 p.m.,

21   when were present on behalf of the respective

22   parties:

**Capital Reporting Company**

Page 8

1  took place somewhere between the time of the big

2  snowstorm and the date that Mr. Philbin was

3  injured; is that correct?

4      A      I know that they took place at that

5  point.

6      Q      What were the conversations about?

7      A      It was regarding the relocation of the

8  piles of snow.

9      Q      Okay.  And you remember how many

10  conversations there were?

11      A      One, maybe two.

12      Q      Okay.  And who's Jim Whidden?

13      A      Jim Whidden, to my knowledge, was Jay

14  Harman's boss.

15      Q      Okay.  And where did he work?  I mean,

16  besides Wackenhut?

17      A      He had an office on the base.

18      Q      What was his specific position?

19      A      I'm not quite sure.

20      Q      Okay.

21      A      Facility manager, something like that.

22      Q      I think Mr. Harman said that he was the

## Capital Reporting Company

Page 9

1    facility manager.  All right.

2            And do you remember what the exchange

3    was about between either you and Mr. Whidden or

4    you and Mr. Harman?

5        A    The request was to bring in extremely

6    heavy equipment to move the piles of snow.

7        Q    You were asked to bring in extremely

8    heavy equipment?

9        A    I wouldn't call it asked; I was

10   instructed.

11       Q    When was it, do you remember?

12       A    Probably within 48 hours of all of the

13   clearing that we could possibly do with our own,

14   you know, regular pieces, the call was put out.

15       Q    So you're saying it was probably within

16   48 hours of the big snowstorm ending?

17       A    I would say within 48 hours of us doing

18   everything that we could with the standard

19   equipment to get every inch of pavement we could

20   on the base clear.

21       Q    All right.  Let me do some housekeeping

22   before we go further.

# Capital Reporting Company

1          MR. SAMET:  I think we have an

2      agreement with all counsel that the exhibits

3      that we introduced as part of Mr. Harman's

4      deposition can also serve in a duplicate

5      capacity first as Exhibits 1 through 12 of

6      this deposition; is that correct, Counsel?

7          MS. WHELIHAN:  Yeah.  You want to make

8      them global exhibits?

9          MR. DONOHUE:  So stipulated.

10          MR. SAMET:  Yeah.  That's okay with

11      you, Deb?

12          MS. WHELIHAN:  Yeah.

13          MR. SAMET:  All right.  Then I'm going

14      to -- let me have these marked.

15          (Whereupon, Exhibit No. 13 was marked

16      for identification.)

17          (Whereupon, there were discussions off

18      the record.)

19      BY MR. SAMET:

20      Q    Mr. Lewandowski, you've been shown

21      Exhibit No. 13 -- what's been marked as Exhibit

22      No. 13.

## Capital Reporting Company

Page 11

1          Can you please tell us what that

2    exhibit is?

3        A      It's a collection of snow removal site

4    visit reports.  The document in format was created

5    by the Brickman Group to document basically the

6    services rendered on any of our snow removal

7    sites.

8        Q      Okay.  This covers the period

9    December 5th of 2003 through February 28, 2003?

10       A      Yes.

11           MR. DONOHUE:  Bear with me just a

12    second, please.  Off the record.

13           (Whereupon, there were discussions off

14    the record.)

15    BY MR. SAMET:

16       Q      Mr. Lewandowski, I count 16 snow

17    removal site visit reports consisting of Exhibit

18    No. 13 that cover the period December 5th of 2002

19    to February 28 of 2003.

20           Would that be correct?

21       A      Yes.

22       Q      Okay.  And are there any others besides

# Capital Reporting Company

Page 12

1    the ones that have been produced and marked today

2    as Exhibit 13?

3        A     I don't recall if there were any events

4    after the 28th.

5        Q     I'm not talking about after.

6            MR. DONOHUE:  For that period.

7    BY MR. SAMET:

8        Q     After February 28?

9        A     That's it.

10       Q     Okay.  All right.  Now, can you show me

11   where among these snow removal site visit reports

12   the extremely heavy equipment work was done to

13   move the snow?

14       A     Yes, the sheet with the date of

15   2/23/03.

16       Q     Okay.  That says it was a Sunday; is

17   that correct?

18       A     Yes.

19       Q     Okay.  What equipment was brought out

20   there?

21       A     Rubber tire loader, which I believe is

22   indicated on there, that is an extremely large

## Capital Reporting Company

1    piece of equipment that highway -- State highway,

2    County would use to clear shoulders and things

3    like that.  Just because of the sheer weight and

4    volume of the snow.

5         Q    Okay.  Does that have like a bucket?

6         A    Yes.

7         Q    Okay.  So you could lift up piles of

8    snow --

9         A    Yes.

10        Q    -- and then drive them somewhere else?

11        A    Yes.

12        Q    All right.  Where on February 23rd was

13   the snow taken from and where was it moved to, do

14   you know?

15             MR. DONOHUE:  I'm going to object

16        because we have our next witness who can

17        address these questions, Mr. Lewandowski.

18             MR. SAMET:  No objection.  If you can't

19        address it, you should just say that.  That's

20        not a grounds for an objection.  It's also a

21        speaking objection.  If he doesn't know, say

22        "I don't know."

## Capital Reporting Company

Page 14

1       MR. DONOHUE:  If you are asking him

2  personal knowledge -- I mean, he can tell

3  certain things from documents.

4       I just want to make sure that you

5  understand that what the source of his

6  awareness is, whether it's personal knowledge

7  or document review, that's all.

8  BY MR. SAMET:

9       Q    Where was the snow removed from on

10  February 23rd and where was it moved to,

11  Mr. Lewandowski?

12       A    Can't tell you for sure because I

13  wasn't there.

14       Q    Okay.  Where was it supposed to be

15  removed from, and where was it supposed to be

16  removed to?

17       A    All piles in parking lots were to be

18  removed from the parking spaces and relocated to

19  the lower perimeter wood line.

20       Q    What's a lower perimeter wood line?

21       A    I can show you on a map of the

22  property.

**Capital Reporting Company**

1              MR. DONOHUE:  I think it's No. 5, Bob.

2     BY MR. SAMET:

3        Q      Okay.  I'm showing you the next to the

4     last page of Exhibit No. 5, which is a map of

5     Nebraska Avenue complex.

6        A      So for this rear lower parking lot

7     (indicating).

8        Q      Right.

9        A      Would be anywhere along this edge

10    (indicating).

11       Q      Okay.

12       A      And you know, for instance, this

13    parking lot (indicating), it would be relocated

14    probably over here (indicating).

15       Q      Okay.  So snow was moved from areas

16    where it was covering parking spaces to areas

17    where it was around the edge of the parking lot?

18             MR. DONOHUE:  Objection.  Lack of

19         foundation.  He said he wasn't there, he

20         can't tell you exactly.  You asked him where

21         was it supposed to be.

22             This is the problem, he's not the right

## Capital Reporting Company

Page 16

1      witness for these questions.

2            MR. SAMET:  He's a supervisor.

3            MR. DONOHUE:  No, he's not.

4            MR. SAMET:  He's not?

5            MR. DONOHUE:  No, he's not.

6            MS. WHELIHAN:  Branch manager.

7  BY MR. SAMET:

8    Q    Mr. Lewandowski, the snow was supposed

9  to be removed from areas to the perimeter of the

10  parking lots; is that correct?

11          THE WITNESS:  Should I answer?

12          MR. DONOHUE:  If you know.  If you

13    don't know, tell Counsel you don't know.

14    A    I don't know.

15  BY MR. SAMET:

16    Q    You don't know where it was supposed to

17  be moved to?

18    A    I know where -- I know where it was

19  directed to go to, but I didn't physically see it

20  happen.

21    Q    Okay.  Where was it directed to go to?

22    A    To the perimeter of the parking lot,

## Capital Reporting Company

Page 17

1    out of the parking lot onto grass.

2         Q    Okay.  All right.  And what was the

3    reason for moving the snow?

4         A    The availability of parking spaces.

5         Q    To free up parking spaces that were

6    being covered by piles of snow?

7         A    A substantial percentage of spaces were

8    null and void because of the snow pile.

9         Q    Okay.  Do you know that for a fact?

10        A    I know that based on the phone call

11   that I received from Wackenhut having it removed,

12   but I did not physically see it.

13        Q    And how many workers did you have out

14   there doing this work on February 23rd, if you

15   know?

16        A    A single loader and operator.

17        Q    Was there any -- what was the weather

18   that day, do you know?

19        A    No idea.

20        Q    Was there any salt or sand put down at

21   that time?

22             MR. DONOHUE:  Again, are you asking him

## Capital Reporting Company

Page 18

1          from his review of the document only?

2     BY MR. SAMET:

3          Q      Well, was any salt or sand supposed to

4     be put down at the time?

5          A      To my knowledge, based on the documents

6     alone, I would say no.

7          Q      Okay.

8               MR. DONOHUE:  Off the record.

9               (Whereupon, there were discussions off

10    the record.)

11    BY MR. SAMET:

12         Q      Mr. Lewandowski, when did you first

13    learn of Mr. Philbin's injury?

14         A      I don't recall a specific date.  I do

15    recall that it wasn't anytime near when it

16    happened.  It was at least a year.

17         Q      Okay.  And how did you learn about it

18    then?

19         A      From my corporate office.

20         Q      Okay.  So you have no recollection of

21    learning about it on or about February 26, 2003?

22         A      I do not.

## Capital Reporting Company

1    Q    All right.  Do you have any personal

2    knowledge of the condition of any of the surfaces

3    at the Nebraska Avenue complex between

4    February 14th and February 26, 2003?

5    A    I do not.

6    Q    Okay.  Did Brickman perform any salting

7    or sanding in between February 19th and

8    February 25th, 2003?

9    A    Once again, I don't have direct

10   knowledge other than referencing these site visit

11   reports.

12   Q    Feel free to reference site visit

13   reports and tell me if there was any salting or

14   sanding anytime between February 19th and

15   February 25th, 2003, inclusive.

16       MR. DONOHUE:  Again, on the basis of

17       lack of personal knowledge, I object.  All he

18       has to go by are documents.

19   A    The 19th, the document indicates no.

20   Next date was the 23rd, no.  And next document is

21   the 26th, yes.  According to these papers.

22

Page 20

1    BY MR. SAMET:

2        Q    Okay.  Did Brickman perform any salting

3    or sanding of any sidewalks or steps or any other

4    surface areas at the Nebraska Avenue complex

5    between February 25th -- February 19 and

6    February 25th, inclusive?

7            MR. DONOHUE:  Same objection; lack of

8        personal knowledge.

9    BY MR. SAMET:

10       Q    Based upon the records you have in

11   front of you?

12       A    Based upon the records that I have in

13   front of me, no.

14       Q    Did Brickman perform any routine

15   inspections of the surfaces at the Nebraska Avenue

16   complex when Brickman's personnel were out there

17   on the scene other than in connection with the

18   work you specifically were requested to perform?

19       A    No, we were acting under the sole

20   direction from Wackenhut.

21       Q    Okay.  Was Brickman supplied a copy of

22   Exhibit No. 3 when it was issued in October of

# Capital Reporting Company

1   2002?  I'm referring to the snow and ice removal

2   plan.

3       A     The document was reviewed at a meeting

4   that I attended I guess on this date or -- no,

5   it's -- no, this would have been -- yeah, in the

6   fall, before that winter.

7              And I don't recall specifically me

8   taking this away from the meeting.  It may have

9   been my co-worker.

10      Q     Who is your co-worker?

11      A     It was reviewed by my co-worker Adam

12  Grasswick.

13      Q     Adam was at this meeting, too?

14      A     Yes.

15      Q     How did this meeting come about?

16      A     It was just in preparation for the

17  upcoming winter, Wackenhut wanted to review the

18  plan for future weather events, and my

19  recollection is that Dave Sears from the Navy also

20  attended this.

21              And his -- basically his peace of mind

22  was what the meeting was about, was there was a

# Capital Reporting Company

Page 22

1    plan in place and that the people were on the same

2    page.

3        Q       Do you know who drafted that plan?

4        A       I do not.

5        Q       Did you have any input into the

6    drafting of that plan?

7        A       Not directly, not to my knowledge.

8        Q       Okay.  At that meeting, to the extent

9    that that plan called for any action on the part

10   of Brickman, did you concur that it was

11   acceptable?

12       A       I'm sorry, say that again.

13       Q       To the extent that there might have

14   been anything in that plan that would have

15   required Brickman to --

16       A       Right.

17       Q       -- do something, at that meeting did

18   you agree that it was okay with you?

19       A       Yes, from what I recall.

20       Q       Under what circumstances was Brickman

21   required to do any salting or sanding of any

22   surface areas at the Nebraska Avenue complex?

# Capital Reporting Company

Page 23

1          MR. DONOHUE:  I object.  The document

2     will speak for itself but --

3 BY MR. SAMET:

4     Q    Let me rephrase it.

5          What was your understanding as to under

6 what circumstances Brickman was required to do any

7 salting or sanding of the surface areas at the

8 National -- at the Nebraska Avenue complex?

9     A    We essentially did whatever the client

10 requested.  Understand that came -- that message

11 or communication came through the voice of a

12 Wackenhut employee.

13     Q    Was Brickman ever -- to your

14 recollection, up to February 26, 2003, was

15 Brickman ever requested by Wackenhut to come out

16 solely for the purpose of sanding or salting any

17 surface areas, not in connection with actual snow

18 removal?

19          MS. WHELIHAN:  Objection.

20     A    I don't know.

21 BY MR. SAMET:

22     Q    Do you recall any such instances prior

Page 24

1    to February 26 of 2003 in which Brickman may have

2    ever been asked to come out solely for the purpose

3    of sanding or salting surfaces?

4        A      Once again, I don't know.  I don't

5    remember.

6        Q      Okay.  As you sit here today, do you

7    recall Brickman ever being called by Wackenhut to

8    come out and sand or salt any surfaces at the

9    Nebraska Avenue complex solely for that purpose

10   and not also at the same time in connection with

11   snow removal?

12       A      I would just simply rely in referencing

13   these papers.

14       Q      I'm not asking you that.  I'm asking

15   you based upon your --

16       A      No, I don't recall.

17       Q      Okay.  When Brickman sanded or salted

18   parking lots, how was that done, was it done with

19   a spreader?

20       A      A Ford Super Duty with a ball hopper

21   spreader mounted on the back of it which can hold

22   up to three tons of bulk rock salt or de-icer.

Page 25

1     Q    And this would be broadcast over a

2  large area?

3     A    Yes.

4     Q    Okay.  Was it ever -- were parking lots

5  ever salted and sanded by hand?

6     A    No.

7     Q    All right.  What was your

8  understanding, if any, as to whether Brickman was

9  required or had an obligation to perform any

10  visual inspections of surface areas at the

11  Nebraska Avenue complex for conditions that either

12  already had or were likely to produce ice

13  formation?

14       MR. DONOHUE:  Objection to the form and

15    other substantive reasons.

16       I don't instruct you not to answer.

17     A    My impression, that's the best I can

18  give you, is that I was -- it was not part of my

19  responsibility to make any decision that the work

20  looks good or we need to do more.

21       We were there to be told what to do,

22  and that's what we did.  We didn't offer our

Page 26

1    opinion unless it was requested.

2    BY MR. SAMET:

3        Q        Did Wackenhut ever supervise any of the

4    work that your men performed out at the Nebraska

5    Avenue complex?

6                MS. WHELIHAN:  Objection.

7                MR. DONOHUE:  I'm going to object only

8        to the extent that your question may fairly

9        call for personal knowledge, and he was not

10       involved in performing the work.

11               So you're -- there's a gap here.  Part

12       of the problem.

13               To the extent you have knowledge, I

14       don't instruct you not to answer because it's

15       a foundation issue.

16       A        I don't have direct knowledge.  All I

17   know --

18               MR. SAMET:  Speaking objections,

19       improper.

20               MR. DONOHUE:  But he's --

21               MR. SAMET:  I don't care.  You've made

22       long speeches.  You essentially tell your

**Capital Reporting Company**

Page 27

1          witness what to answer.

2     BY MR. SAMET:

3          Q      Listen, I interrupted your answer.  Let

4     me ask the question again.

5               Did Wackenhut ever provide any

6     supervision of Brickenhut's (sic) work at the

7     Nebraska Avenue complex?

8               MS. WHELIHAN:  Objection.

9               MR. DONOHUE:  Same objection.

10    A      To my knowledge, which is solely based

11    from talking to my employees there, we would

12    receive communication to move to such-and-such an

13    area of priority if they deemed it necessary based

14    on their discussions with the Government.

15    BY MR. SAMET:

16         Q      All right.  So there were -- your

17    understanding is there were occasions when they

18    would tell you where they wanted the work

19    performed and in what order; is that correct?

20         A      To my knowledge, that -- that was what

21    my employees told me happened on occasion.

22         Q      Okay.  Did Mr. Grasswick ever get sick

Page 28

1    when you had to go out and fill in for him up at

2    the Nebraska Avenue complex?

3        A    No, our employees aren't allowed to get

4    sick during snow removal.

5        Q    Did he ever take any time off?

6        A    Not that winter, no.

7        Q    So you never performed any work at all

8    out at the Nebraska Avenue complex, you

9    personally?

10       A    Thankfully not.

11       Q    Okay.  Other than the documents which

12    have been marked as Exhibit No. 13, are there any

13    other documents that Brickman has covering the

14    period December 5th to February 28, 2003, showing

15    the work that Brickman performed out at the

16    Nebraska Avenue complex?

17       A    To my knowledge, this is the only

18    formal document that we created.

19       Q    How would you know who was out at the

20    Nebraska Avenue complex on a given day, or was

21    there any way to know that?

22       A    There were -- there's a roster of

## Capital Reporting Company

1      BY MS. WHELIHAN:

2          Q     Okay.  I don't want you to assume.

3                Well, Wackenhut wouldn't stand over

4      Brickman while it performed its work at the Naval

5      complex, right?

6                MR. SAMET:  Objection, leading.

7          A     Once again, I wasn't there during the

8      services, but the feedback that I got didn't

9      indicate to me from my guys that people were

10     riding in the truck with us all the time and

11     checking to see if we weren't sleeping on the job,

12     that kind of thing.

13     BY MS. WHELIHAN:

14         Q     Okay.  And WSI, Wackenhut, didn't

15     control how Brickman did its work, right?

16               MR. SAMET:  Objection, leading.

17         A     Depends on how you define "control."

18     BY MS. WHELIHAN:

19         Q     Well, in other words, Wackenhut

20     wouldn't tell you how to remove snow or how to

21     treat the snow, that was your province or

22     Brickman's province, right?

# Capital Reporting Company

Page 36

1          MR. SAMET:  Objection.

2     A     Once again, I don't have personal

3   knowledge of exact direction that came from

4   Wackenhut to us.

5   BY MS. WHELIHAN:

6     Q     Okay.  Would it be fair to say that

7   Brickman was an independent contractor?

8     A     Yes.

9     Q     And would it also be correct that

10  Brickman was a professional company involved in

11  snow and ice treatment and removal?

12    A     Yes.

13    Q     Okay.

14         MS. WHELIHAN:  I don't have any other

15  questions.

16         MR. DONOHUE:  You sure?  Speak now or

17  forever hold your peace.

18         We'll waive signature.

19         (Signature having been waived, the

20  deposition of GREGORY LEWANDOWSKI was concluded at

21  12:54 p.m.)

22